## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHARON BLACKMON-MALLOY, et al.,   )
                                )
         Plaintiffs,        )
                                  )
                  v.     ) Case No. 01-2221(EGS/JMF)
                                  )
UNITED STATES CAPITOL POLICE,    )    **JURY TRIAL REQUESTED**
                                  )
         Defendant.        )
_____)

## JOINT FIFTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1. By and through undersigned counsel, Plaintiffs Sharon Blackmon-Malloy, *et al.*, hereby file this Joint Fifth Amended Consolidated Class Action Complaint which addresses a pattern and practice of race discrimination, hostile work environment, and retaliation in employment, in violation of the Congressional Accountability Act, 2 U.S.C. § 1311, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, and the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

### Jurisdiction and Venue

2. This Court has jurisdiction over this Complaint because questions of federal law are presented, pursuant to 2 U.S.C. § 1408 and 42 U.S.C. § 2000e, as amended.

3. This Court is the proper venue pursuant to 2 U.S.C. § 1408 and 42 U.S.C. § 2000e.

4. All 72 Plaintiffs[1] named herein have exhausted their administrative remedies as prescribed by the Congressional Accountability Act, 2 U.S.C. § 1408, as more fully described below in paragraphs discussing the facts of their allegations, in that they all requested counseling within 180 days of having experienced a discriminatory act, completed counseling and mediation at the Office of Compliance, provided notice of their claims to the Capitol Police upon request, received end of mediation notices, and filed suit within 90 days of receipt of end of mediation notices.

## **Parties**

5. All Plaintiffs listed herein are present or former Officers or employees of the U.S. Capitol Police and are either African American or associated with African American Officers, who experienced racial discrimination and/or retaliation in their employment with the U.S. Capitol Police.

6. The Defendant is the United States Capitol Police, 119 D Street, N.E., Washington, DC 20510.  Defendant was timely served with the original Complaints on or about the dates of their filing, as follows:

Civil Action No. 01-2221 - October 29, 2001

---

[1]   This Complaint does not include the allegations of Plaintiff Derrick Macon, who is representing himself *pro se*.

Civil Action No. 02-1346 - July 2, 2002

Civil Action No. 02-1859 - September 20, 2002

Civil Action No. 02-2481 - December 17, 2002

Civil Action No. 03-1505 - July 10, 2003

Civil Action No. 03-2644 - December 29, 2003

Civil Action No. 04-0320 - February 26, 2004

Civil Action No. 04-0943 - June 9, 2004

Civil Action No. 05-0491 - March 10, 2005

Civil Action No. 06-0653 - April 10, 2006.

## Facts

7. The Defendant has subjected the Plaintiffs listed herein to a systemic pattern and practice of a racially hostile work environment including harassment and insult; race discrimination in promotions, other selections, work assignments, discipline, and termination; and retaliation for protected EEO activity and opposition to discriminatory practices.  This has persisted from the early 1960s through the dates of filing of the Complaints, and indeed, continues to the present day.

8. This systemic unwelcome racial harassment created a climate of fear among the African American Officers of the U.S. Capitol Police, such that even those who were not the direct target of the white Officers' racist words and actions were

affected and intimidated by the hostile work environment.  This climate of fear persists to the present day.

9. The treatment of the Plaintiffs listed herein has been sufficiently severe and/or pervasive to alter a term, condition, or privilege of employment of a reasonable Officer or employee.

10. The ongoing frequent, severe, systemic harassment to which the Plaintiffs listed herein have been unremittingly subjected for years, if not decades, constitutes a single employment practice.

11. The Defendant knew or should have known of the racial harassment and hostile work environment and failed to take proper remedial action.

12. Specific facts relating to each Plaintiff, including his or her exhaustion of remedies, are set forth below:

### Case 01-2221

<u>All Plaintiffs Listed Herein</u>

13. Most Plaintiffs requested counseling on April 12, 2001, in conjunction with a march to the Office of Compliance, where they presented an Administrative Complaint, signed by 207 Plaintiffs, which was drafted by their then-counsel, Charles Jerome Ware.  Additional Plaintiffs requested counseling individually in the days following.

14. Each of the Plaintiffs listed below, following their requests for counseling described in the individual paragraphs, engaged in counseling either individually or through their counsel or other representative, and each received an end of counseling notice through their attorney, Charles Jerome Ware. Attorney Ware requested mediation on behalf of each of the Plaintiffs listed herein.

15. In addition to face-to-face mediation sessions in which some of the Plaintiffs engaged, as described below, attorney Charles Jerome Ware engaged in mediation on behalf of all of his clients, both in meetings with the mediators and Defendant's counsel and in telephone conferences with the mediators and Defendant's counsel.  The mediation period lasted from June 5, 2001, until August 1, 2001.  Attorney Ware received an end of mediation notice on behalf of all of the Plaintiffs listed herein (and other complainants) on August 3, 2001, after which suit was timely filed on behalf of all complainants, including Plaintiffs listed herein, on October 29, 2001.

16. Despite the fact that 2 U.S.C. § 1403 and its implementing regulations require that the mediation period last only 30 days unless extended by consent of both parties and the Executive Director of the Office of Compliance, Defendant rejected any meetings with the approximately 270 Plaintiffs

other than individual face-to-face mediation sessions.  Only eight such individual mediation sessions could be completed within 57 days, after which Plaintiffs declined to agree to a further extension of the mediation period (beyond the 27 additional days to which Plaintiff had already consented).

17.  Through the mediators, Defendant requested from Plaintiffs a document indicating which Plaintiffs' claims corresponded to which claims in the Administrative Complaint.  That document, referred to below as a "categorization document," was prepared by Plaintiffs Sharon Blackmon-Malloy and Vernier Riggs and was provided to the mediators, who in turn provided a copy to Defendant during the mediation period.  Defendant requested no other documentation from Plaintiffs prior to the individual mediation sessions on which it insisted.

18. During the mediation period, Defendant also came into possession of a notebook containing information concerning the claims of 76 Plaintiffs.  Although the source of the documents in the notebook is unknown, the documents appear to be copies of documents presented to the Office of Compliance by individual Plaintiffs during the counseling period.

<u>Shafton Adams</u>

19. Shafton Adams experienced a hostile work environment based on race and retaliation for complaining of racial

discrimination from 1997 through 2000, beginning when he
received an unjustified CP-550 (disciplinary) Performance Note
for tardiness issued by Sgt. Rose Cabezas even though, according
to Defendant's representatives, the Sergeant was not Shafton
Adams' direct supervisor and thus had no authority to issue the
discipline.  After Officer Adams filed a grievance concerning
this event, which was not resolved, Sgt. Cabezas retaliated by
maintaining a hostile environment in which she was discourteous
to Officer Adams (and not to other Officers), issued him another
inappropriate CP-550, attacked Officer Adams' professionalism,
threatened his removal from the program to which he was
assigned, and expressed delight when her continuing hostility
motivated Officer Adams voluntarily to seek reassignment to
avoid her.

20. Two incidents of discrimination in the course of this
hostile work environment occurred within 180 days of Officer
Adams' April 12, 2001, request for counseling:  In October and
November of 2000, Officer Adams applied for openings as a
Criminal Investigator and as an Intelligence Investigator.  He
possessed all of the KSAs ("knowledge, skills, and abilities")
for the positions as announced.  Despite this, he was not called
for an interview.  The white Officers selected for the positions

had less experience than Officer Adams, no background in investigations (unlike Officer Adams), and less seniority.

21. Officer Adams timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation. He provided notice of his claims in a face-to-face mediation on July 23, 2001. He provided additional notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

<u>Sharon Blackmon-Malloy - Class Agent</u>

22. Sharon Blackmon-Malloy experienced racial discrimination in the promotion process. She took the examination for promotion to Lieutenant on November 4, 2000, and received an on-site score of 75, which should have moved her into the next phase of the examination process. However, when the applicants' scores were posted, Officer Blackmon-Malloy's score was falsely recorded as a 69, lowering her overall score and resulting in her not being promoted at that time. The scores of white Officers who took the exam were not changed.

23. Officer Blackmon-Malloy also experienced a hostile work environment based on race and retaliation for her complaints of discrimination and her leadership as President of the Black

Police Association ("BPA"), including discrimination in assignments and repeated unjustified CP-550 (poor job performance) write-ups.  One such discriminatory write-up occurred on December 6, 2000; Officer Blackmon-Malloy complained to the Capitol Police about it on March 14, 2001, without result.

24. Officer Blackmon-Malloy experienced further racial discrimination and retaliation when she received five additional CP-550 performance notes on February 23, 2001, involving the incorrect placement of Notices of Infractions.  Such a minor irregularity is not normally written up when committed by a white Officer.  When Officer Blackmon-Malloy disagreed with the five CP-550 performance notes, she received a CP-534 command discipline report.

25. Officer Blackmon-Malloy timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.  She provided notice of her claims in a face-to-face mediation on July 23, 2001.  She provided additional notice of her claims through the representations of her counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.  Notice of her complaint concerning the unjustified CP-550 she received on December 6,

2000, was also provided as Exhibit 18 to the Administrative Complaint filed with the Office of Compliance on April 12, 2001, a copy of which was received by Defendant during the mediation process.

Clinton Bradford

26. Clinton Bradford was subjected to a hostile work environment over a period of numerous years, including "loss" of his paperwork (which contained evidence of successful scores on the required examinations for shooting and agility) when he applied for the Dignitary Protection Unit and a refusal to adjust transfer dates from one section to another, even though white Officers were permitted to adjust transfer dates.

27. The hostile work environment was continued through late 2000 and early 2001, when Officer Bradford unsuccessfully applied for assignment to the K-9 Unit but was told by his lieutenant that he was not selected despite his qualifications because "most black people are afraid of dogs."

28. Officer Bradford timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation. He provided notice of his claims in a face-to-face mediation on July 25, 2001. He provided additional notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period,

10

and through the categorization document requested by and provided to Defendant.  Defendant also received notice of Officer Bradford's claims through documents received by the Capitol Police from the unknown source described in paragraph 22, above, during the mediation period.

Duvall Phelps - Class Agent

29.  Duvall Phelps was subjected to a hostile work environment based on his race and in retaliation for engaging in protected activity from 1986 until October 31, 2000, including discovering discriminatory notes and symbols in his desk and on his locker, refusal to accommodate his allergy symptoms in post assignments (whereas white Officers' allergies were accommodated), and refusal to accommodate his childcare needs, including not passing on messages from his daughter's school and not releasing him from work on time (whereas white Officers' childcare needs were accommodated).

30.  Officer Phelps was subjected to a discriminatory constructive discharge when, after having been acquitted by a jury of domestic assault, he was required to choose between retiring by October 31, 2000, or being terminated from the force.  White Officers accused and not convicted of offenses of similar or greater seriousness were not required to retire from the force.

11

31. Officer Phelps' retirement date was October 31, 2000, which was within 180 days of his timely request for counseling on April 28, 2001.  He was represented by attorney Charles Jerome Ware in counseling and mediation.  He provided notice of his claims in mediation sessions on July 22, 23, and 25, 2001. He provided additional notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

## Vernier Riggs – Class Agent

32. Vernier Riggs experienced a hostile work environment based on race and in retaliation for engaging in protected activity for many years, from 1985 until the date she requested counseling at the Office of Compliance.  She was harassed when requesting leave for medical appointments or other reasons, whereas white Officers were not so harassed.  She was the target of inappropriate remarks directed at her because of her race. She and other African American Officers were often not accommodated for special situations for which white Officers were routinely accommodated, and were harassed and humiliated when requesting such accommodations.  Officer Riggs also observed that African American Officers were disciplined for

alleged derelictions of duty for which white Officers were not
disciplined.

33. Officer Riggs timely requested counseling on April 12,
2001, and was represented by attorney Charles Jerome Ware in
counseling and mediation. She provided notice of her claims in
a mediation session on July 22, 2001. She provided additional
notice of her claims through the representations of her counsel
to Defendant's counsel during the mediation period, and through
the categorization document requested by and provided to
Defendant.

Frank Adams - Class Agent

34. Frank Adams experienced a hostile work environment,
discrimination in promotion, and retaliation from the beginning
of his employment with the Capitol Police in 1991 through his
retirement. The following discriminatory and retaliatory events
occurred within 180 days of his request for counseling:

35. In violation of its own rules, the Department refused
to investigate charges of insubordination that Officer Adams
filed against a white Officer, but did investigate, through the
Internal Affairs Division (IAD), charges that the white Officer
subsequently filed against Officer Adams on November 11, 2000.

36. The Department, in violation of its own rules, failed
to investigate charges of untruthfulness that Officer Adams

13

filed against a white Officer in violation of its own rules, yet investigated through AID, a frivolous charge that a white canine handler made against Officer Adams on November 16, 2000.  The "misconduct" that resulted in the charge against Officer Adams was that Officer Adams simply said to the white Officer, "Have a nice day."

37. White Officers routinely, in Officer Adams' presence, referred to African American Officers and citizens as "huks." "Huk" was clearly intended to be a derogatory term used to disparage African Americans.  At roll call, on November 17, 2000, a white official announced "There is a new canine at the Blue Plains Canine Training Center. The canine's name is Huk."

38. On November 20, 2000, in the presence of Officer Adams, white Officers referred to black Officers and African American citizens as "gangsters" and referred to whites who were friends of blacks as "FOGs" (an acronym for "Friends of Gangsters").

39. On November 30, 2000, a white official within Officer Adams' chain of command, Captain Preloh, who was charged with conducting a preliminary investigation into allegations filed against Officer Adams by white Officers in the union (FOP), secretly gave the union the document that Adams prepared in his own defense against those charges.  The document should have

14

been given to the IAD investigator, yet that investigator
advised that he never received it

40. On December 1, 2000, Officer Adams was removed for no
reason from investigating a complaint filed by a black citizen
against a white Officer, and the responsibility for conducting
that investigation was given to a white sergeant.

41. On December 10, 2000, Officer Adams wrote a memo to
Chief of Police James Varey advising him of the racist and
hostile work environment in the Patrol Division and made him
aware that the K-9 Unit selection process discriminated against
black and female Officers.  This was protected activity.

42. Management refused to support Officer Adams in his duty
to supervise white employees.  On December 23, 2000, the
division commander, Inspector Parisi (white), ordered Officer
Adams to change the performance evaluation that he had given to
an undisciplined white Officer.  He also ordered Officer Adams
to remove corrective entries from two other white Officers' Unit
personnel files.

43. On or about January 7, 2001, the Department refused to
investigate charges that Officer Adams had filed against a white
Officer for detrimental conduct and untruthfulness.

44. On January 12, 2001, in retaliation for Officer Adams'
objections to racial discrimination within the Patrol Division,

Captain Preloh lowered Officer Adams' Performance Rating Score (at that time used for 15 percent of the promotion examination rating), in an attempt to prevent him from being promoted.

45. On March 30, 2001, the Department published untruths and distortions regarding Officer Adams in a Department-wide publication, in an attempt to cause him mental anguish and embarrassment.

46. Officer Adams timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.  He provided notice of his claims in a face-to-face mediation on July 23, 2001.  He provided additional notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.  Defendant also received notice of Officer Adams' claims through documents received by the Capitol Police from the unknown source described in paragraph 22, above, during the mediation period.

<u>Roy Anderson</u>

47. Roy Anderson was discriminated against on the basis of race in the year 2000 promotion process.  He was not provided with an Incident Command Book needed to prepare for the promotion examination, and he was not invited to participate in

16

a study group prior to the examination. White Officers who participated in the year 2000 promotion process were provided with the materials they needed to study for the examination and were invited to join study groups in which they were coached for the examination. As a result of the discriminatory treatment, Officer Anderson received a low score on the examination and was not promoted. In addition, the disparate treatment of African American candidates, including Officer Anderson, in the promotion process, was part of a hostile work environment that generally provided African American Officers with fewer career opportunities than were provided to white Officers.

48. The complained-of discrimination took place within 180 days of April 12, 2001, the date on which Officer Anderson timely requested counseling. He was represented by attorney Charles Jerome Ware in counseling and mediation. He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

<u>Regina Bolden-Whitaker</u>

49. Regina Bolden-Whitaker was subjected to a hostile work environment based on race, including unjustified disciplinary proceedings and discrimination in assignments, including during

17

the 180-day period preceding her request for counseling.
Officer Bolden-Whitaker applied for a bus driver position for
which she was qualified in 2000, but she was never called for an
interview despite the fact that it remained open at least until
January 2001, when the same job was re-posted again.

50. Officer Bolden-Whitaker did not participate in the year
2000 promotion process because, based on her prior experience,
she believed it would be futile.

51. Officer Bolden-Whitaker timely requested counseling on
April 12, 2001, and was represented by attorney Charles Jerome
Ware in counseling and mediation.  She provided notice of her
claims through the representations of her counsel to Defendant's
counsel during the mediation period, and through the
categorization document requested by and provided to Defendant.

<u>Amando Bowman</u>

52. Amando Bowman was subjected to a hostile work
environment, including discrimination in assignment, based on
race.  Officer Bowman had been assigned to the Containment
Emergency Response Team ("CERT") in 1997.  In November of 2000,
after promotion to the rank of sergeant, Officer Bowman was
reassigned from CERT to the Capitol Division.  He was informed
by his superiors that the reassignment occurred because a newly
promoted sergeant had to return to the field once he/she was

18

promoted.   A white Officer in CERT promoted to sergeant at the same time as Officer Bowman was allowed to remain on CERT and was not required to return to the field after his promotion. The change in assignment resulted in Officer Bowman's loss of the hazardous duty pay associated with assignment to CERT.

53. Officer Bowman timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.  He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

Robert Braswell, Jr.

54. Robert Braswell, Jr. was subjected to a hostile work environment based on race, including discriminatory discipline, and discriminatory denial of training available to white Officers resulting in a denial of assignments, including during the 180-day period preceding his request for counseling.

55. Officer Braswell did not participate in the year 2000 promotion process because, based on his prior experience, he believed it to be futile.

56. Officer Braswell timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.  He provided notice of his claims in

a mediation session on July 25, 2001.  He provided additional
notice of his claims through the representations of his counsel
to Defendant's counsel during the mediation period, and through
the categorization document requested by and provided to
Defendant.

Kevin Bull

57. Kevin Bull and other African American Officers were
discriminated against on the basis of race in the year 2000
promotion process.

58. During the initial meeting that was held in order to
discuss how the entire promotion process was going to be
conducted, the test administrator, with approval of the
Department, stated that during the written assessment portion of
the process, no Capitol Police officials other than applicants
for promotion would be present at the testing center, to prevent
any compromise of the written process.  The administrator also
stated that, consistent with past practice, there would be no
make-up date for the written assessment.

59. Notwithstanding the announcement of the test
administrator, on the day of the written assessment, Capitol
Police Deputy Chief Marsh Krug (who is white) was present at the
assessment center.  Furthermore, the Department subsequently
permitted two white Officers who were not present for the

written assessment to take the same test given to Officer Bull and the other Officers who took the exam on the appointed day. This provided an unfair advantage to the two white Officers, who could learn in advance the questions that would be on the test. No similar advantages were provided to the African American Officers who took the examination.

60. Officer Bull timely requested counseling on May 8, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.  He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant. Defendant also received notice of Officer Bull's claims through documents received by the Capitol Police from the unknown source described in paragraph 22, above, during the mediation period.

Loretta Bullock

61. Loretta Bullock was subjected to a hostile work environment based on race during the six months preceding her request for counseling, including being passed over for an assignment for which she was qualified and had the most seniority, in favor of a less senior white Officer, and witnessing other African American Officers similarly being passed over.

21

62. Officer Bullock timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.  She provided notice of her claims through the representations of her counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

Saphonia Butler

63. Saphonia Butler was subjected to a hostile work environment based on race, including during the six months preceding her request for counseling, including witnessing African American Officers being passed over for positions for which they were qualified in favor of less qualified white Officers.  Additionally, during this period, available assignment opportunities were not posted, but rather white Officers were informed of them by word of mouth, and African American Officers, including Officer Butler, did not learn of the positions until it was too late to apply.

64. Officer Butler did not participate in the year 2000 promotion process because, based on past experience, she believed it was futile.

65. Officer Butler timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.  She provided notice of her claims

through the representations of her counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

Dorian Coward

66. Dorian Coward was subjected to a hostile work environment based on race, including during the 180 days preceding his request for counseling, in that his supervisors regularly yelled at him and spoke to him disrespectfully, and did not similarly treat white Officers. In addition, he was denied assignments for which he was qualified because of his race.

67. Officer Coward timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation. He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

J. Carroll Creekmur

68. J. Carroll Creekmur was subjected to a hostile work environment based on race, including during the 180 days preceding his request for counseling, because he observed white Officers consistently engaged in racial profiling toward members of the public, stopping cars based on the African American race

23

of the driver rather than on any observed conduct.  He also observed that white Officers harassed African American homeless persons, but not white homeless persons, purporting to do a health and welfare check in the attempt to find grounds for an arrest.

69. Officer Creekmur experienced retaliation for protected activity when he brought the racial profiling to the attention of his white sergeant, who publicized the fact that Officer Creekmur had brought this to his attention and who had Officer Creekmur summoned to the Internal Affairs Division.

70. Officer Creekmur timely requested counseling on May 11, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.  He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

<u>Donald Dixon</u>

71. Donald Dixon experienced a hostile work environment, including discrimination in assignments and discipline, and retaliation for opposing discrimination, including during the 180 days preceding his request for counseling.  A white Officer in Officer Dixon's command, Sgt. Frieslander, left his service weapon in a public place on a date when Officer Dixon was not on

24

duty.  The incident was reported to Captain Tom Noord (white), who failed to discipline Sergeant Frieslander.  The incident was later referred to the Internal Affairs Division, and Captain Noord and Sergeant Frieslander falsely stated that Officer Dixon had also responded to the incident and that Captain Noord had assigned the responsibility for discipline to Officer Dixon. Therefore, Officer Dixon was blamed for this breach in discipline although he was not on duty the night of the incident and was unaware of the circumstances.

72. On one occasion, a trainee approached Officer Dixon and stated that she was uncomfortable with the white male Officers demanding that she falsify traffic citations.  Officer Dixon initiated an investigation and found that a white male Officer had stated, "If she knew what was good for her she needed to go along with the program, and that all the Officers falsified tickets."

73. During October 2000 through 2001, Officer Dixon was subjected to numerous AID investigations for trivial alleged infractions.

74. Assistant Chief Robert Howe (the Department's number two official) informed Officer Dixon that, because he had stated that he was thinking about retiring within the next three years, he would be transferred.  Officer Dixon was then involuntarily

transferred to the day shift at the Capitol Division.   When Officer Dixon arrived, he was presented with a work contract that he had to sign as if he had been subjected to discipline. After Officer Dixon worked that assignment for a period, a white male sergeant informed him that Assistant Chief Howe had transferred him there because it was the toughest place to work and that he (Howe) believed that Officer Dixon would not last more than a couple of months and he would quit or retire.   The transfer was motivated by Officer Dixon's race and in retaliation for his opposition to discrimination.

75. Officer Dixon timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.   He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

Kevin R. Evans

76. Kevin R. Evans experienced a hostile work environment, including during the 180-day period preceding his request for counseling.   Although Officer Evans is a high school graduate (as all Capitol Police Officers are required to be) and a college graduate, his personnel record reflects incorrectly that he failed to complete high school and does not reflect his

26

college degree.  The Capitol Police failed to correct the error in his record despite submission of a correction form on multiple occasions.  The failure to correct his record despite multiple requests has resulted in Officer Evans being denied multiple opportunities for training and preferred assignments on the purported ground that he lacks the educational qualifications.  No white Officers have experienced a similar error in their personnel records.

77. Officer Evans timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.  He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

Kim Ewings

78. Officer Ewings participated in the year 2000 promotion process and experienced discrimination, in that white Officers were allowed to take leave that was not charged against their leave accounts to take the oral board examinations, but African American Officers such as Officer Ewings either took the examinations on scheduled days off or were charged leave. Moreover, although Officer Ewings was permitted to attend a study session offered by superior Officers, African American

Officers other than Officer Ewings were told the class was full, even though white Officers were permitted to attend. In addition, the disparate treatment of African American candidates, including Officer Ewings, in the promotion process, was part of a hostile work environment that generally provided African American Officers with fewer career opportunities than were provided to white Officers.

79. Officer Ewings timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation. She provided notice of her claims through the representations of her counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant. Additionally, the Capitol Police received from the unknown source described in paragraph 22, above, a document by Officer Ewings during the mediation period which outlined her complaints about the unfair and discriminatory aspects of the promotion process.

Arnold Fields

80. Arnold Fields was subjected to a hostile work environment in retaliation for his filing a complaint against a white Officer, then-Sgt. Kathryn Stillman, which began in April 2000 when he filed the complaint and continued into 2001.

28

Following his complaint, he was subjected to an unjustified Internal Affairs investigation and suspended based on a report by a Department-paid psychologist, although his personal psychologist had certified that he was fit to work.  Following his return from his suspension, Officer Fields was assigned to undesirable posts and given an unjustified unsatisfactory performance review.  He was also harassed in other ways, *e.g.*, in January 2001 he was questioned by his white supervisor for not wearing a badge, whereas white and Hispanic officers who were also not wearing their badges at that time were not questioned.

81. Officer Fields did not participate in the year 2000 promotion process because, based on his prior experience, he believed it to be futile.

82. Officer Fields timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.  He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

David L. Fleming

83. David L. Fleming was subjected to a hostile work environment in November 2000, when two white Officers falsely

accused him of smoking marijuana, at a time when he was in uniform and on patrol. He was not permitted to have a union representative present during the investigation of this false charge. When he was cleared of the charge, the white Officers were not disciplined in any way. No white Officers have suffered similar false charges.

84. Officer Fleming timely requested counseling on May 9, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation. He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant. Additionally, his claim was also provided as Exhibit 17 to the Administrative Complaint filed with the Office of Compliance on April 12, 2001, a copy of which was received by Defendant during the mediation process.

Gary Goines

85. Gary Goines participated in the year 2000 promotion process but was not promoted due to discrimination in the administration and scoring of the examination, and retaliation against him because of his complaints lodged against white Officers in 1999, during which he was frequently subjected to racist comments.

86. Although Officer Goines received a mid-range score on the written portion of the examination, he received a very low score on the oral component, for which there was no recording.

87. Of the 24 candidates in Officer Goines' rookie year, the two African Americans have remained privates first class, whereas the 22 white candidates have advanced upward through the ranks.

88. Officer Goines timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.  He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

Clarence Haizlip

89. Clarence Haizlip experienced a hostile work environment for virtually his entire career in the Capitol Police, experiencing discrimination in assignments and in the promotion process, as well as discrimination in discipline.  During the 180 days preceding his request for counseling, he continued to feel intimidated and in a hostile work environment because he witnessed discrimination and retaliation against fellow African American Officers, particularly those who were leaders of the Black Police Association.

31

90. Officer Haizlip timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.  He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

Mark Harrison

91. Mark Harrison is a white man who was employed by the Capitol Police as a Fitness Specialist.  He was retaliated against for his support of and friendship with African American Officers and employees.  As a result of the harassment he experienced, he brought Office of Compliance Complaint No. 00-CP-40(DA) against the Defendant.  He signed a Settlement Agreement and Full Release in that case on March 13, 2001, in which he waived any further claim for any action that occurred prior to the date of signing.

92. Immediately after the signing of the Settlement Agreement, the Capitol Police resumed its harassment of Mr. Harrison for his support of African American Officers and non-Officer personnel.  The position of Director of the Fitness Center had been vacant since late 2000, a position for which Mr. Harrison was qualified by specialized training and experience, and for which he intended to apply.  However, to prevent Mr.

Harrison from obtaining this post, the Capitol Police did not post the vacancy, but instead appointed Sergeant Richard Burton, an individual without education or experience as a health or fitness professional, as "supervisor" of the Fitness Center and Physical Training section of the Capitol Police.

93. As part of his duties as Fitness Specialist, Mr. Harrison wrote articles for "1828," an in-house magazine of the Capitol Police.  When he wrote an article about updates at the Fitness Center that included the information that Sgt. Burton had been appointed as "supervisor" of the Fitness Center, the article was edited to remove that information.

94. Mr. Harrison timely requested counseling on May 15, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.  He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

Larry Ikard - Former Class Agent

95. Larry Ikard was subjected to discrimination in the canine officer selection process, which began in 1999 and continued through February 2001.  During Officer Ikard's interview, the training sergeant spent a large portion of the time praising the white Officers who had also applied for the

33

position.   Officer Ikard was then questioned about his leave record from almost 10 years previously, although the vacancy announcement stated that only the previous year would be reviewed.

96.  The rank list for the Officers was kept secret, in violation of long-standing Department policy.  When Officer Ikard learned of the rankings, he had received a low ranking, which prevented him from selection for the K-9 Unit training. Officer Ikard passed the physical agility and endurance training program, yet was ranked lower than white Officers who had not passed those programs.

97. Officer Ikard complained to Chief James Rohan concerning the discrimination he experienced.  He received a written response from Chief James Varey on February 15, 2001, stating that there was insufficient evidence to support his allegations of discrimination.

98. Officer Ikard participated in the year 2000 promotion process, but was not promoted due to discrimination in the administration and scoring of the examination, and retaliation against him because of his opposition to discriminatory practices.

99. Officer Ikard also experienced a hostile work environment throughout his career with the Capitol Police,

including during the 180 days preceding his request for counseling. He heard white Officers repeatedly use racial slurs in reference to, or directed at, African American police Officers. For example, white Officers labeled the D.C. Metropolitan Police Department as the "ghetto police" and referred to African Americans as "huks" or "gangsters." They referred to white Officers who befriended African American Officers as "huk lovers," "friends of gangsters," or "FOGs"(an acronym for "friends of gangsters"). The K-9 Unit announced at roll call that the new black dog in the Unit was named "Huk." Although the dog's name was changed after Officer Ikard and other African American Officers complained, white Officers named another dog "Ike," which was the name by which Officer Ikard was commonly known in the Department.

100. Officer Ikard was also subjected to retaliation for his opposition to discrimination, including a refusal of other Officers to cooperate with him in the performance of official duties.

101. Officer Ikard timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation. He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the

35

categorization document requested by and provided to Defendant. Notice of his claims was also provided as Exhibit 15 to the Administrative Complaint filed with the Office of Compliance on April 12, 2001, a copy of which was received by Defendant during the mediation process. In addition, Defendant received notice of Officer Ikard's claims through documents received by the Capitol Police from the unknown source described in paragraph 22, above, during the mediation period.

Dwayne Inabinet

102. Dwayne Inabinet participated in the year 2000 promotion process, but was not promoted due to discrimination in the administration and scoring of the examination.

103. Officer Inabinet experienced a hostile work environment, including during the 180 days preceding his request for counseling, in the form of hearing the use of racist epithets such as the use of the "n" word, "huk," "boy," "black bitch," and the term, "Ghetto Police" as a reference to the D.C. Metropolitan Police Department. Moreover, Officer Inabinet has suffered discriminatory treatment in the terms and condition of his employment in the form of being yelled at, threatened, and denied privileges that similarly situated white Officers received. He had also witnessed other African American Officers similarly treated. Officer Inabinet also experienced

36

discrimination in the form of duty assignments, the imposition of disciplinary actions, and less favorable treatment than white Officers with regard to the use of leave.

104. Officer Inabinet also experienced retaliation:  After African American Officers complained about their treatment, Lt. Estervan (white), who was in charge of Officer Inabinet's assignments, began providing him with unfavorable assignments and reacted differently to him.

105. Officer Inabinet timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.  He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant. In addition, Defendant received notice of Officer Inabinet's claims through documents received by the Capitol Police from the unknown source described in paragraph 22, above, during the mediation period.

Gregory Jackson

106. Gregory Jackson experienced a hostile work environment and retaliation for opposing racial discrimination, including during the 180 days preceding his request for counseling, in that he was the target of harassment:  His leave slips were lost

or misplaced and his assignments changed at roll call at the whim of white Officers. Further, his white supervisors retaliated against him because of his opposition to racial discrimination by informing him that there were complaints against him, but they would refuse to divulge the identity of the complainants or even the nature of the complaints.

107. Officer Jackson also experienced a hostile work environment during the 180 days preceding his request for counseling because he witnessed racist actions or practices such as the display of a hangman's noose and a swastika and unprovoked stops of African American drivers. He also witnessed frequent acts of racial discrimination directed at his fellow African American Officers, including the use of racist epithets, yelling at and threatening African American Officers but not white Officers, and denying African American Officers normal privileges that were granted to white Officers.

108. Officer Jackson timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation. He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

38

Michael Jenkins

109. Michael Jenkins experienced a hostile work environment in the form of discrimination in assignments, including during February 2001, which was within 180 days of his request for counseling.  Officer Jenkins' superior assigned overtime (which provides extra pay) to white Officers and not to African American Officers, despite the fact that overtime was to be assigned in alphabetical order.  Moreover, Officer Jenkins received unfavorable assignments in adverse weather conditions more often than did white Officers.

110. Officer Jenkins timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.  He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

John N. Johnson

111. John N. Johnson experienced racial discrimination in the year 2000 promotion process.  Officer Johnson participated in the process, but his Performance Rating Scale Score (a score assigned after all testing to determine the order in which successful candidates will be promoted) was downgraded because of his alleged failure to do certain things that were not

39

criteria for promotion eligibility (*e.g.*, an alleged failure to volunteer his services upon request).   As a result of this downgrading, white Officers with less seniority were promoted to sergeant instead of him.

112. Officer Johnson timely requested counseling on April 12, 2001, and he was represented by attorney Charles Jerome Ware in counseling and mediation.  He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

Michael Malloy

113. Michael Malloy participated in the year 2000 promotion process and was discriminated against on the basis of his race in the administration and scoring of the examination.

114. Officer Malloy timely requested counseling on May 11, 2001, and he was represented by attorney Charles Jerome Ware in counseling and mediation.  He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant. Furthermore, the Defendant received written notice of his claim from the unknown source described in paragraph 22, above, during the mediation period.

Kevin Matthews

115. Kevin Matthews was subjected to racially discriminatory discipline on February 13, 2001, which was within 180 days of his request for counseling.   White Officers have received significantly lesser punishments for the same infraction as that allegedly committed by Officer Matthews:   White Officers were allowed to retain their regular assignments, whereas Officer Matthews was removed from his regular position.

116. Officer Matthews timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.   He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant. Furthermore, the Defendant received written notice of his claim from the unknown source described in paragraph 22, above, during the mediation period.

Danny L. McElroy

117. Danny L. McElroy was subjected to racially discriminatory discipline in March 2001, which was within 180 days of his request for counseling.   He received a CP-550 disciplinary notice for leaving his post to conduct personal business, when in fact he was engaged in official business.   The

41

sergeant who wrote the CP-550 admitted that she knew the discipline was unwarranted. Other Officers who were in fact conducting personal business at the time did not receive CP-550 notices.

118. Officer McElroy timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation. He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

<u>Brent Mills</u>

119. Brent Mills experienced discrimination in the promotion process. In September 2000, he was at the top of the eligibility list for promotion to sergeant; the list was due to expire on September 30, 2000. An African American Sergeant, Earl Allen, Jr., had requested to retire on September 28, 2000, and had he done so, Officer Mills would have been promoted to sergeant. Instead, officials of Defendant asked Sergeant Allen to delay his retirement until October 1, 2000, after the expiration of the list, and thus Officer Mills was not promoted. Defendant's officials gave Sgt. Allen no substantial reason for asking him to delay his retirement; it is evident that the true purpose was to deny promotion to an African American Officer.

120.  In November 2000, Defendant promoted four white Officers to the position of sergeant from the new promotion eligibility list.  Officer Mills protested his treatment, and on February 5, 2001, received a letter from Chief Varey denying him relief.

121. Officer Mills timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.  He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.  Furthermore, the Defendant received detailed written notice of his claim during the mediation period from the unknown source described in paragraph 22, above.

Joseph Moore

122.  Joseph Moore experienced racial discrimination in assignments and promotion, including during the 180 days preceding his request for counseling.  Although he had finally been permitted to attend Motorcycle School and had successfully passed the course, he was never given motorcycle assignments.

123. Officer Moore participated in the year 2000 promotion cycle, but was not promoted due to discrimination in the administration and scoring of the examination.

43

124. Officer Moore also experienced a hostile work environment, including during the 180 days preceding his request for counseling, in that he was denied training opportunities, and he witnessed African American Officers routinely being verbally abused, denied privileges awarded white Officers, and subjected to unfair discipline.

125. Officer Moore timely requested counseling on May 11, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation. He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant. Furthermore, the Defendant received written notice of his claim concerning discrimination in the promotion process during the mediation period from the unknown source described in paragraph 22, above.

Teresa (Bradby) Morgan

126. Teresa (Bradby) Morgan experienced a hostile work environment, including during the 180 days preceding her request for counseling, because her white superiors repeatedly referred to African Americans in a disparaging manner, such as "them people," and to an African American female Officer as a "black

bitch." She was also aware of discrimination to which other African American Officers were subjected.

127. Officer Morgan timely requested counseling on May 15, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation. She provided notice of her claims in an individual mediation session on July 25, 2001, as well as through the representations of her counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

Barry Nixon

128. Barry Nixon experienced a hostile work environment, including during the 180 days preceding his request for counseling, in that he was spoken to in a derogatory manner not used in speaking to white Officers, and addressed with racist epithets. He observed other African American Officers similarly treated, and who were criticized or disciplined for conduct permitted of white Officers.

129. Officer Nixon also experienced discrimination in assignments during the 180 days preceding his request for counseling. White Officers received more desirable assignments than did Officer Nixon and other African American Officers, and in winter, including the winter of 2000-01, he and other African American Officers were much more likely than white Officers to

be assigned to outside posts.  Furthermore, Officer Nixon and other African American Officers were not made aware of openings for specialty assignments until it was too late to apply for them, whereas white Officers were informed by word of mouth of the availability of such assignments.

130. Officer Nixon did not participate in the year 2000 promotion process because he believed it to be futile, in that he had passed the written examination at least six times in the past without being promoted to sergeant, although he had been maintained in the position of acting sergeant for approximately 10 years during the period from 1988 to 1999.

131. Officer Nixon timely requested counseling on May 5, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.  He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

Luther Peterson - Class Agent

132. Luther Peterson was subjected to discriminatory discipline on April 4, 2001, when he was disciplined for using a firearm to repel an intruder in his home in late 2000, despite the fact that he was not charged with any violation of law by authorities in either Prince George's County or the State of

46

Maryland, where his home is located, and despite the fact that white Officers charged with similar infractions received lesser discipline.  In this disciplinary hearing, Officer Peterson was deprived of his right to be represented by his union representative.

133. Because of the pending discipline, Officer Peterson withdrew from the year 2000 promotion process, which he had already entered, because he believed that it would be futile to proceed in the face of the discriminatory charge.

134. Officer Peterson timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.  He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant. Furthermore, the Defendant received written notice of his claim concerning discrimination in the promotion process during the mediation period from the unknown source described in paragraph 22, above.

Mary Jane Rhone

135. Mary Jane Rhone worked as an Officer for Defendant from 1976 until 1993.  She currently serves as a civilian Human Resources Specialist in the Office of Human Resources.  The

47

Defendant discriminated against Ms. Rhone on the basis of race and retaliated against for her opposition to racial discrimination in the Department, including her participation in the formation of the Black Police Association, an organization formed to monitor and expose the discrimination in the Capitol Police.

136. Ms. Rhone experienced racial discrimination, including in the 180 days preceding her request for counseling, in that her performance was subjected to greater scrutiny and she was given less desirable work assignments that white employees and those who did not oppose discrimination. Ms. Rhone was also denied training opportunities, which restricted her ability to obtain promotions, with concomitant loss of pay and emotional distress.

137. Ms. Rhone timely requested counseling May 11, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation. She provided notice of her claims through the representations of her counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

James Roberts

138. James Roberts experienced a hostile work environment based on race, including discrimination in assignments,

including during the 180 days preceding his request for counseling. Whenever adverse weather conditions existed, he and other African American Officers were always assigned to outside positions, and they were passed over for positions in specialty Units. He also experienced a hostile work environment in witnessing the discrimination experienced by other African American Officers, such as losing permanent posts if they were out on sick leave, whereas white Officers did not lose their permanent posts after being out on sick leave.

139. Officer Roberts timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation. He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

Theodore Rodgers

140. Theodore Rodgers experienced a hostile work environment based on race, including during the 180 days preceding his request for counseling, in that he was falsely accused by his lieutenant of stealing money from a wallet lost by a visiting child, despite an absence of evidence and the presence of witnesses who could vouch for him, and subsequently harassed by his lieutenant because the lieutenant lacked a basis to

49

discipline him for the supposed theft.  Moreover, he was a witness to racist activities, specifically a noose hanging in the locker room, and was aware of racial discrimination in assignments given to other African American Officers.

141. Officer Rodgers participated in the year 2000 promotion process, but was not promoted due to discrimination in the administration and scoring of the examination.

142. Officer Rodgers timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.  He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

Joseph Simpson

143. Joseph Simpson participated in the year 2000 promotion process, but was not promoted due to discrimination in the administration and scoring of the examination.

144. Officer Simpson also experienced a hostile work environment based on race, including during the 180 days preceding his request for counseling, in that he observed that qualified African American Officers were not promoted, nor were they assigned to special detail units for which they applied.

50

145. Officer Simpson timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.  He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

Thomas Spavone

146. Thomas Spavone is Hispanic, and was discriminated against, including during the 180 days preceding his request for counseling, in retaliation for his association with and support of African American Officers.

147. Officer Spavone was denied the opportunity to compete for specialty assignments because openings were not posted, but rather communicated by word of mouth to white Officers, but not to African American Officers or to Officer Spavone.  He was also denied training, and denied positions for which he applied and was qualified, which positions went to white Officers.

148. Officer Spavone also experienced retaliatory discrimination when he applied for positions, in that Inspector Parks (who is white) called Officer Spavone into his office and questioned him as to why he was applying for positions he was allegedly "not qualified for."  White Officers and those who did

not associate with African American Officers were not questioned in this manner.

149. Officer Spavone experienced retaliatory discrimination in discipline in that, after an altercation with a white Officer, he was disciplined and the white Officer was not.

150. Officer Spavone did not participate in the year 2000 promotion process because he believed it would be futile, based on his previous experience and observation.

151. Officer Spavone timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.  He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant. Furthermore, the Defendant received written notice of his claims during the mediation period from the unknown source described in paragraph 22, above.

Robert Spruill

152. Robert Spruill participated in the year 2000 promotion process, but was not promoted due to discrimination in the administration and scoring of the examination.  Among other irregularities, white Officers were tutored prior to the

examination, and African American Officers, including Officer Spruill, were not tutored.

153. Officer Spruill also experienced a hostile work environment based on race, including during the 180 days preceding his request for counseling, in that he was addressed and witnessed other African American Officers being addressed with racial epithets and in other offensive ways, he was aware that a noose had been left in the locker room without any repercussions, and he observed, with concern, that Sharon Blackmon-Malloy, a leader of the Black Police Association, was a target of retaliation.

154. Officer Spruill timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.  He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant. Furthermore, the Defendant received written notice of his claims during the mediation period from the unknown source described in paragraph 22, above.

Dwight Sturdivant

155. Dwight Sturdivant experienced a hostile work environment, including during the 180 days preceding his request

for counseling, in that white Officers were generally assigned to the shift and duty they requested, whereas African American Officers, including Officer Sturdivant, were much less likely to receive the assignments for which they had expressed a preference, and more frequently than white Officers had their assignments and shifts changed to those for which they had expressed no preference.   Furthermore, Officer Sturdivant was aware of frequent incidents in which African American Officers were disciplined for infractions for which white Officers were not disciplined.

156. Officer Sturdivant timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.   He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

Gerald Thomas

157. Gerald Thomas experienced discrimination in assignments and a hostile work environment, including during the 180 days preceding his request for counseling, in that openings for specialty assignments were not posted, but rather communicated to white Officers by word of mouth.   Accordingly, he learned of such openings only after they were filled and had no opportunity

to apply for them.   Further, Officer Thomas observed that participating in the promotion process was futile for African American Officers regardless of ability, and that knowledge made him feel that the work environment was hostile to African Americans.

158. Officer Thomas timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.   He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

Anwar R. Thompson

159. Anwar Thompson experienced a hostile work environment, including during the 180 days preceding his request for counseling, in that he frequently heard African American Officers spoken of by white Officers in a derogatory manner, and was himself subjected to racially based insults.   In addition, the brakes on his bicycle, parked in a location accessible only to Officers of the Capitol Police, were disconnected, an attack on him as an African American.   Further, openings for specialty assignments were not posted, but rather communicated to white Officers by word of mouth.   Accordingly, Officer Thompson and

other African American Officers learned of such openings only after they were filled and had no opportunity to apply for them.

160. Officer Thompson timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.  He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

Dale Veal

161. Dale Veal experienced a hostile work environment, including during the 180 days preceding his request for counseling, in that he and other minorities were bypassed for overtime, whereas white Officers were given more overtime assignments.  Additionally, he was repeatedly denied training opportunities for which he was qualified, specifically motorcycle training, whereas white Officers who requested such training were allowed access to it.

162. Officer Veal was assigned to highly undesirable work stations, known as "punishment posts," during the 180 days preceding his request for counseling, in retaliation for his opposition to racial discrimination in work assignments.

163. Officer Veal did not participate in the year 2000 promotion process because he believed it would be futile, based on his previous experience.

164. Officer Veal timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.  He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant. He also attended a mediation session with Defendant's representatives on June 30, 2001.  Furthermore, the Defendant received written notice of his claims during the mediation period from the unknown source described in paragraph 22, above.

Reginald W. Waters

165. Reginald W. Waters experienced a hostile work environment, including during the 180 days preceding his request for counseling, in that openings for specialty assignments and training opportunities were not posted, but rather communicated to white Officers by word of mouth.  Accordingly, he learned of such openings only after they were filled and had no opportunity to apply for them.

166. Officer Waters did not participate in the year 2000 promotion process because he believed it would be futile, based on his previous experience.

167. Officer Waters timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation. He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant. Furthermore, the Defendant received written notice of his claims during the mediation period from the unknown source described in paragraph 22, above.

Richard Webb

168. Richard Webb experienced racial discrimination in assignment, promotion, and retaliation including during the 180 days preceding his request for counseling. He attended the Capitol Police K-9 Unit try-outs in 2000. All candidates were informed by the head of K-9 training, Sergeant Williams (white), that if any candidate failed to complete an exercise during the try-out, he would be eliminated from consideration for the position. Officer Webb completed all of the K-9 Unit try-out exercises and was informed by Sergeant Williams that he had performed well and was the top candidate for the position.

However, he was not placed in the K-9 Unit; instead at least two white Officers who had failed to complete all of the exercises and required training were included among the 10 white Officers who obtained positions in the K-9 Unit.  Further, during the interview process, Officer Webb was questioned concerning his medical leave status during a period eight years prior to the selection period; no white Officers were so questioned.

169. Officer Webb protested the unfair selection, but on February 15, 2001, he received a letter from Chief James Varey denying his protest.

170. Officer Webb participated in the year 2000 promotion process, but was not promoted due to discrimination in the administration and scoring of the examination.

171. Officer Webb was subjected to a hostile work environment based on race.  White Officers in the Capitol Police repeatedly used racial slurs in reference to, or directed at, African American police Officers.  White Officers labeled the D.C. Metropolitan Police Department as the "ghetto police" and referred to African Americans as "huks" or "gangsters."  They referred to other white Officers who befriend African American Officers as "huk lovers," "friends of gangsters," or "FOGs" (an acronym for "friends of gangsters").  The K-9 Unit announced at roll call that the new black dog in the Unit was named "Huk."

59

The dog's name was changed after African American Officers complained. The white Officers gave another dog the name "Ike," which was the name by which African American Officer Larry Ikard was commonly known around the Department.

172. Because of his race, Officer Webb was denied the opportunity to attend special schools and training, including during the 180 days preceding his request for counseling, which limited his opportunities for advancement.

173. Officer Webb timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation. He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

McArthur Whitaker

174. McArthur Whitaker experienced a hostile work environment, including during the 180 days prior to his request for counseling. In September and October 2000, he was removed from his motorcycle assignment on the pretext that motorcycles were no longer being used, and his motorcycle was given to a white Officer. When he objected to this, he was disciplined. Throughout October and November 2000, Officer Whitaker attempted to reverse these discriminatory actions and was in fact told

that the discipline he had received was unwarranted, but the discipline was never reversed.  On another occasion, Officer Whitaker was also disciplined for use of a cell phone, whereas white Officers were not disciplined for use of cell phones.

175. Officer Whitaker did not participate in the year 2000 promotion process because he believed it would be futile, based on his previous experience.

176. Officer Whitaker timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.  He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant. Furthermore, the Defendant received written notice of his claims during the mediation period from the unknown source described in paragraph 22, above.

<u>McKinley White</u>

177. McKinley White experienced a hostile work environment, including discrimination in assignments, during the 180 days preceding his request for counseling.  Openings for specialty assignments and training opportunities were not posted, but rather communicated to white Officers by word of mouth. Accordingly, he learned of such openings too late to apply for

them.  He applied to become part of the K-9 Unit, having had 10 years experience as a dog handler and trainer, and he performed better than any other Officer who participated in the trials on that day.  However, the position was given to a white Officer who did not participate in the trials at all.

178. Officer White experienced a hostile work environment, including during the 180 days preceding his request for counseling, in that he was aware of retaliation against Officers who spoke out against discrimination, and he was deterred from speaking out to oppose discrimination.

179. Officer White did not participate in the year 2000 promotion process because he believed it would be futile, based on his previous experience.

180. Officer White timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.  He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

Howard Whitehurst

181. Howard Whitehurst experienced a hostile work environment, including during the 180 days preceding his request for counseling, including discrimination in assignments,

discipline, and performance evaluations. Moreover, he was aware that other African American Officers were experiencing discrimination in assignments and discipline. In November 2000, he requested certain positions in the H-1 Unit that were not given to him. Subsequently, he was removed from his permanent post and given a less desirable assignment to rotating "floating assignments," whereas white Officers with less seniority were given more favorable assignments and permanent assignments. Officer

182. Officer Whitehurst did not participate in the year 2000 promotion process because he believed it would be futile, based on his previous experience.

183. Officer Whitehurst timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation. He provided notice of his claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

Diane Willis

184. Diane Willis was subjected to a hostile work environment based on race, including during the 180 days preceding her request for counseling, in that she was consistently treated with disrespect by her superior Officers

(white), including their screaming at her if she made any kind of request, treatment to which white Officers were not subjected, and denying her preferred assignments in favor of white Officers who received those assignments.

185. Officer Willis did not participate in the year 2000 promotion process because she believed it would be futile, based on her previous experience.

186. Officer Willis timely requested counseling on April 12, 2001, and was represented by attorney Charles Jerome Ware in counseling and mediation.  She provided notice of her claims through the representations of her counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

<u>Craig Young</u>

187. Craig Young experienced a hostile work environment, including during the 180 days preceding his request for counseling.  Openings for specialty assignments and training opportunities were not posted, but rather communicated to white Officers by word of mouth.  Accordingly, he learned of such openings too late to apply for them.  Additionally, some specialty assignments required certain experience or other qualifications for which one could prepare in advance if one were informed of those requirements before the opening arose.

White Officers received this information in advance; however, even when assignment openings were posted or African American Officers were otherwise made aware of them, the African American Officers, including Officer Young, did not learn of the criteria until that time, when it was too late to obtain the requisite qualifications.

188. Officer Craig Young further experienced a hostile work environment because he was aware of many instances in which African American Officers were given undesirable work assignments not given white Officers or were held more strictly than white Officers to disciplinary standards.  He further observed that leaders of the Black Police Association who spoke out against such injustices were the victims of retaliation. Officer Young also spoke out against the racial injustices of which he was aware.  Although the supervisors on his shift during that period did not retaliate against him, he was conscious that if he were to be transferred to a different shift he would likely face retaliation.

189. Officer Craig Young was discriminated against in the year 2000 promotion process, in which he participated at the beginning.  Practice questions taken from previous examinations were made available only to applicants who were white or not outspoken.  As Officer Young was both non-white and outspoken,

practice questions were not made available to him.  As a result,

he believed he was unlikely to succeed on the examination, and

he withdrew from the process.

190. Officer Craig Young timely requested counseling on

April 12, 2001, and was represented by attorney Charles Jerome

Ware in counseling and mediation.  He provided notice of his

claims through the representations of his counsel to Defendant's

counsel during the mediation period, and through the

categorization document requested by and provided to Defendant.

Furthermore, the Defendant received written notice of his claims

during the mediation period from the unknown source described in

paragraph 22, above.

Kendrick Young

191. Kendrick Young participated in the year 2000 promotion

process at the beginning, but because of racial discrimination

he experienced during the process, he withdrew from it.

192. Officer Young was subjected to a hostile work

environment because of his awareness that African American

Officers could not receive fair consideration in the promotion

process.

193. Officer Kendrick Young timely requested counseling on

May  11, 2001, and was represented by attorney Charles Jerome

Ware in counseling and mediation.  He provided notice of his

claims through the representations of his counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

<u>Helen Bond-Jones, Earnestine Harding, Jerry Howard, Theortis Jones, Jerome Lofty, Ronnie Massie, Keith Steward, and Cynthia Williams</u>

194. Officers Bond-Jones, Harding, Howard, Jones, Lofty, Massie, Steward, and Williams experienced a hostile work environment based on race throughout their tenure with the Capitol Police, including during the 180 days preceding their requests for counseling, because they frequently witnessed other African American Officers being victimized by one or more of the following types of racially discriminatory conduct:

· unprovoked traffic stops of African American drivers, but not white drivers;

· being addressed with racial slurs and victimized by racist actions such as displays of a noose or a swastika;

· yelling at and threatening African American Officers but not white Officers, belittling conduct toward African American Officers, and denying African American Officers normal privileges that were granted to white Officers;

· assignments and training opportunities that were not timely posted, but of which white Officers were informed by word of mouth;

·   placing photos of African American Officers, but not white
    Officers, on exam files during promotional processes;

·   denial of assignments and promotions that should have been
    awarded to African American Officers on the basis of
    qualifications and seniority, but were instead given to
    white Officers possessing lesser qualifications and
    seniority;

·   discipline for African American Officers that was harsher
    than for white Officers guilty of similar infractions, or
    discipline of African American Officers for conduct
    permitted on the part of white Officers.

195. Officers Bond-Jones, Harding, Howard, Jones, Lofty,
Massie, Steward, and Williams timely requested counseling on
April 12, 2001, and were represented by attorney Charles Jerome
Ware in counseling and mediation.  They provided notice of their
claims through the representations of their counsel to
Defendant's counsel during the mediation period, and through the
categorization document requested by and provided to Defendant.

James Gupton, Michael Killebrew, and Cynthia Williams

196. Officers Gupton, Killebrew, and Williams did not
participate in the year 2000 promotion process because, based on
their exposure to the hostile work environment and the failure

to promote African American Officers in past years, they believed it to be futile.

197. Officers Gupton, Killebrew, and Williams timely requested counseling on April 12, 2001, and were represented by attorney Charles Jerome Ware in counseling and mediation.  They provided notice of their claims through the representations of their counsel to Defendant's counsel during the mediation period, and through the categorization document requested by and provided to Defendant.

## Civil Action No. 02-1346

198. Plaintiff Arnold Fields, an African American male, was employed with the Capitol Police from August 18, 1984, until his retirement on October 31, 2008.  His participation in protected EEO activity was well known to his superiors in the Capitol Police.

199. On or about June 7, 2001, Officer Fields, while at his post at the Dirksen Senate Office Building, instructed a Congressional staff member to place his cell phone on the X-ray machine. The staff member failed to comply with Officer Fields' instruction, stating that "the belt was wet."  Officer Fields then provided the staff member with a tray, but the staff member still refused to cooperate, opting instead to place his cell phone inside of a colleague's pocket book.  The staff member

then proceeded through the metal detector, without his cell phone, and later retrieved the cell phone from his colleague.

200. A short time later, Officer Fields was summoned to speak with Sergeant Kyle Miller, who is white.  Upon his arrival at Sgt. Miller's desk, Sgt. Miller inquired about what had transpired.  After explaining the situation to Sgt. Miller, Sgt. Miller stated that Officer Fields "needed to be more open and stop closing people out."  Officer Fields responded to this inappropriate comment by requesting that Sgt. Miller stay on the situation at hand.  Sgt. Miller stated that he "stopped this situation from going to Internal Affairs."  Officer Fields responded by stating that he "was following general policies and procedures, and that if you feel that the staff member has a valid claim against me, then by all means send it to Internal Affairs."  Sgt. Miller then made a disparaging remark about Officer Fields' commitment to his job and stated that he reviewed his personnel file and discovered that Officer Fields had been written up for an incident when he previously was assigned to House Detail.  (Officer Fields had been assaulted by a white Sergeant, Kathryn Stillman, and had filed a complaint against her.)

201. Officer Fields' difficulties with Sgt. Miller continued after the above incident.  On or about August 6, 2001, Sgt.

Miller asked Officer Fields to provide dates that he could appear in court with respect to tickets he had issued.  At that time, Sgt. Miller stated that he had reviewed Officer Fields' personnel file again and noticed that he had taken a week of sick leave.  Sgt. Miller requested documentation for said sick leave from Officer Fields, who then informed Sgt. Miller that the information he sought was contained in his personnel folder and that he should consult directly with Officer Fields' supervisor, Sergeant Finkle, for that information.  At that point, Officer Fields determined that he was being targeted for harassment and retaliation by Sgt. Miller.

202. On or about August 29, 2001, Officer Fields was called to Inspector Goldston's office to review his annual performance evaluation.  The evaluation and ratings had been compiled by Sgt. Miller, who had succeeded Sgt. Finkle as Officer Fields' supervisor.  The evaluation stated, *inter alia*, that Officer Fields did not possess the requisite interpersonal skills needed for his position.  After reviewing the unsatisfactory evaluation, Officer Fields refused to sign it because of its highly prejudicial and biased content, which was entirely unrelated to his job performance.

203. On or about August 31, 2001, Officer Fields sent a memorandum to then-Chief James J. Varey in which he discussed in

detail his refutation of his annual performance evaluation. Further, on or about November 26, 2001, Officer Fields prepared a memorandum in which he enumerated six examples of targeted retaliation against him.  These examples include, but are not limited to, the following:  reassignment of work duties to weekend duty and perimeter duty during the fall and winter months (Sgt. Miller made up the schedule), being rescheduled to work on his approved day off, disputing medical documentation, and receiving a personnel performance note. It is clear from these examples that Plaintiff suffered from Defendant's racial animus, in the form of retaliation.  Officer Fields received no relief from the retaliation despite making it known to his superiors.

204. Officer Fields timely requested counseling on January 17, 2002; he acknowledged receipt of his notification of end of counseling period on February 22, 2002; he requested mediation on February 25, 2002; and a mediation session took place on March 14, 2002.  Officer Fields acknowledged receipt of his notification of end of mediation on April 25, 2002, and suit was timely filed on July 2, 2002.  Officer Fields was represented in counseling and mediation by attorneys of Gebhardt & Associates, LLP.

### Civil Action No. 02-1859

205. Plaintiff Sharon Blackmon-Malloy, an African American female, was a Capitol Police Officer from October 12, 1982, until her retirement on October 31, 2007. She is the lead class agent in Civil Action 01-2221, and was at the time of the events described below.

206. Prior to the initiation of Civil Action No. 01-2221, then-Sergeant Blackmon-Malloy protested a reduction of her on-site score for the Lieutenants' examination, and lodged numerous complaints of racial discrimination relating to that reduction. The suit, in part, alleges not only the discriminatory reduction of her score, but also that the limited number of African American Sergeants and Lieutenants in the Capitol Police is the direct result of racially discriminatory practices.

207. In Civil Action No. 01-2221, Sgt. Blackmon-Malloy also raised issues of retaliation against her for her protected activity, in the form of unwarranted performance notes and a command disciplinary report in her personnel file.

208. Sgt. Blackmon-Malloy's advocacy of the civil rights of African American and other minority Officers in the Capitol Police has been well known in the Department since at least 1990, when she was one of the initial members of the BPA. She subsequently served on the board of the BPA and also served as

73

its president for several years.  She and the BPA have been
active and visible in publicly supporting the civil rights of
African American and other minority Officers.

209. In late 2001, Sgt. Blackmon-Malloy was assigned to work
in the Department's Operations Command Center.  Under the
Department's General Order 1230, "[e]mployees are authorized to
use tobacco products only in approved areas," and shall not use
lighted tobacco products "[w]hen non-smoking employees may be
involuntarily exposed to secondhand smoke."  The Operations
Command Center is located in an open area of atrium on the
seventh floor of Department headquarters, and the Officers
assigned to the Center are stationed at a large central table
with a telephone bank, so that they can easily communicate with
each other and relay incoming calls to the Center Commander.

210. The Command Center was not designated as a smoking
area.  In fact, the entire headquarters building was a no-
smoking area, except for one room on the fourth floor that was
specially ventilated and designated as a smoking room.
Nevertheless, Officers on the seventh floor smoked heavily in
their offices and polluted the atmosphere of the atrium so badly
that non-smoking Officers such as Sgt. Blackmon-Malloy reeked of
tobacco when they left the office.

211. Sgt. Blackmon-Malloy is a life-long non-smoker.  After she reported to the Command Center, white Officers repeatedly lit cigarettes and smoked in the offices surrounding the Command Center, suffusing it with smoke, despite her repeated requests that they abide by the General Order and not smoke in unauthorized areas adjacent to the Command Center.  In late September 2001, Sgt. Blackmon-Malloy first approached Lieutenant Timothy Connors (white), a heavy smoker with an office on the seventh floor adjoining the atrium, and asked him to ensure that General Order 1230 was adhered to on the floor.  Lt. Connors said that he would ask people to stop smoking, but he took no action and the heavy smoking on the floor continued.

212. Sgt. Blackmon-Malloy then approached then-Chief James Varey (white) and asked him to enforce the General Order on the seventh floor and stop the smoking.  Chief Varey assured Sgt. Blackmon-Malloy that he would take care of the problem, but he did not do so and the fog of tobacco smoke continued to be as thick as ever.

213. After Chief Varey failed to act to enforce the General Order, Sgt. Blackmon-Malloy brought the problem to the attention of the Senate Sergeant at Arms, Alphonso Lenhardt.  Mr. Lenhardt also assured Sgt. Blackmon-Malloy that he would take care of the smoking problem, but the problem persisted.

214. As a result of being stationed in this smoke-filled environment for eight hours a day, Sgt. Blackmon-Malloy began to experience headaches, persistent coughing, nausea, loss of appetite, nasal congestion, and fatigue.  She first went to the office of her primary care physician, Joel Wilkerson, M.D., in November 2001, where she was treated by Laila N. Hirjee, M.D. Dr. Wilkerson referred her to pulmonary specialist David C. Gross, M.D., F.C.C.P.  On November 8, 2001, Dr. Gross diagnosed Sgt. Blackmon-Malloy as having a sensitivity to secondhand smoke and opined that no-smoking policies were designed to prevent the kind of symptoms Sgt. Blackmon-Malloy was experiencing.  Sgt. Blackmon-Malloy missed three days of work in November, 2001, as a result of the impact of the secondhand smoke at work, for which she filed a claim for Workers' Compensation that was accepted by the U.S. Department of Labor on July 12, 2002.

215. Knowing of Sgt. Blackmon-Malloy's public opposition to race discrimination within the Department and her participation in the EEO process, Lieutenant Connors, Chief Varey, and Sergeant at Arms Lenhardt deliberately disregarded the protests of Sgt. Blackmon-Malloy about the blatant violation of the smoking policy on the seventh floor, intentionally subjecting her to secondhand smoke to the point that she became physically ill as a result.

216. Sgt. Blackmon-Malloy timely requested counseling on April 8, 2002.  Following receipt of an end of counseling notice, Sgt. Blackmon-Malloy requested mediation, and she participated in mediation on May 22, 2002.  Sgt. Blackmon-Malloy acknowledged receipt of her end of mediation notice on June 27, 2002, and timely filed suit on September 20, 2002.

### Civil Action No. 02-3481

217. Plaintiff Leonard D. Ross, an African American male, was at all relevant times an Officer of the Capitol Police.  He is a member of the proposed class in the main case, Civil Action No. 01-2221.[2]

218. As of December 2002, Officer Ross had taken the Sergeant's examination four times.  Each time, Officer Ross scored very well on the written examination, but his score dropped drastically on the subjective oral examination, with the result that he failed to be promoted to Sergeant.  In documents submitted to the Office of Compliance in support of his request for counseling in the main case, Officer Ross made it clear that

---

[2] Although Officer Ross completed counseling and mediation for the claims raised in the main case and was a named Plaintiff in the original and First Amended Complaint, Plaintiffs do not at this time have documentary evidence that he experienced a discriminatory event within 180 days of his request for counseling in that case.  However, Defendant has been aware of his membership in the proposed class from the beginning.

he believed that his failure to score well on the oral examination was the result of racial discrimination.

219. The Capitol Police retaliated against Officer Ross for his participation in the main case by issuing him discriminatory discipline, thereby decreasing the likelihood that he could be promoted even if he scored well on the examinations in the year 2002 promotion process.

220. Officer Ross was issued a CP-534 Command Discipline Report on June 27, 2002, for allegedly discussing a pending investigation with another Officer.  The Capitol Police Department accused Officer Ross of allegedly communicating to Officer Christopher Robinson that Officer Phillip Shepperson was under internal investigation.  In fact, all Officer Ross said was that Officer Shepperson, who was living with Officer Ross's estranged wife, was driving Officer Ross's family car and interfering with his ability to see his daughter.

221. Officer Ross was issued another CP-534 Command Discipline Report on September 16, 2002, dated July 29, 2002 (presumably to replace the first CP-534, which contained a number of errors), resulting in the forfeiture of 24 hours of leave.  Although the penalty was subsequently reduced to a warning, the CP-534 remained in Officer Ross's personnel file

and would be considered in any future application for a promotion.

222. Officer Robinson informed Officer Ross that Officer Shepperson had brandished a firearm in his presence, an act which is not only in violation of police regulations but also of the criminal code.  As a sworn police officer, Officer Robinson was expected to report this serious misconduct to a superior officer.  Perhaps through inexperience, Officer Robinson did not report this misconduct, so Officer Ross reported it to his white superior, Sergeant Eric Waldow.  When Officer Ross approached Sgt. Waldow to report the brandishing of the firearm, Sgt. Waldo asked, "Are you talking about the badge incident in Georgia?" or words to that effect.  Improper display of a badge would normally be the subject of an internal investigation.  Officer Ross responded that he was not talking about improper display of a badge, but about the brandishing of a weapon.  Officer Ross' discussion of the brandishing of a weapon with Officer Robinson was no different from Sgt. Waldow's discussion of the badge-flashing incident with Officer Ross, yet Sgt. Waldow was not disciplined.

223. In issuing the CP-534 Command Discipline Report to Officer Ross, the Defendant disregarded the provisions of Section 30.02 of the Collective Bargaining Agreement, which

required the Department to summon and notify Officer Ross when it investigated his alleged misconduct, and to complete its investigation within 60 days.  Officer Ross never received notice of the beginning or completion of an investigation.  Upon information and belief, no investigation in accordance with Department procedures ever took place.

224.  Officer Ross timely requested counseling for this matter on July 23, 2002.  He acknowledged receipt of an end of counseling notice on July 29, 2002, and requested mediation the same day.  He participated in mediation and acknowledged receipt of an end of mediation notice on September 20, 2002.  He timely filed suit on December 17, 2002.

## Civil Action No. 03-1505

225. Since the filing of the Complaint in the Blackmon-Malloy proposed class action (C.A. No. 02-2221) on October 29, 2001, Plaintiff Arnold Fields has been subjected to continuing harassment based on his race, African American, and his participation as a class agent in the proposed class action.

226. On July 2, 2002, Officer Fields filed a Complaint in this Court alleging that he was retaliated against and discriminated against when he was subjected to a hostile work environment and given an unfair and inaccurate performance

appraisal.  This case was later consolidated with the Blackmon-Malloy proposed class action and was stayed on February 5, 2003.

227.  On October 7, 2002, Officer Fields learned from Sergeant Raymond Goodine that a statement that Officer Fields had refused to sign required forms was being placed in Officer Fields' yearly evaluation. There was no reason to put this statement in Officer Fields' evaluation except to harass him.

228.  On October 12, 2002, Officer Fields took leave previously approved under the Family Friendly Leave Act because his mother-in-law was undergoing surgery for a total knee replacement.  On October 15, 2002, Officer Fields received a call from Officer Richard Gossman (white), the Senate Clerk, questioning him about whether he had been on duty on October 12, 2002, for time and attendance purposes.  Officer Fields informed Officer Gossman that he had been on FFLA leave on that day.

229. On October 24, 2002, Officer Fields was relieved of his post at the East Door in the Hart Senate Office Building and informed that he was to report to headquarters, where a union representative would be waiting.  Upon his arrival at the headquarters, Sgt. Raymond Goodine informed him, "An investigation has been initiated against you regarding your whereabouts on October 12, 2002, and if you are not truthful about this information, the Department will have the right to

terminate your employment." Sgt. Goodine requested that Officer
Fields sign a statement to this effect in writing, but Officer
Fields refused to sign.

230. Officer Fields informed Sgt. Goodine that he had called
Officer Alyce Diggs, the office clerk, on October 11, 2002, and
had properly requested leave under the FFLA.  Officer Diggs then
confirmed that Officer Fields had requested FFLA.  After
speaking to Officer Diggs, Sgt. Goodine stated that there was no
need for further investigation.

231. Officer Fields then inquired of Sgt. Goodine who had
launched this baseless and harassing investigation of his leave.
Sgt. Goodine replied that he did not know, which was an unusual
answer for an investigating Officer to make.  When Officer
Fields asked to see Inspector Vickie Frye (white), he was told
he could not see her because she was in a meeting.  He then
asked to see the Captain on duty, Captain John DeLucca (white).

232. Captain DeLucca spoke to Officer Fields in a hostile
tone as soon as Officer Fields entered his office.  Captain
DeLucca peremptorily demanded to know, "Why are you here?"
despite knowing already why Officer Fields had come to see him.
Officer Fields responded, "You know why I am here," and added,
"We go way back Captain, and I categorize you as a 'racist.'"
Captain DeLucca responded that he was not and that Officer

82

Fields should watch his tone, despite the fact that Captain DeLucca had initially greeted Officer Fields in a hostile manner. Captain DeLucca then admitted that he really did know why Officer Fields had come to see him, because he stated that he was aware of the investigation and that it was initiated by Sergeant Mary Palka (white) from the Capitol detail.

233. On November 1, 2002, Officer Fields was on duty at the Rotunda in the Russell Building when he was called to the Inspector's Office to meet with Inspector Vickie Frye. Inspector Frye informed Officer Fields that because he had called Captain DeLucca a "racist," she was recommending that he be subjected to discipline, issued a CP-534, and deprived of 24 hours of pay. Although he was offered the possibility of a lesser penalty if he agreed with the charge, Officer Fields stated that he would not agree to the charge.

234. On November 6, 2002, Officer Fields and Inspector Frye met with Deputy Chief Christopher McGaffin (white). Officer Fields explained that everyone involved in the baseless investigation of his FFLA leave was white, except for Sgt. Goodine, who had stated he did not know what the investigation was about or who had initiated it. Officer Fields also informed Deputy Chief McGaffin that there had been no investigation of

Officer Glynis Senn, who is not a named class agent in the Blackmon-Malloy class, or of white Officer Frank Jones, who also had not reported for work on October 12, 2002. Deputy Chief McGaffin recommended that this issue be turned over to the Internal Affairs Division. Officer Fields was then interviewed by Sergeant Eric Waldow (white) of IAD on December 2, 2002.

235. On January 9, 2003, Officer Fields received his annual evaluation. The evaluation grade was reduced due to retaliation for his protesting the discriminatory investigation of his taking leave on October 12, 2002. Officer Fields was rated "below average" in "Acceptance of Responsibility." His evaluation grade was reduced despite the fact that the evaluation also notes that (1) while assigned to the entrances, he performs all administrative searches in a professional manner; (2) as an emergency responder, he answers the radio and handles all calls expeditiously; (3) he is prepared to handle any situation; and (4) he assisted the Senate Division by reporting to duty when all Officers were assigned long hours immediately following the 9/11 attacks.

236. On January 27, 2003, Inspector Frye informed Officer Fields that all charges under the CP-534 had been dismissed, and that he was being given a notation (CP-550) in his personnel

file.  Officer Fields disagreed with the derogatory notation and
refused to sign it.

237. The aforesaid actions taken against Officer Fields were
in retaliation for his leading role as a class agent in the
Blackmon-Malloy proposed class action and for his subsequent
Complaint of retaliation filed in this Court.

238. The aforesaid actions taken against Officer Fields
constituted a hostile, abusive work environment.

239. Officer Fields timely requested counseling on February
11, 2003, and acknowledged receipt of an end of counseling
notice on February 14, 2003.   Mediation was requested on
February 14, 2003, and a mediation session occurred on March 26,
2003.  Receipt of an end of mediation notice was acknowledged on
April 15, 2003.  Suit was timely filed on July 10, 2003.

### Civil Action No. 03-2644

240. Since the filing of the Blackmon-Malloy proposed class
action (case number 01-2221) on October 29, 2001, numerous
members of the Blackmon-Malloy class have been subjected to a
pattern of unwarranted discipline and harassment.

Regina Bolden-Whitaker

241. Regina Bolden-Whitaker had been an employee of the U.S.
Capitol Police since August 21, 1985. An African American, she
is a named Plaintiff in the Blackmon-Malloy proposed class

action.  The Capitol Police retaliated against Officer Bolden-Whitaker for her participation in the suit.  On April 10, 2003, she was asked to sign a deputation form she did not recognize. Since she did not fully understand the effect of that document, and because it was not adequately explained to her, Officer Bolden-Whitaker did not wish to sign it at that time and declined to do so.  Officer Bolden-Whitaker was immediately suspended.

242. Management had previously given a list to Officer Bolden-Whitaker of the documents she was expected to sign as a an employee; the deputation form was not on that list.  On the day following Officer Bolden-Whitaker's suspension, April 11, 2003, Deputy Chief McGaffin (white) explained the deputation form to Officer Bolden-Whitaker, and she signed it and was reinstated.

243. Nevertheless, on April 29, 2003, Lieutenant Harry Wall (white) signed a Form CP-535 Request for Disciplinary Action accusing Officer Bolden-Whitaker of refusing to obey orders because she had declined to sign the document, and he forwarded it to the Internal Affairs Division for investigation. A Form 535 becomes part of an Officer's permanent record and can serve as the basis for termination for any future offense.

244. Officer Bolden-Whitaker timely requested counseling on July 11, 2003, and acknowledged receipt of an end of counseling notice on August 11, 2003. Mediation was requested on August 11, 2003, and a mediation session occurred on September 4, 2003. Officer Bolden-Whitaker acknowledged receipt of an end of mediation notice on September 30, 2003, and suit was timely filed on December 29, 2003.

Arnold Fields

245. In addition to Officer Fields' participation in the case number 01-2221, he also filed two individual retaliation complaints, described above, case numbers 02-1346 and 03-1505. The Capitol Police further retaliated against Officer Fields for his participation in these complaints.

246. On March 25, 2003, there were two emergency evacuation alarms in the Hart and Dirksen Senate Office Buildings. Officer Fields was on duty during the first alarm and reported to the intersection of First Street and Massachusetts Avenue, N.E., to direct traffic. When the second alarm sounded, Officer Fields was on his uncompensated lunch break inside the Dirksen breakroom with six other Officers. They did not hear the alarm. Sergeant Dana Sundberg (white) entered the room and told the Officers of the alarm, at which point Officer Fields proceeded to the staging area, and then to First and Massachusetts.

247. On March 27, 2003, Officer Fields was called to a meeting with Sergeant J.T. Moriarty and Sergeant Norman (both white), who were investigating the evacuation. Officer Fields was asked to provide a written statement describing his actions during the evacuation.  He asked to be questioned orally instead.  The Sergeants agreed and questioned Officer Fields. At no point did they issue an order to Officer Fields to provide a written statement.

248. On April 30, 2003, Captain Delucca (white) signed two CP-535 Requests for Disciplinary Action charging Officer Fields with misconduct, and he forwarded them to the Internal Affairs Division for investigation.  The first Request accused Officer Fields of violating the rules of conduct by failing to respond to an emergency evacuation on March 25, 2003.  The second Request accused him of disobeying an order to provide a written statement.

249. Officer Fields timely requested counseling on July 1, 2003, and acknowledged receipt of an end of counseling notification on August 6, 2003.  Officer Fields requested mediation on August 6, 2003, and a mediation session took place on September 4, 2003.  Officer Fields acknowledged receipt of an end of mediation notice on September 30, 2003.  Suit was timely filed on December 29, 2003.

Ave Maria Harris

250. Officer Harris, and African American female, is also a Plaintiff in case number 01-2221.  The Capitol Police has retaliated against Officer Harris for her participation in that suit.

251. Like Officer Fields, Officer Harris was on her lunch break in the Dirksen breakroom during the second evacuation alarm on March 25, 2003, and did not hear the alarm.  After being notified of the evacuation by Sergeant Sundberg, she left the breakroom, exited the Dirksen Building, and reported to Inspector Frye (white) and Captain Delucca.  Not receiving any tasks from them, she waited outside until her break ended, then returned to her post.

252. On March 27, 2003, Officer Harris was interrogated in an intimidating manner by Sergeant Moriarty and Sergeant Norman.

253. On May 2, 2003, during roll call, several Officers - those being investigated regarding the March 25 evacuation - were asked to stand by after roll call. Captain Delucca told Officer Harris that he would be submitting a CP-535 Request for Discipline regarding her. On July 17, 2003, Captain Delucca signed a CP-535 Request for Disciplinary Action accusing Officer Harris of violating the rules of conduct by failing to respond to an emergency evacuation on March 25, 2003.

254. Officer Harris timely requested counseling on July 29, 2003, and acknowledged receipt of an end of counseling notice on August 11, 2003.  Mediation was requested on August 11, 2003, and a mediation session occurred on September 4, 2003.  Officer Harris acknowledged receipt of an end of mediation notice on September 30, 2003.  Suit was timely filed December 29, 2003.

Duvall Phelps

255. Duvall Phelps, an African American male, is also a Plaintiff and proposed class agent in case number 01-2221. Additionally, he is known to Defendant as one who has assisted other minority Officers of the Capitol Police in bringing discrimination claims, even following his forced retirement from the Capitol Police on October 31, 2000.  The Capitol Police has retaliated against Officer Phelps for his participation in the lawsuit and for his protected activity in aid of other Officers.

256. In January 2002, Officer Elizabeth Burtt (white) threatened to deny retired Officer Phelps access to the buildings of the Capitol complex.  Before this, the standing practice was to allow building access to retired Members of Congress and retired Capitol Police Officers.  On January 23, 2002, Sergeant Givens (white) instructed Officer Dale Veal to deny Mr. Phelps building access.  Sergeant Givens later admitted that retirees are allowed building access.

257. On January 25, 2003, Mr. Phelps was in the Rayburn House Office Building discussing EEO matters with Timothy Hunter. Two white Officers, Sergeants Leonard and Hogan, observed Mr. Phelps and ordered an African American Officer to escort Mr. Phelps out of the building. Mr. Phelps asked to be escorted to the Capitol Police's House Division office instead, and he was escorted there, where he spoke with Sgt. Leonard. Sgt. Leonard informed Mr. Phelps that he had received a call from another official, who had presumably seen Mr. Phelps, asking, "Is that Phelps?" Sgt. Leonard later told another Officer that he was tired of Mr. Phelps being in the building.

258. On February 2, 2003, Lieutenant Rosencrans announced at roll call that a certain retiree was illegally entering the buildings, and that he should be denied access and required to park his car where the public parks. By contrast, Capitol Police officials in the House Division have requested that Officer Robert Braswell park the vehicle of a particular white Capitol Police retiree named Schwartz in the Upper D Street Garage - a restricted parking garage reserved for staff - when that retiree visits Capitol Hill.

259. On July 20 or 21, 2003, items were stolen from Mr. Phelps' vehicle, including his Capitol Police credentials and badge. Lead Class Agent Sharon Blackmon-Malloy's vehicle was

91

also tampered with in the same timeframe. Mr. Phelps' credentials were turned in to the Capitol Police on July 31 or August 1, 2003.

260. Mr. Phelps timely requested counseling on August 11, 2003, and acknowledged receipt of an end of counseling notice on August 19, 2003. Mediation was requested on August 19, 2003. A mediation session took place, and Mr. Phelps acknowledged receipt of an end of mediation notice on October 2, 2003. Suit was timely filed on December 29, 2003.

261. White Officers, who are not members of the Blackmon-Malloy proposed class, have not been subjected to similarly retaliatory and discriminatory treatment. White Officers who allegedly failed to follow the rules of conduct have not been issued Form CP-535's. White retired Officers have not been denied access to Capitol complex buildings, or otherwise harassed.

### Civil Action No. 04-0320

262. This action was initially filed as a proposed class action, and all of the class allegations recited in the original Complaint are incorporated herein by reference.

263. Plaintiff Class Agents Kendrick Young, Tyrone D. Brooks, Sandra Brown-James, Gary D. Goines, Tammie D. Green, John N. Johnson, Governor Latson, Jr., Danny McElroy, Brent A.

Mills, Conrad Smith, Reginald W. Waters, Richard R. Webb, and Frank W. Wilkes, Jr., are African American Officers, all of whom were employed by Defendant on the date of initial filing and were candidates for promotion to Sergeant in the 2002-2004 promotion process.  Plaintiffs Dale Veal and Larry Ikard are members of the proposed class who exhausted their administrative remedies (as further described in paragraphs 291, 292,and 294 below) but were not initially named Plaintiffs in this proposed class action.

264. Plaintiff Class Agent Sharon Blackmon-Malloy was at the time of the initial filing a Sergeant employed by Defendant and a candidate for promotion to Lieutenant in the 2002-2004 promotion process.

265. Plaintiffs are or were also class agents or members of the proposed class in case number 01-2221.

266. Every two years the U.S. Capitol Police administers a promotional examination for Officers seeking promotion to Sergeant ("Sergeant's exam") and an examination for Sergeants seeking promotion to Lieutenant ("Lieutenant's exam").  The results of these exams are posted on a list and used as the basis for making promotions for the next two years.

267. Both the Sergeant's exam and the Lieutenant's exam for the 2002-2004 period consisted of two parts: a Written

Examination (or "Knowledge Test") and Simulation Exercises (or "Skills Assessment").

268. The Written Examinations for both Sergeant and Lieutenant candidates were administered by the Defendant and its testing contractor on February 22, 2003.

269. The Simulation Exercises portion of the Sergeant's exam was administered by the Defendant and its testing contractor on May 10, 2003.

270. The Simulation Exercises portion of the Lieutenant's exam was administered by the Defendant and its testing contractor on May 11, 2003.

271. As demonstrated below, the Defendant bent the rules in order to promote favored white candidates for Sergeant and Lieutenant, to the detriment and disadvantage of the Plaintiffs listed herein and other similarly situated African American Officers and Sergeants seeking promotion.

Sergeant's Exam

272. The Capitol Police surreptitiously arranged for Officer Kim Bolinger (white) and her husband, Officer Andrew Bolinger (white), to take the Simulation Exercises on May 15, 2003, five days after the scheduled test date of May 10, 2003.  This special accommodation would have given the Bolingers more time

94

to prepare for the examination and the opportunity to speak with Officers who had already taken the examination.

273. Upon information and belief, Defendant's testing contractor recommended against the later Sergeant's exam date for the Bolingers, but was overruled by Defendant's top officials.

274. Defendant created an "advice of counsel" defense as the reason for this preferential treatment, citing the Family Medical Leave Act as justification.  This defense was contrived.

275. After the administration of the May 10, 2003, Sergeant's exam, but before May 15, 2003, Plaintiffs learned of the exception being made by the Defendant for the Bolingers. Plaintiffs Danny L. McElroy and Brent A. Mills, along with Officer Stephanie Haney (white female), met with the Capitol Police Chief on May 14, 2003, in an attempt to dissuade him from allowing any candidates to take the Sergeant's exam after the scheduled date, since it would provide an unfair advantage to those who could take it later.  Officer Haney informed Defendant that in the previous testing cycle, she had requested to take the Sergeant's exam late, because of a condition related to her pregnancy, but management had  denied her request.

276. Confronted with the furor over this preferential treatment, and aware of the numerous allegations of systematic

race discrimination by the U.S. Capitol Police, Defendant canceled the special May 15, 2003, Sergeant's exam date for the Bolingers.  Instead, it was announced that a new Simulation Exercise/Skills Assessment would be developed and administered to the Bolingers and a few other Sergeant candidates in September 2003.  This decision contradicted both the Department's past practice (*e.g.*, the Stephanie Haney case) and, on information and belief, the testing contractor's procedures and recommendation to the U.S. Capitol Police.

277. On February 13, 2004, Kim Bolinger was promoted to Sergeant based upon her score on the 2003 Sergeant's exam, including the late Simulation Exercises that she was allowed to take after the scheduled date of May 10, 2003.

278. Kim Bolinger was promoted to Sergeant as a result of this preferential treatment.

279. As Sergeant, Kim Bolinger receives higher pay than she did as an Officer, and she is paid more than Plaintiffs and other Sergeant candidates who were not promoted.

280. As Sergeant, Kim Bolinger has supervisory authority over rank-and-file Officers.  Upon information and belief, she has supervisory authority over certain Plaintiffs and other Sergeant candidates who played by the rules and took the

Simulation Exercises on the May 10, 2003, scheduled test date, but who were not promoted.

281. Other Sergeant candidates who were allowed to take the Simulation Exercises in September 2003 have not been promoted.

282. Plaintiffs and numerous other African American Sergeant candidates did not receive the same benefit - promotion to Sergeant - or the same special treatment that Defendant provided to Kim Bolinger.

<u>Lieutenant's Exam</u>

283. Defendant also provided preferential treatment to white Sergeant Kathryn Stillman, a candidate for Lieutenant, by allowing her to take the Simulation Exercises portion of the Lieutenant's exam in September 2003, and the Written Test in October 2003. Thus, the white sergeant had several more months to prepare for the exam than those, like Sgt. Blackmon-Malloy, who took both portions of the Lieutenant's exam on the regularly scheduled dates.

284. On February 13, 2004, the white Sergeant was promoted to Lieutenant based upon her score on the 2003 Lieutenant's exam, both parts of which she was allowed to take late.

285. On information and belief, Defendant's provision for a sergeant to take the Lieutenant's exam late was against the

Department's past practice and the testing contractor's procedures and recommendation.

286. The Lieutenant thus promoted received higher pay than she did as a Sergeant, and was paid more than then-Sgt. Blackmon-Malloy and other Lieutenant candidates who were not promoted during the 2002-2004 promotion cycle.

287. The Lieutenant thus promoted had supervisory authority over Sergeants and rank-and-file Officers, including over Lieutenant candidates who took both portions of the Lieutenant's exam on the regularly scheduled dates but who were not promoted.

288. Other facts, described in paragraph 289, below, support Plaintiffs' contention that the process was rigged to benefit the white Sergeant over the African American Sgt. Blackmon-Malloy and other candidates.

289. Although Sgt. Blackmon-Malloy was then an Instructor in Defendant's Training Services Bureau, where she trained new recruits as well as Officers, she improbably received a score of 0.5 on the Process Video Scenario Exercise.  This score did not accurately reflect the full range of her abilities, including instructing, directing, coaching, supervising, delegating, scheduling, and coordinating recruits.  This unusually low score is also improbable considering that Sgt. Blackmon-Malloy received the highest score on the Skills Assessment's written

exercise: a 4.1, within the range categorized as "Outstanding." Sgt. Blackmon-Malloy was ranked 17 out of the 25 Sergeants who took the regularly scheduled Lieutenant's exam.  Ten candidates were promoted to Lieutenant, including Sgt. Stillman.  If Sgt. Blackmon-Malloy had received a 1.5 or higher on the Process Video Scenario Exercise, she would have been ranked among the top 10 candidates for  promotion to Lieutenant.  She never received individualized feedback about her performance on the exam.

290.  Plaintiffs and other African American Lieutenant candidates did not receive the same benefit - promotion to Lieutenant - or the same special treatment that Defendant provided to the white Sergeant.

291. Plaintiffs Kendrick Young, Tyrone Brooks, Sandra Brown-James, Tammie D. Green, John N. Johnson, Governor Latson, Danny McElroy, Conrad Smith, Reginald W. Waters, Frank Wilkes, and Dale Veal timely requested counseling on October 9, 2003, received end of counseling notices on October 15, 2003, requested mediation on October 15, 2003, participated in mediation sessions during late October 2003, and acknowledged receipt of end of mediation notices on December 5, 2003.

292. Plaintiffs Gary D. Goines, Brent A. Mills, Richard R. Webb, and Larry Ikard timely requested counseling on November 4,

2003, received end of counseling notices on December 5, 2003, requested mediation on December 5, 2003, participated in mediation sessions during December or early January, and acknowledged receipt of end of mediation notices on January 9, 2004.

293. Sharon Blackmon-Malloy timely requested counseling on October 27, 2003; notification of end of counseling was sent to her on  November 28, 2003; she requested mediation on December 4, 2003, participated in mediation on December 23, 2003, and acknowledged receipt of an end of mediation notice on January 9, 2004.

294. Suit was timely filed on February 26, 2004.

### Civil Action No. 04-0943

295. On August 28, 2003, Lieutenant Frank Adams, an African American male and a Plaintiff in Civil Action 01-0221, was denied training in the John Hopkins University Police Executive Leadership Program (PELP).  Lt. Adams met the qualifications stated in the training announcement, *i.e.,* Lieutenants and above with at least a bachelor's degree were eligible to participate in the program, but Lt. Adams was not permitted to participate.

296. On September 11, 2003, Lt. Adams was denied training at the "Management College" through The Institute for Law Enforcement Administration. Four white Lieutenants were selected

100

for the training, although there was no announcement or competitive process. Lt. Adams applied for the same training, but his application was denied without explanation.

297. On October 27, 2003, Lt. Adams was denied training at the FBI National Academy, despite the fact that he qualified for the program according to the specifications of the training announcement.

298. The denial of Lt. Adams' requests for training, in programs for which he qualified, and in which white Lieutenants were permitted to participate, was due to racial discrimination and retaliation for Lt. Adams' participation in Civil Action No. 01-2221 and other opposition to racial discrimination in the Department.

299. In October and November 2003, Lt. Adams was subjected to a hostile work environment, including the following events: Division Commander Callaway made false statements about Lt. Adams in an attempt to impugn Lt. Adams' reputation and to enhance his own, and attempted to prevent Lt. Adams from being transferred to a career-enhancing assignment. Lt. Adams was also required to work extended hours with only compensatory time (not overtime) available, when white Officers who previously occupied his position were not required to do so. He was denied transfers to available positions for which he qualified, whereas

white Officers were permitted such transfers, and was involuntarily transferred from desired positions to less desirable positions. The hostile work environment was motivated by racial discrimination and by retaliation for Lt. Adams' participation in Civil Action No. 01-2221 and other opposition to racial discrimination in the Department.

300. Lt. Adams timely requested counseling on December 9, 2003, and requested mediation on January 24, 2004. He attended a face-to-face mediation session on February 27, 2004, in which he provided notice of his claims. Mediation ended on March 16, 2004, and Lt. Adams received an end of mediation notice. He timely filed Civil Action No. 04-0943 on June 6, 2004.

## Civil Action No. 05-0491

301. Lt. Frank Adams was subjected to a hostile work environment on the basis of race and in retaliation for his continued opposition to discrimination, in that on June 23, 2004, white management officials placed a newly promoted white Lieutenant over him as his superior, despite the fact that the white Lieutenant was junior to Lt. Adams in seniority and was known to have previously engaged in racially motivated harassment of Lt. Adams.

302. Lieutenant Adams sought promotion to Captain but was not promoted due to discrimination in the administration and

102

scoring of the promotion process.  He received notice of his nonpromotion on July 1, 2004.

303. Lt. Adams repeatedly sought a transfer from the hostile work environment but was denied it, while white Lieutenants continued to receive requested transfers to career-enhancing positions.

304. Lt. Adams timely requested counseling on August 16, 2004, and requested mediation on September 20, 2004.  He attended a mediation session on September 20, 2004, during which he provided Defendant notice of his claims.  Mediation ended on December 20, 2004, and Lt. Adams received an end of mediation notice.  He timely filed the Complaint in Civil Action No. 05-0491 on March 10, 2005.

### Civil Action No. 06-0653

305. Lt. Frank Adams was again denied promotion to Captain on November 24, 2005, due to discrimination in the administration and scoring of the promotion process and in retaliation for his continued opposition to discrimination.

306. Throughout the 180 days preceding his request for counseling, Lt. Adams was denied training or other career-enhancing opportunities which he requested, while white Officers were granted such opportunities.  These denials were based on

race and on retaliation for Lt. Adams' continued opposition to discrimination.

307. Lt. Adams timely requested counseling on December 8, 2005, and requested mediation on December 15, 2005. He attended a mediation session on January 13, 2006, at which he provided Defendant with notice of his claims. Mediation ended on January 17, 2006, and Lt. Adams received an end of mediation notice. He timely filed the Complaint in Civil Action No. 06-0653 on April 10, 2006.

## Damages

308. The Plaintiffs listed herein have suffered injuries and harms by reason of the discriminatory and retaliatory acts described above. These injuries and harms include loss of rank and/or compensation, damage to their careers, damage to their reputations, humiliation and emotional distress, loss of enjoyment of life, and pain and suffering.

## Additional Allegations of Discrimination

309. All allegations of fact in Plaintiffs' Joint Second Amended Complaint dated January 29, 2003, and Plaintiffs' Joint Fourth Amended Complaint dated May 10, 2010, which are not specifically set forth in this Complaint and which are not inconsistent with this Complaint, are hereby incorporated by reference and made a part of this Complaint.

310. All allegations of fact in the Complaints filed in Civil Actions Nos. 02-1346, 02-1859, 02-2481, 03-1505, 03-2644, 04-0320, 04-0943, 05-0491, and 06-0653, which are not specifically set forth in this Complaint and which are not inconsistent with this Complaint, are hereby incorporated by reference and made a part of this Complaint.

## Class Allegations

311. This action is properly maintainable as a class action under Rule 23(a) of the Federal Rules of Civil Procedure.

312. The members of the proposed class are sufficiently numerous to make joinder impracticable.

313. Plaintiffs' claims raise questions of law or fact common to the class. These common questions include, but are not limited to:

> a.   Whether Defendant subjected the Plaintiffs listed herein to a hostile work environment based on their race (African American).
>
> b.   Whether Defendant discriminated against certain of the Plaintiffs listed herein in promotions and promotional and assignment opportunities based on their race (African American).
>
> c.   Whether Defendant discriminated against certain of the Plaintiffs listed herein in discipline and

terminations based on their race (African American).

d.   Whether Defendant retaliated against Plaintiffs listed herein because of their protected activity in filing discrimination complaints and opposing discrimination.

314. The claims of the Plaintiff Class Agents and named class members are typical of those advanced by the class.

315. The named Plaintiffs and counsel will properly represent the interests of the class and its members.

316. The class action is also properly maintainable pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) because Defendant has acted on grounds generally applicable to the class, making appropriate final injunctive relief or declaratory relief with respect to the entire class and the questions of law and fact common to members of the class predominate over questions affecting individual members and a class action is superior to other available methods for the fair and efficient resolution of this controversy.

## Causes of Action

### Count I

317. The U.S. Capitol Police have subjected the Plaintiffs listed herein to a discriminatory hostile work environment based

on their race (African American) in violation of the Congressional Accountability Act, 2 U.S.C. § 1311, *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.*, which it applies.

## Count II

318. The U.S. Capitol Police have discriminated against certain of the Plaintiffs listed herein based on their race (African American) in assignments, training, promotions, discipline, and terminations in violation of the Congressional Accountability Act, 2 U.S.C. § 1311, *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.*, which it applies.

## Count III

319. The U.S. Capitol Police have unlawfully retaliated against certain of the Plaintiffs listed herein because Plaintiffs have engaged in activity protected by the Congressional Accountability in violation of the Congressional Accountability Act, 2 U.S.C. § 1311, *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.*, which it applies.

## Relief Requested

320. Wherefore, Plaintiffs respectfully pray this Court to grant the following relief:

A. Entry of a permanent injunction requiring the Defendant to cease all of the discriminatory and retaliatory practices described herein, including a requirement to

- create a standard protocol for candidates to prepare for written promotion examinations, including equal provision of study materials and study preparation classes to all candidates regardless of race;

- create a standard protocol for the non-written portions of promotion examinations that prevents the consideration of criteria not announced for the examination and prevents consideration of the race of the candidate;

- create a standard protocol for the publication to Officers of available training and of vacancies for specialty assignments;

- create a standard protocol for the filling of vacant specialty assignments that prevents the consideration of criteria not announced for the position and prevents consideration of the race of the candidate;

- create a standard protocol that insures against unequal assignments based on an Officer's race;

- create a standard protocol for the assignment of overtime;

- create a standard protocol that insures against unequal discipline based upon an Officer's race; and

· create a standard protocol that insures against unequal referral to or use of the Internal Affairs Division based upon race.

B. Continued supervision by this Court of the Defendant's implementation of the injunctive relief ordered, for a period not to exceed the length of time that this case has been pending in federal court.

C. Retroactive promotion and back pay for all Plaintiffs herein who were discriminatorily denied promotion.

D. Back pay for all Plaintiffs herein found to have been discriminatorily denied overtime pay or hazardous duty pay.

E. Priority placement for specialty assignments for all Plaintiffs herein who were discriminatorily denied specialty assignments for which they applied or who were discriminatorily denied the opportunity to apply for specialty assignments.

F. Reinstatement of Plaintiff Duvall Phelps and back pay for the period during which he was involuntarily retired.

G. The maximum allowable damages to compensate all Plaintiffs herein for the emotional distress and humiliation they suffered due to Defendant's discriminatory practices.

H. Payment of reasonable attorneys' fees and the costs and expenses of this action, including the consolidated cases.

Respectfully submitted,

By:  /s/ Lenore C. Garon
     LENORE C. GARON
     (D.C. Bar No. 172205)
     VALENCIA R. RAINEY
     (D.C. Bar No. 435254)
     DANIEL K. GEBHARDT
     (D.C. Bar No. 975703)
     GEBHARDT & ASSOCIATES, LLP
     1101 17th Street, N.W., Suite 807
     Washington, DC 20036-4716
     (202) 496-0400 (office)
     (202) 496-0404 (fax)


By:  /s/ Nathaniel D. Johnson
     NATHANIEL D. JOHNSON
     The Law Firm of
         Nathaniel D. Johnson, L.L.C.
     10665 Stanhaven Place
     Suite 3101
     White Plains, MD 20695
     301-645-9103 (office)
     301-932-8290 (fax)

July 10, 2013          Counsel for Plaintiffs