**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SHARON BLACKMON-MALLOY,
*et al.*,

                    Plaintiffs,

v.

UNITED STATES CAPITOL POLICE
BOARD,

                    Defendant.

Civ. Action No. 01-2221
(EGS)

<u>**MEMORANDUM OPINION**</u>

## I.  Introduction

Plaintiffs, a group of African American Capitol Police Officers, allege that they suffered racial discrimination, retaliation, and a hostile work environment, in violation of the Congressional Accountability Act ("CAA"), 2 U.S.C. § 1301, *et seq.*, during their employment with the U.S. Capitol Police ("Defendant" or "the Department"). *See* Fourth Amended Complaint ("FAC"), ECF No. 278.[1] Pending before the Court are sixteen motions to dismiss claims from Plaintiffs: (1) Frank Adams ("Lieutenant Adams"), (2) Sharon Blackmon-Malloy ("Lieutenant Blackmon-Malloy"), (3) Regina Bolden-Whitaker ("Officer Bolden-

---

[1] When citing electronic filings throughout this Opinion, the Court refers to the ECF header page numbers, not the page numbers of the filed documents, unless the documents do not include ECF header page numbers, in which case the page numbers of the filed documents are used instead.

Whitaker"), (4) Tyrone Brooks ("Officer Brooks"), (5) Arnold
Fields ("Officer Fields"), (6) Tammie Green ("Officer Green"),
(7) Ave Maria Harris ("Officer Harris"), (8) Larry Ikard
("Sergeant Ikard"), (9) Governor Latson ("Officer Latson"), (10)
Kevin Matthews, Sr. ("Officer Matthews"), (11) Danny McElroy
("Officer McElroy"), (12) Luther Peterson ("Officer Peterson"),
(13) Reginald Waters ("Officer Waters"), (14) Richard Webb
("Officer Webb"), (15) Frank Wilkes ("Officer Wilkes"), and (16)
Kendrick Young ("Officer Young") (collectively, "Plaintiffs");
and two motions to correct the claims of Officer Brooks and
Officer Latson.

Upon careful consideration of the motions, the oppositions,
the replies thereto, the applicable law, and the entire record,
the Court **GRANTS** the two motions to correct; **GRANTS** Defendant's
motions to dismiss the claims listed in Appendix C; **DENIES**
Defendant's motions to dismiss the claims listed in Appendix B;
and **DISMISSES** *sua sponte* Officer Waters' claim for hostile work
environment, which is also listed in Appendix C, for lack of
subject matter jurisdiction. The Court will only allow
plaintiffs listed in Appendix D to proceed in this action, and
they will be permitted to proceed only as to the claims listed
in that chart.

## II.  Background

This main case, *Blackmon-Malloy v. U.S. Capitol Police Bd.*
("*Blackmon-Malloy*"), No. 1-2221, began in 2001 as a proposed
class action by numerous Black officers in the Department,
alleging various incidents of racial discrimination,
retaliation, and hostile work environment. *See generally* FAC,
ECF No. 278. Several plaintiffs from *Blackmon-Malloy* filed
additional suits against the Department with new allegations of
discrimination, retaliation, and/or hostile work environment
over the next several years. As relevant to the current motion
to dismiss, these suits include *Adams v. U.S. Capitol Police Bd.*
("*Adams I*"), No. 4-943; *Adams v. U.S. Capitol Police Bd.* ("*Adams
II*"), No. 5-491; *Adams v. U.S. Capitol Police* ("*Adams III*"), No.
6-653; *Blackmon-Malloy v. U.S. Capitol Police Bd.* ("*Blackmon-
Malloy II*"), No. 2-1859; *Bolden-Whitaker v. U.S. Capitol Police
Bd.* ("*Bolden-Whitaker*"), No. 3-2644; *Fields v. U.S. Capitol
Police Bd.* ("*Fields I*"), No. 2-1346; *Fields v. U.S. Capitol
Police Bd.* ("*Fields II*"), No. 3-1505; and *Young v. U.S. Capitol
Police Bd.* ("*Young*"), No. 4-320.

The following factual background provides a brief overview
of the allegations from the various suits, with additional
details in the analysis sections pertaining to each Plaintiff's
individual claims. The procedural background provides a brief
overview of the case, focusing on the most recent procedural

developments as they pertain to the current motions to dismiss. A more comprehensive procedural history can be found in this Court's 2016 opinion regarding subject matter jurisdiction. *See* Mem. Op. ("12(b)(1) Op."), ECF No. 429 at 2-35.

### A. Factual

#### 1. General Environment

The Court assumes the following facts alleged in the Fourth Amended Complaint ("FAC") to be true for the purposes of deciding this motion and construes them in Plaintiffs' favor. *See Baird v. Gotbaum* ("*Baird II*"), 792 F.3d 166, 169 n.2 (D.C. Cir. 2015). For years, Black officers were "subjected to racist slurs, insults, and threats" throughout the Department. FAC, ECF No. 278 ¶ 17. White officers often referred to African Americans—both fellow officers and members of the public—as "Huks" and "gangsters." *Id.* ¶ 18. They called the D.C. Metropolitan Police Department the "ghetto police." *Id.* And they referred to other officers, who were friendly with African American officers, as "Huk Lovers," "Friends of Gangsters," or "FOGs." *Id.* ¶ 20.

Some units in the Department were worse than others. For example, officers from the K-9 Unit reportedly used the N-word "freely." *Id.* ¶ 21. And while then-Officer Ikard worked there, the Unit had two black-colored dogs. *Id.* ¶ 19. One of which, was named "Ike," the same as then-Officer Ikard's nickname, and the

4

other of which was named "Huk." *Id.* "[W]hite Officers of the K-9 unit" would shout "Ike" at the dog "to demean and humiliate [then-]Officer Ikard." *Id.* And the Unit "backed down" from the name "Huk" "in response to outrage from Black Officers." *Id.*

In another instance in 2000, General Counsel John Caulfield ("Mr. Caulfield"), who gave "advice on discipline and promotions in the department," used the N-word toward a Virginia cab driver. *Id.* ¶ 24. Despite protests from Black officers, Mr. Caulfield "returned to work without incident." *Id.* The fact that these slurs were "commonly employed by the white Officers of the U.S. Capitol Police," affected many of the Black officers in the Department. *Id.* ¶ 25; FAC—Ex. 1, ECF No. 278-1 (listing over 100 "Black Officers whose work environments were affected").

In addition to the offensive language, several racist actions were perpetuated against Black officers, including use of a "hangman's noose," "a swastika," "death threats," "unprovoked traffic stops of Black Officers by white Officers," and "bear hunting" where Black officers were subjected to false write-ups. *Id.* ¶ 26. These actions "cast a pall of fear and intimidation over other Black Officers who were aware of what had occurred." *Id.*; FAC—Ex. 2, ECF No. 278-2 (listing over 50 "Black Officers who were aware of what had occurred").

### 2. Promotions

One particular area of concern was the promotion of officers throughout the Department. As of February 2001, white officers made up 67% of the force but 84% of the high-ranking officers. *Id.* ¶ 44. Black officers made up 29% of the force but only 13% of the high-ranking officers. *Id.* As of 2002, "no Black Officer on the U.S. Capitol was in the department's developmental pool for high-ranking Officers." *Id.* ¶ 50.

Furthermore, the comments of several Department officials led officers to question the fairness of the promotion process. For example, a high-ranking official of the Department informed a group of managers that he "wanted to control the Officers who were promoted, so some Officers applying for promotions would always miss the required score by a few points." *Id.* ¶ 49. Additionally, former Chief Gary Abrecht stated that "Blacks can't compete" and "Blacks can't take tests." *Id.* ¶ 57.

Every two years, the Department administers examinations for officers seeking promotion to Sergeant and Lieutenant. *See* Class Action Compl., *Young v. U.S. Capitol Police Bd.*, No. 4-320 ("*Young* Compl."), ECF No. 1 ¶ 10.[2] In the 2000 promotion process, then-Sergeant Blackmon-Malloy sought a promotion to Lieutenant.

---

[2] Docket materials from the consolidated cases are cited in full on their first mention and are subsequently cited with only their short name and pincite (without an ECF number) to avoid confusion with the docket numbers from the main case.

*Id.* ¶ 47. She received an on-site score of 75, but her score was later recorded and posted as a 69, which "impacted her overall score and resulted in her not being promoted." *Id.* When then-Sergeant Blackmon-Malloy inquired about the change, she was told that "there was an error in the calculation of her on-site score." *Id.* ¶ 48.

Several officers complained of unfairness in the 2002 promotion process. For the 2002-2004 period, the Sergeant's and Lieutenant's examinations had two parts: a written exam and a simulation exercise. *Young* Compl. ¶ 11.

For the Sergeant's exam, the simulation exercise was administered to most candidates on May 10, 2003. *Id.* ¶¶ 13, 20. However, Chief Terrance Gainer ("Chief Gainer") allowed two white candidates and several other candidates to take the simulation exercise on a later date. *Id.* ¶¶ 16, 20. The two white candidates were originally scheduled to take the exam on May 15, 2003, five days after the regularly scheduled test. *Id.* ¶ 16. But after several officers complained about potential unfairness, Chief Gainer cancelled the May 15 exam, developed a new exam, and then administered that exam to several candidates in September 2003. *Id.* ¶¶ 19-20. One white officer, who was permitted to take the exam on the later date, was promoted to Sergeant in February 2004. *Id.* ¶ 21.

For the Lieutenant's exam, one white sergeant was allowed
to take both portions of the exam in Fall 2003, several months
after the regularly scheduled exam dates. *Id.* ¶¶ 12, 14, 28.
This sergeant was then promoted to Lieutenant based on her
score. *Id.* ¶ 32. Furthermore, during this exam process, then-
Sergeant Blackmon-Malloy received a score of 0.5 on a portion of
the exam, which caused her to be ranked 17 out of 25 sergeants.
*Id.* ¶ 36. The score was "surprising" since she received the
"highest score" on another part of her exam and was categorized
within the range of "Outstanding" in that portion of the exam.
*Id.* Then-Sergeant Blackmon-Malloy was never given
"individualized feedback about her performance on the exam." *Id.*

Beyond contentions with the general promotion process,
several Black officers recount incidents where they were passed
over for specific positions. For example, Lieutenant Adams was
denied promotion to the rank of Captain. *See* Compl. *Adams v.
U.S. Capitol Police Bd.*, No. 5-491 ("*Adams II* Compl."), ECF No.
1 ¶ 11. Then-Officer Ikard was passed over for a vacant position
in the K-9 Unit from 1999-2001 "[d]espite his qualifications for
the position." *See* Joint Second Am. Class Action Compl. ("SAC"),
ECF No. 51 ¶ 27. And Officer Webb was also denied a position
with the K-9 Unit around the same time period "in favor of a
less qualified white applicant." FAC, ECF No. 278 ¶ 21.

### 3. Discipline

Many Black officers also described incidents involving disparities in discipline. For example, Lieutenant Adams was subjected to several Internal Affairs investigations based on "untruthful and unsupported allegations against him," but the Department "refused to investigate his charges against white subordinate Officers." FAC, ECF No. 278 ¶ 31. Then-Sergeant Blackmon-Malloy received numerous CP-550 performance notes in her personnel folder for "such a minor infraction that there should not have been any entries in her personnel jacket" and a CP-534 command discipline report for "disagreeing with the five CP-550 performance notes." *Id.* ¶ 70. Officer Bolden-Whitaker was "immediately suspended" when she refused to sign a form that she "did not recognize," "did not fully understand the effect of," and "was not adequately explained to her." First Am. Class Action Compl. Challenging Retaliation, *Bolden-Whitaker v. U.S. Capitol Police Bd.*, No. 3-2644 ("*Bolden-Whitaker* Compl."), ECF No. 21 ¶ 17. Officer Fields was reprimanded and investigated for his use of family leave while a white officer was not investigated for failing to report to work on the same day. *See* First Am. Compl., *Fields v. U.S. Capitol Police Bd.*, No. 3-1505 ("*Fields II* Compl."), ECF No. 8-2 ¶¶ 12-14, 18. Additionally, Officer Fields and Officer Harris were investigated by Internal Affairs for over a year and a half when they failed to hear an

9

alarm and evacuate while they were on break during a shift. *See* *Bolden-Whitaker* Compl. ¶¶ 18-19.

### 4. Work Assignments and Opportunities

Several Black officers also described instances where they were given unfavorable assignments, unfavorable working conditions, or denied certain favorable opportunities.

For example, white officers and management officials in the Patrol Division attempted to force Lieutenant Adams "to request an assignment to another division" and he was "subsequently involuntarily transferred." FAC, ECF No. 278 ¶ 30. Lieutenant Adams was also denied several training opportunities at the FBI National Academy and Johns Hopkins University. *See* Compl., *Adams v. U.S. Capitol Police Bd.*, No. 4-943 ("*Adams I* Compl."), ECF No. 1 ¶¶ 11-12.

Then-Sergeant Blackmon-Malloy was given a new assignment to the "Operations Command Center after the terrorist attacks on September 11, 2001." Compl., *Blackmon-Malloy v. U.S. Capitol Police Bd.*, No. 2-1859 ("*Blackmon-Malloy II* Compl."), ECF No. 1 ¶ 9. The change in assignment required that then-Sergeant Blackmon-Malloy work on the seventh floor of the Department's headquarters, which, despite being under the Department's general no smoking order, was nonetheless "pollute[d]" with smoke "so badly that non-smoking officers . . . reek[ed] of tobacco when they [would] leave the office." *Id.* ¶¶ 9-10.

Despite then-Sergeant Blackmon-Malloy's repeated complaints about the violation of policy and her health, her superiors "took no action and the heavy smoking on the floor continued." *Id.* ¶ 11. The smoke caused her "headaches, persistent coughing, nausea, loss of appetite, nasal congestion, and fatigue" so severe that she contacted her physician and missed three days of work. *Id.* ¶ 14.

Officer Fields was reassigned to "weekend duty and perimeter duty during the fall and winter months," and was "rescheduled to work on his approved day off." Compl., *Fields v. U.S. Capitol Police Bd.*, No. 2-1346 ("*Fields I* Compl."), ECF No. 1 ¶ 7.E. He also had his schedule changed "without his knowledge or consent." *Fields II* Compl. ¶ 23.

**B. Procedural**

**1. Beginning of Litigation**

On October 29, 2001, Plaintiffs—which at the time included over 300 African American officers—filed suit against the Department for various claims under the CAA. *See generally* Class Action Compl. for Temporary & Permanent Injunctive Relief, Monetary Damages & Awards, & Other Remedies ("Compl."), ECF No. 1. The following February, Plaintiffs filed a Motion to Certify the Class. *See* Pls.' Mot. for Class Certification, ECF No. 10. That July, Defendant filed its first Motion to Dismiss, arguing, *inter alia*, that Plaintiffs had failed to exhaust their

11

administrative remedies as required by the CAA. *See* Mot. to Dismiss or Strike Compls., ECF No. 20 at 1. In a separate motion filed the same day, Defendant also asked the Court to stay briefing on the class certification question pending the outcome of Defendant's Motion to Dismiss. *See* Def.'s Mot. to Postpone Briefing with Respect to Pls.' Mot. for Class Certification, ECF No. 19 at 1. That September, this Court denied Plaintiffs' motion to certify a class "without prejudice to refiling at such time as the Court has resolved the pending motion to dismiss." *See* Order, ECF No. 31 at 1. In January 2003, the Court denied without prejudice Defendant's first motion to dismiss "in light of plaintiffs' upcoming filing of a Joint Second Amended Complaint." Order, ECF No. 48 at 1.

Plaintiffs filed their Joint Second Amended Complaint on January 29, 2003. *See* SAC, ECF No. 51. The claims, still all based on the CAA, included racial discrimination, hostile work environment, and retaliation. *See generally id.* Furthermore, the retaliation claims included subsequent incidents that took place after the filing of the suit. *See, e.g., id.* ¶ 38 ("Since the filing of this proposed class action, Officer Webb has been subjected to retaliation and consistently receives bad assignments.").

## 2. Jurisdictional Issues

Defendant filed its second Motion to Dismiss in December 2003, reiterating the same jurisdictional issue—that Plaintiffs had failed to exhaust their administrative remedies as required by the CAA. *See* Mot. to Dismiss Joint Second Am. Class Action Compl., ECF No. 64 at 1. On September 30, 2004, the Court granted Defendant's motion. *See* Mem. Op. & Order, ECF No. 92 at 35.

That opinion had several key holdings. First, the Court determined that the CAA's administrative exhaustion requirement was jurisdictional and that therefore the doctrine of vicarious exhaustion could not apply to the proposed class claims. *See id.* at 6-18. Therefore, "only employees who have completed counseling and mediation" could proceed with their claims. *Id.* at 17. Second, the Court determined that the CAA's counseling and mediation requirement meant that each plaintiff had to appear in-person in order to properly exhaust. *See id.* at 26 ("Thus, mediation is a process that requires, at the very least, meetings involving the parties and a neutral. It also requires an employee's presence."). Third, the Court concluded that "it is unclear which, if any, of plaintiffs' claims remain viable" and "because it is a plaintiff's burden [to establish subject matter jurisdiction] in the face of a Rule 12(b)(1) challenge," it granted Defendant's motion to dismiss, "without prejudice to

reconsideration of those plaintiffs' claims that conform to the timely counseling and mediation requests as explained in this Memorandum Opinion." *Id.* at 35.

The Court then stated that any motion for reconsideration of any plaintiff's claims "shall clearly state (and provide appropriate documentation for) the allegedly discriminatory act, the date the act occurred, the date counseling was requested, the date the claimant attended counseling, the date mediation was requested, and the date a mediation session was attended." *Id.* at 36. The Court required plaintiffs in the consolidated cases—which at the time included *Blackmon-Malloy II*, *Fields I*, *Fields II*, *Bolden-Whitaker*, and *Young*—to "file an appropriate pleading . . . explaining how they have conformed to the exhaustion requirements." *Id.* Finally, the Court denied as moot, Plaintiffs' second Motion to Certify a Class. *Id.*

In January 2005, Plaintiffs filed a motion for reconsideration, arguing that "at least 19 Officers" met the requirements for exhaustion. *See* Pls.' Mot. for Recons. of the Ct.'s Sept. 30, 2004 Mem. Op. & Order, ECF No. 96 at 3. The Court referred the exhaustion issues to Magistrate Judge Facciola and ordered the parties to "file a side-by-side chart stating with clarity and precision for each plaintiff the exact cause of action that a plaintiff has, the precise factual and legal predicates for each claim, whether administrative

14

proceedings were commenced and concluded for that plaintiff, and if so, the detailed nature of those proceedings and defendants' precise defenses to the plaintiff's claims." *See* Minute Order (Aug. 4, 2005).

Magistrate Judge Facciola issued a Report and Recommendation in March 2007. *See* R. & R., ECF No. 151. He concluded that "the majority of the claims must be dismissed for failure to exhaust administrative remedies or failure to provide required support, while a small group of claims satisfies the requirements set forth in Judge Sullivan's orders." *Id.* at 2. In August 2007, the Court issued an order adopting Magistrate Judge Facciola's recommendations and dismissed with prejudice all the claims the Report and Recommendation determined were not properly exhausted. *See* Order, ECF No. 180 at 1. Plaintiffs appealed the following month. *See* Pls.' Notice of Appeal, ECF No. 181.

### 3. Appeal to the Court of Appeals for the District of Columbia Circuit

The Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") considered three issues on appeal: (1) "whether the three-step [CAA exhaustion] process is jurisdictional," (2) "whether in-person attendance by the employees is required at counseling or mediation," and (3) "whether receipt of end of counseling and mediation notices demonstrates completion of

counseling and mediation." *Blackmon-Malloy v. U.S. Capitol Police Bd.* ("*Blackmon-Malloy III*"), 575 F.3d 699, 701-02 (D.C. Cir. 2009).

On the first issue, the D.C. Circuit held that the "three-step process is jurisdictional" and therefore that "equitable doctrines, such as vicarious exhaustion, do not apply to excuse compliance with it." *Id.* at 702. On the second issue, the D.C. Circuit held that "neither the CAA nor the procedural rules of the Office of Compliance require in-person attendance by the employee at counseling or mediation." Finally, on the third issue, the D.C. Circuit held that "receipt of written notice of the end of mediation from the Office of Compliance triggered the CAA's 30 to 90-day period for electing whether to pursue judicial or administrative relief and demonstrated the employee's completion of counseling and mediation." *Id.*

Within its analysis, the D.C. Circuit made several important observations about the CAA's administrative exhaustion requirement. It observed that mediation was "completed" for CAA purposes when the employee "timely request[s] counseling and mediation, [does] not thwart[] mediation by failing to give the employing office notice of the claim upon request, and receiv[es] notice of the end of mediation before filing suit." *Id.* at 711; *see also id.* at 713. Critically, the D.C. Circuit noted that the requirement "must be read in light of the

16

provisions on confidentiality." *Id.* at 711. And that those

provisions "indicate[] Congress's intent that the end of

mediation notice serves to demonstrate an employee's completion

of the process and to commence the formal complaint

proceedings." *Id.* The D.C. Circuit then acknowledged that

"[n]othing in the CAA suggests Congress intended courts to

engage in a mini-trial on the content of counseling and

mediation sessions," and that therefore an employee is not

required to show that a claim was "actually mediated" to prove

exhaustion. *Id.*

The case was then remanded to the district court to

determine "which officers made timely requests . . . and

provided notices of their claims upon request, and which

officers received end of mediation notices and made timely

elections." *Id.* at 714 n.5.

### 4. Jurisdictional Issues on Remand

After conferring with the parties on how best to proceed,

the Court ordered Plaintiffs to "file a new complaint pleading

subject matter jurisdiction as set forth in the D.C. Circuit's

decision for individual and class claims." Order, ECF No. 271 at

2. The parties were also required to file a joint pleading

listing: (1) plaintiffs the parties agreed "have exhausted their

remedies as set forth by the Circuit," (2) plaintiffs the

parties agreed have not exhausted and thus are not within the

17

court's jurisdiction, (3) and plaintiffs as to whom exhaustion is disputed. *Id.*

On May 10, 2010, Plaintiffs filed their FAC, claiming racial discrimination, hostile work environment, and retaliation. *See* FAC, ECF No. 278. The FAC described specific instances of discrimination, retaliation, and/or hostile work environment for some individuals. *See, e.g.*, *id.* ¶ 19 (discussing Sergeant Ikard's experience in the Department's K-9 Unit). But it also generally stated that "other Black Officers" experienced similar issues and listed those officers' names in attached exhibits. *See, e.g.*, *id.* ¶ 25 (claiming that "other Black Officers whose work environments were affected . . . are identified in Exhibit 1"); FAC—Ex. 1, ECF No. 278-1 (listing over 100 officers). Regarding exhaustion, the FAC made many blanket claims that "Plaintiffs" in a certain "category" all met the requirements without providing documentation or discussing the individual exhaustion details for each plaintiff. *See, e.g.*, FAC, ECF No. 278 ¶ 25 ("All the Plaintiffs in this category, among others, made timely requests for counseling (or charges of discrimination) to the Office of Compliance; provided the Office with any and all information requested, received End of Mediation Notices; and timely filed in U.S. District Court within 90 days thereafter.").

18

In August 2010, Defendant filed its third Motion to
Dismiss, arguing that the conclusory statements in the FAC
failed to demonstrate that the Court has jurisdiction over each
claim asserted by each officer. *See* Mem. in Supp. of Def.'s Mot.
to Dismiss the Fourth Am. Compl., ECF No. 299 at 20-21. In March
2012, after Plaintiffs filed their opposition and Defendant
filed its reply, the Court again referred the motion to
Magistrate Judge Facciola. *See* Minute Order (Mar. 9, 2012).
Magistrate Judge Facciola issued a Report and Recommendation
that December. *See* R. & R. ("Magistrate R. & R."), ECF No. 376.
He also issued a supplemental Report and Recommendation after
the parties provided clarification on the claims of five
plaintiffs. *See* R. & R. ("Magistrate Suppl. R. & R."), ECF No.
389.

The Court issued its opinion addressing Plaintiffs'
objections to Magistrate Judge Facciola's Report and
Recommendation in October 2016. *See* 12(b)(1) Op., ECF No. 429.
It also later issued a supplemental opinion regarding Lieutenant
Adams' claims and Lieutenant Blackmon-Malloy's motion for
reconsideration of the Court's dismissal of her 2000 non-
promotion claim. *See* Mem. Op. & Order ("Suppl. 12(b)(1) Op."),
ECF No. 497 at 1. To summarize and clarify which claims by which
plaintiffs remained viable, the Court created a chart—Appendix

II—listing the properly exhausted remaining claims. *See* Mem. Op. & Order—App. II ("App. II"), ECF No. 497-4.

According to Appendix II, only twenty-four plaintiffs had properly exhausted their claims:(1) Lieutenant Adams; (2) Lieutenant Blackmon-Malloy; (3) Officer Bolden-Whitaker; (4) Officer Tyrone Brooks; (5) Officer Sandra Brown-James; (6) Officer Fields; (7) Officer Gary Goines; (8) Officer Tammie Green; (9) Officer Harris; (10) Sergeant Ikard; (11) Officer John Johnson; (12) Officer Governor Latson; (13) Officer Kevin Matthews, Sr.; (14) Officer Danny McElroy; (15) Officer Brent Mills; (16) Officer Luther Peterson; (17) Officer Duvall Phelps; (18) Officer Vernier Riggs; (19) Officer Leonard Ross; (20) Officer Dale Veal; (21) Officer Reginald Waters; (22) Officer Webb; (23) Officer Frank Wilkes; and (24) Officer Kendrick Young. *See id.*

### 5. **Developments Leading to Current Motions to Dismiss**

Although Plaintiffs encountered representation issues throughout the litigation, in July 2018, the last proposed class counsel withdrew from the case. *See* Minute Order (July 26, 2018). Over the next few years, many plaintiffs chose to proceed *pro se*. *See, e.g.*, Notice of Pro Se Appearance, ECF No. 465 (stating Officer Brooks' intention to proceed *pro se*). Four plaintiffs—Officer Fields, Sergeant Ikard (through his wife,

Regina Ikard, following his death), Officer Veal, and Officer
Waters—secured counsel. *See* Notice of Appearance, ECF No. 454
(Officer Fields); Notice of Appearance, ECF No. 498 (Officer
Veal); Notice of Appearance, ECF No. 499 (Officer Waters); and
Appearance of Counsel, ECF No. 530 (Sergeant Ikard). In July
2019, Officers Johnson and Riggs withdrew from the case. *See*
Minute Order (July 30, 2019) (granting Officer Riggs' "motion to
withdraw from case"); Minute Order (July 30, 2019) (granting
Officer Johnson's "motion to withdraw from case").

In August 2021, proceeding *pro se*, Officer Brooks and
Officer Latson submitted motions to correct entry of the Court's
description of their claims in Appendix II. *See* Mot. to Correct
Entry Regarding Pl. Tyrone D. Brooks in App. II to the Ct.'s
Mem. Op. & Order ("Brooks Correction Mot."), ECF No. 505; Mot.
to Correct Entry Regarding Pl. Governor Latson in App. II to the
Ct.'s Mem. Op. & Order ("Latson Correction Mot."), ECF No. 506.

In October 2021, Defendant filed twenty-one motions to
dismiss—one for each of the remaining Plaintiffs except for
Officer Veal. *See* Def.'s Mot. to Dismiss Pl. Brent Mills'
Claims, ECF No. 507; Def.'s Mot. to Dismiss Pl. Kendrick Young's
Claims, ECF No. 508; Def.'s Mot. to Dismiss Pl. Frank Wilkes,
Jr.'s Claims, ECF No. 509; Def.'s Mot. to Dismiss Pl. Governor
Latson, Jr.'s Claims, ECF No. 510; Def.'s Mot. to Dismiss Pl.
Tammie Green's Claims, ECF No. 511; Def.'s Mot. to Dismiss Pl.

Tyrone Brooks' Claims, ECF No. 512; Def.'s Mot. to Dismiss Pl.
Sandra Brown-James' Claims, ECF No. 513; Def.'s Partial Mot. to
Dismiss Pl. Sharon Blackmon-Malloy's Claims, ECF No. 514; Def.'s
Partial Mot. to Dismiss Pl. Frank Adams' Claims, ECF No. 515;
Def.'s Mot. to Dismiss Pl. Arnold Fields' Claims, ECF No. 516;
Def.'s Mot. to Dismiss Pl. Gary Goines' Claims, ECF No. 517;
Def.'s Mot. to Dismiss Pl. Danny McElroy's Claims, ECF No. 518;
Def.'s Partial Mot. to Dismiss Pl. Luther Peterson's Claims, ECF
No. 519; Def.'s Mot. to Dismiss Pl. Reginald Water's Claims, ECF
No. 520; Def.'s Mot. to Dismiss Pl. Leonard Ross's Claims, ECF
No. 521; Def.'s Partial Mot. to Dismiss Pl. Richard Webb's
Claims, ECF No. 522; Def.'s Mot. to Dismiss Pl. Duvall Phelps'
Claims, ECF No. 523; Mot. to Dismiss the Compl. of Pl. Ave Maria
Harris, ECF No. 524; Mot. to Dismiss the Compl. of Pl. Regina
Bolden-Whitaker, ECF No. 525; Mot. to Dismiss the Compl. of Pl.
Kevin Matthews, Sr., ECF No. 526; and Mot. to Dismiss the
Complaint of Pl. Regina Ikard, Personal Representative of the
Estate of Larry Ikard, ECF No. 527.

    The Court gave Plaintiffs until December 29, 2021 to file
their responses. *See* Minute Order (Nov. 24, 2021). As of
February 2022, thirteen plaintiffs—Officer Peterson, Officer
McElroy, Officer Ross, Officer Brooks, Officer Webb, Officer
Green, Officer Latson, Officer Brown-James, Officer Matthews,
Officer Mills, Officer Young, Officer Goines, and Officer

Phelps—had failed to file their opposition briefs and Defendant moved to have those plaintiffs' claims dismissed as conceded. *See* Def.'s Suppl. Submission in Further Supp. of Its Mot. to Dismiss Certain Pls., ECF No. 552 at 1-2. In April 2023, the Court issued orders to the identified plaintiffs to respond to the motions to dismiss by April 28, 2023, or "[i]f plaintiff fails to timely respond, the Court may grant the motion as conceded and dismiss the complaint." *See, e.g.*, Order, ECF No. 554 (addressing Officer Mills). On May 12, 2023, the Court dismissed Officer Mills, Officer Brown-James, Officer Goines, Officer Ross, and Officer Phelps for failure to respond to their respective motions to dismiss. *See* Minute Order (May 12, 2023) (Mills); Minute Order (May 12, 2023) (Brown-James); Minute Order (May 12, 2023) (Goines); Minute Order (May 12, 2023) (Ross); and Minute Order (May 12, 2023) (Phelps).

All other Plaintiffs—Lieutenant Adams, Lieutenant Blackmon-Malloy, Officer Bolden-Whitaker, Officer Brooks, Officer Fields, Officer Green, Officer Harris, Sergeant Ikard, Officer Latson, Officer Matthews, Officer McElroy, Officer Peterson, Officer Waters, Officer Webb, Officer Wilkes, and Officer Young—responded with briefs in opposition to their respective motions to dismiss and Defendant filed its replies.

Thus, pending before the Court are sixteen motions to dismiss and two motions to correct entry. These motions are ripe and ready to be adjudicated.

## III. Standard of Review

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). To survive a 12(b)(6) motion, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal* ("*Iqbal*"), 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly* ("*Twombly*"), 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The standard does not amount to a "probability requirement," but it does require more than a "sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

When evaluating a 12(b)(6) motion, the Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [courts] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.* ("*St. Francis Xavier*"), 117 F.3d 621, 624 (D.C. Cir. 1997). Furthermore, the court "must accept as true

all of the factual allegations contained in the complaint."
*Atherton v. D.C. Off. of the Mayor*, 567 F.3d 672, 681 (D.C. Cir.
2009) (internal quotation marks omitted). The court must also
give the plaintiff the "benefit of all inferences that can be
derived from the facts alleged." *Id.* at 677 (internal quotation
marks omitted). However, the court is "not bound to accept as
true a legal conclusion couched as a factual allegation."
*Papasan v. Allain*, 478 U.S. 265, 286 (1986). And "[t]hreadbare
recitals of the elements of a cause of action, supported by mere
conclusory statements" are not sufficient to survive a motion to
dismiss. *Iqbal*, 556 U.S. at 678.

IV.   **Applicable Law**

   **A. Discrimination**

   The CAA, 2 U.S.C. § 1301, *et seq.*, extends "the protections
of Title VII of the Civil Rights Act of 1964 . . . . to employees
of the legislative branch." *Blackmon-Malloy III*, 575 F.3d at
701. "Courts have consistently relied on judicial
interpretations of Title VII when addressing the substance of
employment discrimination, hostile work environment, and
retaliation claims brought under the CAA." *Newton v. Off. of the
Architect of the Capitol*, 905 F. Supp. 2d 88, 92 (D.D.C. 2012)
(collecting cases); *see also Blackmon-Malloy III*, 575 F.3d at
706 ("The CAA incorporates much of Title VII's substantive law
. . . ."). Thus, a *prima facie* racial discrimination claim under

the CAA requires showing that "(i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008). When the discrimination allegations are based on a theory of disparate treatment, the plaintiff can establish causation by showing that "the unfavorable action gives rise to an inference of discrimination." *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005) (internal quotation marks omitted). Plaintiffs often create this inference by "demonstrating that [they were] treated differently from similarly situated employees who are not part of the protected class," but this is "not the only way" to establish the inference. *Id.*

An adverse employment action is one that effects the "terms, conditions, or privileges of employment." *Chambers v. District of Columbia*, 35 F.4th 870, 874 (D.C. Cir. 2022) (en banc) (internal quotation marks omitted). The D.C. Circuit has recognized that firing, failing to hire, failing to promote, a considerable change in benefits, reassignment with significantly difference responsibilities, and denial or forced acceptance of a job transfer may all be considered adverse employment actions. *See id.* at 872; *Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C. Cir. 2003).

Although a complaint alleging racial discrimination must meet the applicable pleading standard, a plaintiff is not

required to plead a *prima facie* case of discrimination in order to survive a motion to dismiss. *See Brady v. Off. of the Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) (noting that in the context of a CAA discrimination claim "[a]t the motion to dismiss stage, the district court cannot throw out a complaint even if the plaintiff did not plead the elements of a prima facie case"); *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (observing that "the ordinary rules for assessing the sufficiency of a complaint apply" for Title VII claims). And "if a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a prima facie case." *Swierkiewicz*, 534 U.S. at 511. Direct evidence of discrimination can be proved in a variety of ways, including "a statement that itself shows racial . . . bias in the decision." *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011).

### B. Retaliation

Title VII substantive law also applies to CAA retaliation claims. *See Newton*, 905 F. Supp. 2d at 92; *Blackmon-Malloy III*, 575 F.3d at 706. "To prove retaliation, the plaintiff generally must establish that he or she suffered (i) a materially adverse action (ii) because he or she had brought or threatened to bring a discrimination claim." *Baloch*, 550 F.3d at 1198.

A "materially adverse action" in a retaliation claim differs from an "adverse employment action" for a discrimination claim. *See id.* at 1198 n.4 ("'Adverse actions' in the retaliation context encompass a broader sweep of actions than those in a pure discrimination claim."). In order to qualify as a materially adverse action, the plaintiff must show that the action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White* ("*Burlington N.*"), 548 U.S. 53, 68 (2006) (internal quotation marks omitted). Such actions are "not limited to discriminatory actions that affect the terms and conditions of employment," *id.* at 64; and can include "harm *outside* the workplace," *id.* at 63.

The inquiry employs an "objective approach," which separates "significant from trivial harms." *Chambers*, 35 F.4th at 876-77 (internal quotation marks omitted). "Whether a particular [action] is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Burlington N.*, 548 U.S. at 71 (internal quotation marks omitted). Generally, "a materially adverse action in the workplace involves a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different

responsibilities, or a decision causing significant change in benefits." *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013) (internal quotation marks omitted). Such actions establish the "objectively tangible harm" required to sustain a claim of retaliation. *See Forkkio v. Powell*, 306 F.3d 1127, 1131-32 (D.C. Cir. 2002).

To meet the causation element, a plaintiff may submit direct evidence of retaliation. *See Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 578 (D.C. Cir. 2013) (reversing grant of summary judgment for defendant because plaintiff offered "direct evidence of retaliation"—an affidavit stating plaintiff was given "a choice between dropping his claims with the EEOC and being fired"). Or, a plaintiff may allege facts supporting an inference of retaliation, which is a "minimal burden." *See Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006) (observing that "close temporal proximity" is typically the method of establishing an inference of retaliation, but finding such an inference when plaintiff "repeatedly engaged in protected activity during the period when she also experienced [the materially adverse action]").

## C. Hostile Work Environment

To sustain a hostile work environment claim, a plaintiff must "show that his employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe

or pervasive to alter the conditions of the victim's employment
and create an abusive working environment.'" *Baloch*, 550 F.3d at
1201 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21
(1993)). The conduct generally "consists of several individual
acts that 'may not be actionable on [their] own' but become
actionable due to their 'cumulative effect.'" *Baird II*, 792 F.3d
at 168 (quoting *Nat'l R.R. Passenger Corp. v. Morgan* ("*Morgan*"),
536 U.S. 101, 115 (2002)). However, multiple incidents must be
"adequately linked," which can be shown in a variety of ways,
including that they "involve the same type of employment
actions, occur relatively frequently, [or are] perpetrated by
the same managers." *Id.* at 168-69 (internal quotation marks
omitted).

In determining whether an environment is "sufficiently
severe or pervasive," a court must consider the "totality of the
circumstances," including "the frequency of the discriminatory
conduct, its severity, its offensiveness, and whether it
interferes with an employee's work performance." *Baloch*, 550
F.3d at 1201 (internal quotation marks omitted). "[S]imple
teasing, offhand comments, and isolated incidents (unless
extremely serious) will not amount to discriminatory changes in
the terms and conditions of employment." *Faragher v. City of
Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks
and citation omitted). The standard is an objective one,

requiring a plaintiff to establish "an environment that a reasonable person would find hostile or abusive." *Harris*, 510 U.S. at 21. However, the victim must also "subjectively perceive the environment to be abusive" in order to claim that the conduct has "actually altered the conditions of the victim's employment." *Id.* at 21-22.

"Although a plaintiff need not plead a *prima facie* case of hostile work environment in the complaint, the alleged facts must support such a claim." *Holston v. Yellen*, 630 F. Supp. 3d 47, 59 (D.D.C. 2022) (quoting *McKeithan v. Boarman*, 803 F. Supp. 2d 63, 69 (D.D.C. 2011)).

## V.   Analysis

The following analysis is organized by plaintiff; by case number, if necessary; and then by claim. Although many Plaintiffs are currently proceeding *pro se*, most complaints were drafted by counsel and thus, the Court will not construe those complaints liberally. However, the Court will construe liberally all complaints and briefs drafted *pro se*. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." (internal quotation marks and citations omitted)).

## A. Frank Adams

Lieutenant Adams' remaining claims are for hostile work environment, discrimination, and retaliation from *Blackmon-Malloy*, *Adams I*, *Adams II*, and *Adams III*. *See* App. II, ECF No. 497-4 at 1. Defendant seeks a "partial motion to dismiss," challenging Lieutenant Adams' hostile work environment and discrimination claims and the "majority of his retaliation claim[s]." Def.'s Mem. of P. & A. in Supp. of Partial Mot. to Dismiss Pl. Frank Adams' Claims ("Adams MTD"), ECF No. 515-1 at 5-6.

In his briefing, Lieutenant Adams often alleges additional facts from the record which were not included in, referenced by, or otherwise incorporated into the operative complaints. *See, e.g.*, Errata to Correct Pl.'s Opp'n to Def.'s Partial Mot. to Dismiss ("Adams Opp'n"), ECF No. 542 at 18 ("refer[ring] the Defendant and the Court" to a "sworn Declaration, at ECF 96-76"); *id.* at 20 ("realleg[ing] all allegations submitted in [Lieutenant Adams'] Supplemental Briefing at ECF 475-2"). The Court is circumscribed in what it may consider on a motion to dismiss and even a *pro se* party may not expand the scope of allegations or amend pleadings through his briefing. *See Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003) ("It is axiomatic that a complaint may not be amended by the briefs in opposition to a

32

motion to dismiss." (internal quotation marks omitted)); *Ferrell v. Fudge*, No. 21-1412, 2023 WL 2043148, at *8 (applying principle to a *pro se* litigant). Thus, in the discussion below, the Court limits its consideration of facts to those alleged in the complaints, the materials incorporated into the complaints, and any additional facts of which the Court may take judicial notice. *See St. Francis Xavier*, 117 F.3d at 624.

### 1. *Blackmon-Malloy* (No. 1-2221)

In the FAC, Lieutenant Adams alleges he was subject to discrimination, retaliation, and a racially hostile work environment while employed by Defendant. Specifically, he alleges he was discriminated against when he was more severely disciplined than white officers, and when he was unfairly denied promotion after the 2000 Lieutenant's exam. *See* FAC, ECF No. 278 ¶ 68; FAC—Ex. 10, ECF No. 278-10; FAC, ECF No. 278 ¶ 54; FAC—Ex. 8, ECF No. 278-8. He alleges he was retaliated against by: (1) being reprimanded "for following direct orders from a higher-ranking Lieutenant"; (2) having his performance rating disregarded, which he alleges "impeded his opportunity for promotion"; and (3) being subjected to an internal affairs investigation, which was triggered by false accusations and which resulted in corrective documentation being placed in his file and published "in official department correspondence." FAC, ECF No. 278 ¶¶ 67, 73; FAC—Ex. 11, No. 278-11. Finally, he

alleges: (1) he was subjected to a racially hostile work environment when "white management officials allowed, encouraged, and participated with white Officers in hostilities towards [him] in an effort to force him to request an assignment to another division"; (2) he was "subsequently involuntarily transferred"; (3) he was "ordered . . . to change the performance rating of an undisciplined, disruptive K-9 Officer and to remove instructive entries regarding the negative performance of other white Officers from their Unit personnel records"; (4) he was "subjected to many unsubstantiated and frivolous investigations by the Internal Affairs Division"; (5) "management refused to investigate his charges against white subordinate Officers who made untruthful and unsupported allegations against him"; (6) the Department "published . . . the inaccurate findings from an investigation of a complaint that a white Officer made against [him]"; (7) he was "affected" by "racist epithets [that] were commonly employed by the white Officers"; and (8) he was "impact[ed]" by "overtly racist actions" aimed "toward Black Officers, such as a hangman's noose, a swastika, death threats, unprovoked traffic stops of Black Officers by white Officers, and 'bear hunting' (false write-ups)". FAC, ECF No. 278 ¶¶ 25-26, 28, 30-31.

**a. Discrimination**

Beginning with discrimination, Defendant argues that Lieutenant Adams' "race discrimination claim . . . cannot survive dismissal because the FAC lacks any facts that would support an inference that Adams' race is the reason he was not promoted in the 2000 lieutenant promotions process." Adams MTD, ECF No. 515-1 at 20. The Court disagrees.

The FAC identifies Lieutenant Adams as one of the "Black Officers [who] took the year 2000 Lieutenant's promotion exam" but was "unfairly denied" promotion. FAC, ECF No. 278 ¶ 54; FAC— Ex. 8, ECF No. 278-8. The FAC also alleges that discrimination in promotions against African Americans is "evident in the lopsided imbalance between the proportion of African Americans among the rank and file and the proportion of African Americans in the command structure." *Id.* ¶ 43. It goes on to cite statistics showing that African American officers made up 29% of the force but only 13% of the high-ranking Officers, *id.* ¶ 44; and that "as of 2002, no Black Officer on the U.S. Capitol Police was in the department's developmental pool for high-ranking Officers," *id.* ¶ 50. It also alleges that "[a] significant number of qualified Black Officers took part in the biased year 2000 promotion process" but failed to promote where "less qualified white Officers" were promoted. *Id.* ¶ 45. Finally, the FAC alleges that the "number two official on the

U.S. Capitol Police department" stated that he "wanted to control the Officers who were promoted, so some Officers applying for promotions would always miss the required score by a few points," *id.* ¶ 49; and that the former Chief stated that "'Blacks can't compete' or that Blacks can't take tests," *id.* ¶ 57.

Based on these allegations, the Court understands Lieutenant Adams' claim to be for disparate treatment discrimination on a "pattern or practice" theory. *See Palmer v. Shultz*, 815 F.2d 84, 90 (D.C. Cir. 1987) ("Disparate treatment claims can involve an isolated incident of discrimination against a single individual, or, . . . . allegations of a 'pattern or practice' of discrimination affecting an entire class of individuals."). Under this theory of liability, the "inference of discrimination" required to survive a motion to dismiss can be based on circumstantial evidence, including statistical evidence. *See id.* ("Circumstantial evidence that the disparity, more likely than not, was a product of unlawful discrimination will suffice to prove a pattern or practice disparate treatment case. Indeed, this circumstantial evidence may itself be entirely statistical in nature." (internal citation omitted)); *Segar v. Smith*, 738 F.2d 1249, 1265-66 (D.C. Cir. 1984) ("[E]specially in cases alleging class-wide discrimination, illicit motive may be inferred from a sufficient showing of

36

disparity between members of the plaintiff class and comparably qualified members of the majority group.").

Accordingly, the Court concludes that the allegations in the FAC are sufficient to support an inference that the Department discriminated against Lieutenant Adams in the 2000 promotions process. The facts allege that the Department has a statistical disparity in high-ranking Black Officers compared to overall Black Officers on the force. It also suggests that the Department is not taking measures to correct the disparity since no Black Officers are in the developmental candidate pool for high-ranking positions. Furthermore, the allegation that less qualified white officers are promoted over Black officers suggests that the problem is not a lack of qualified Black officers eligible for promotion. *See Segar*, 738 F.2d at 1274 ("The most common nondiscriminatory explanation for a systemic disparity in treatment is a lack of qualifications among the minority group members."). Finally, the disparaging remarks from two high-ranking officers—one admitting that the process is intentionally skewed, and the other espousing racial bias— permits an inference that the Department intentionally discriminated against African American officers because of racial bias, taking the allegations of disparate treatment from possible to plausible. *See Alston v. Johnson*, 208 F. Supp. 3d 293, 301-02 (D.D.C. 2016) (holding plaintiff alleged "a

sufficient factual basis to support an inference of
discrimination" where a supervisor "was involved in sending
racist emails" and plaintiff asserted "that he was more
qualified than the white individuals who were selected [for
promotion]"). Defendant addresses none of these factual
allegations in its brief. Furthermore, Lieutenant Adams is not
required to establish a *prima facie* case to survive this motion
to dismiss. *See Brady*, 520 F.3d at 493. Rather, he must only
allege enough facts that allow the Court to consider his
allegations of intentional racial discrimination plausible. The
coupling of the statistical disparity with multiple superiors'
remarks about bias in the process suffice to create such a
plausible inference. Therefore, the Court **DENIES** Defendant's
motion to dismiss Lieutenant Adams' discrimination claim from
*Blackmon-Malloy*.

In its briefing, Defendant does not address Lieutenant
Adams' other discrimination claim from *Blackmon-Malloy*—that he
was more severely disciplined than white officers. *See* FAC, ECF
No. 298 ¶ 68; FAC—Ex. 10, ECF No. 278-10; App. II, ECF No. 497-4
at 1. Accordingly, the Court concludes that Defendant does not
challenge this claim.

### b. Retaliation

Defendant argues that Lieutenant Adams' retaliation claim
from *Blackmon-Malloy* fails because "[n]one of the Fourth Amended

Complaint's factual allegations concerning alleged retaliation
. . . identify a material adverse action." Adams MTD, ECF No.
515-1 at 15. Looking at the allegations and their surrounding
circumstances, the Court agrees.

The Supreme Court established the standard for materially
adverse action as an action that would "dissuade[] a reasonable
worker from making or supporting a charge of discrimination."
*Burlington N.*, 548 U.S. at 68 (internal quotation marks
omitted). However, in referring to "*material* adversity," the
Court was emphatic about "separat[ing] significant from trivial
harms." *Id.* Specifically, the Court pointed out that "[a]n
employee's decision to report discriminatory behavior cannot
immunize that employee from those petty slights or minor
annoyances that often take place at work and that all employees
experience." *Id.*

The D.C. Circuit has observed that usually "a materially
adverse action in the workplace" involves "a significant change
in employment status, such as hiring, firing, failing to
promote, reassignment with significantly different
responsibilities, or a decision causing significant change in
benefits." *Bridgeforth*, 721 F.3d at 663 (internal quotation
marks omitted). These actions produce such obvious negative
consequences that a plaintiff can establish the "objectively

39

tangible harm," required to sustain a claim of retaliation. *Id.* (internal quotation marks omitted).

Turning to Lieutenant Adams' allegations, the FAC identifies several discreet actions that he argues are materially adverse: (1) his "supervisor . . . reprimanded him for following direct orders from a higher-ranking Lieutenant," (2) his supervisor "disregarded the performance rating issued to Lt. Adams by his commanding supervisor, which impeded his opportunity for promotion," (3) his supervisor and another employee "participated in and supported the making of false accusations against Lt. Adams, which in turn led to an investigation by Internal Affairs," and that investigation led to authorizing that "corrective documentation be placed in Lt. Adams' personnel file and published in official department correspondence." FAC, ECF No. 278 ¶ 67.

Beginning with the reprimand, in *Baloch v. Kempthorne*, the D.C. Circuit observed that letters of reprimand are generally not materially adverse actions when they "contain[] no abusive language" and that oral reprimands are often the kind of "sporadic verbal altercations or disagreements" that the Supreme Court has emphasized "do not qualify as adverse actions for purposes of retaliation claims." *Baloch*, 550 F.3d at 1199; *see also Herbert v. Architect of the Capitol*, 839 F. Supp. 2d 284, 302 (D.D.C. 2012) ("In this Circuit, [a] letter of counseling,

written reprimand, or unsatisfactory performance review, if not abusive in tone or language or a predicate for a more tangible form of adverse action, will rarely constitute materially adverse action." (internal quotation marks omitted)). The FAC does not provide details about Lieutenant Adams' alleged reprimand, only stating that he was "reprimanded" for "following direct orders from a higher-ranking Lieutenant." FAC, ECF No. 278 ¶ 67. Critically, it fails to allege that any tangible consequences flowed from the reprimand and therefore fails to establish that the reprimand was a materially adverse action. *See Burlington N.*, 548 U.S. at 68 (observing that "petty slights [and] minor annoyances" do not qualify as material adversity).

Turning to Lieutenant Adams' allegations about his performance evaluation, in *Baloch*, the D.C. Circuit stated that "performance reviews typically constitute adverse actions only when attached to financial harms." *Baloch*, 550 F.3d at 1199; *see also Weber v. Battista*, 494 F.3d 179, 185-86 (D.C. Cir. 2007) ("[T]he two performance evaluations that Weber challenged, though they may not, as the district court said, be 'adverse in an absolute sense,' do qualify as adverse actions insofar as they resulted in her losing a financial award or an award of leave, because a reasonable jury could conclude that such a loss 'could well dissuade a reasonable worker from making or

supporting a charge of discrimination.'" (quoting *Burlington N.*,
548 U.S. at 57)).

In the FAC, Lieutenant Adams does not claim that he
received a lower performance rating as retaliation, but rather
that the disregarding of his "performance rating" was
retaliatory and "impeded his opportunity for promotion." FAC,
ECF No. 278 ¶ 67. As Defendant points out, Adams does not claim
that he was "denied a promotion" in retaliation for his
protected conduct. Adams MTD, ECF No. 515-1 at 17. Such an
accusation would be a clear materially adverse action as
"failing to promote" has been recognized by the D.C. Circuit as
a classic indication of material adversity. *See Bridgeforth*, 721
F.3d at 663. Rather, the facts insinuate that Lieutenant Adams
received a positive performance rating and that rating was
"disregarded." The FAC then goes on to conclude that this
disregarding "impeded [Lieutenant Adams'] opportunity for
promotion." FAC, ECF No. 278 ¶ 67. However, such a conclusion
does not automatically follow from the alleged action—the
disregarding of the performance evaluation. In fact, that action
seems more akin to the "petty slights [and] minor annoyances"
that the Supreme Court has determined do not rise to the level
of "*material* adversity" necessary for a retaliation claim.
*Burlington N.*, 548 U.S. at 68; *see also id.* (observing that

"snubbing by supervisors and co-workers are not actionable" (internal quotation marks and citation omitted)).

Furthermore, the D.C. Circuit has held that any tangible consequences sustaining a retaliation claim must not be "unduly speculative." *Bridgeforth*, 721 F.3d at 663 (internal quotation marks omitted); *see also id.* at 665 (holding that plaintiff failed to establish a materially adverse action because he "has not shown the entitlement to an award [of time-off] that we require"). Looking at the allegations in the FAC, the Court would be forced to speculate in order to find a materially adverse action based on the disregarding of the performance evaluation. If that action did in fact impede Lieutenant Adams' opportunity for promotion, that would require such an opportunity existed, Lieutenant Adams sought to be promoted, and the disregarding of the performance evaluation played a role in his failure to achieve his desired promotion. None of the allegations from the FAC permit an inference that any of those required links existed. *See Baloch*, 550 F.3d at 1199 (declining to find materially adverse action when plaintiff "did not produce evidence showing that the . . . negative performance evaluation could affect his position, grade level, salary, or promotion opportunities"); *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (declining to find materially adverse action when "there was no position to which [plaintiff] might have been

43

promoted" and thus she "was not denied a tangible opportunity to advance her career").

Tuning to Lieutenant Adams' claims of false accusations which led to an investigation by Internal Affairs, in *Velikonja v. Gonzales*, the D.C. Circuit held that a "lengthy investigation"—which "prevented [the plaintiff] from receiving promotions during the pendency of the investigation" and which "placed a cloud over [her] career, which effectively prevent[ed] her from obtaining other career-enhancing assignments for which she is highly qualified"—could qualify as a materially adverse action because "such an investigation could dissuade a reasonable employee from making or supporting a charge of discrimination." *Velikonja v. Gonzales*, 466 F.3d 122, 124 (D.C. Cir. 2006) (internal quotation marks omitted). Following *Velikonja*, district courts in this Circuit have determined that "while the 'mere initiation' of an investigation is generally not sufficient to constitute adverse action for a retaliation claim, an investigation which carries the prospect of material consequences for the plaintiff may constitute adverse action." *Congress v. District of Columbia*, 514 F. Supp. 3d 1, 18 (D.D.C. 2020) (collecting cases). The analysis must inevitably look to potential future harms—whether they actually accrue or not—to determine what a reasonable employee would do in such circumstances. *See Bridgeforth v. Salazar* ("*Salazar*"), 831 F.

44

Supp. 2d 132, 145 (D.D.C. 2011) ("Administrative or disciplinary investigations can constitute materially adverse action that would support a retaliation claim, even if such investigations do not result in disciplinary action. However, the plaintiff must provide evidence that the investigation posed an *objective* harm . . . ." (internal quotation marks and citations omitted)); *Rhodes v. Napolitano*, 656 F. Supp. 2d 174, 185-86 (D.D.C. 2009) (finding "material adversity" even when investigation "failed to find evidence" of Plaintiff's wrongdoing but "threatened [Plaintiff] with more severe disciplinary actions, up to and including . . . removal from the Federal Service" (internal quotation marks omitted)). A plaintiff is not required to prove such harms occurred; only that the "prospect" of objectively tangible harm was feasible at the outset of the investigation.

The FAC fails to allege that any material harms accrued, or had the prospect of accruing, based on the Internal Affairs investigation. As an initial matter, as many district courts in this circuit have held, the mere initiation of the investigation by Internal Affairs is insufficient for material adversity. *See Congress*, 514 F. Supp. 3d at 18 (collecting cases). Although Lieutenant Adams alleges that the investigation was initiated on the basis of "false accusations" by his supervisor and another employee, FAC, ECF No. 278 ¶ 67; the reasoning behind the investigation speaks more to the causation element of a

retaliation claim—suggesting that the allegations were falsified because of a retaliatory motive[3]—rather than the material harm element—which focuses on whether the consequences of a defendant's actions rise to the level of severity to be actionable in court.

The Court must turn to the consequences, or potential consequences of the investigation, to determine whether Lieutenant Adams suffered a materially adverse action. The FAC is silent as to the prospect of harm created by the Internal Affairs investigation and only states that the actual consequences were "that corrective documentation [was] placed in Lt. Adams' personnel file and published in official department correspondence." FAC, ECF No, 278 ¶ 67. Neither of these actions amount to a "significant change in employment status" or a "significant change in benefits." *Bridgeforth*, 721 F.3d at 663 (internal quotation marks omitted). The FAC does not allege that

---

[3] Defendant argues in its reply brief that Lieutenant Adams has failed to "plausibly link the alleged retaliatory conduct to Plaintiff's complaints." Def.'s Reply in Supp. of Partial Mot. to Dismiss Pl. Frank Adams' Claims ("Adams Reply"), ECF No. 550 at 23. Arguments that are raised for the first time in a reply brief are generally not considered out of fairness to the opposing party. *See Herbert v. Nat'l Acad. of Scis.* ("*Nat'l Acad. of Scis.*"), 974 F.2d 192, 196 (D.C. Cir. 1992); *Pauling v. District of Columbia*, No. 13-0943, 2015 WL 13891312, at *2 (D.D.C. June 15, 2015) ("[I]t is well established that district courts need not—and indeed, generally should not—consider arguments raised for the first time in a reply brief."). Thus, the Court will decline to consider Defendant's argument.

the "corrective documentation" was tied to some objectively
tangible harm such as a change in Lieutenant Adams' position,
responsibilities, salary, or other benefits. *See Baloch*, 550
F.3d at 1199; *Weber*, 494 F.3d at 185-86 (finding materially
adverse action when a denial of a "special act award" "resulted
in [plaintiff] losing a financial award or an award of leave").
And, as discussed above, any tie into promotion opportunities
would require speculation. Thus, even providing Lieutenant Adams
the benefit of all inferences—as the Court must on this motion
to dismiss—the FAC's allegations fall short of plausibly
alleging that Lieutenant Adams suffered a materially adverse
action. Accordingly, the Court **GRANTS** Defendant's motion to
dismiss Lieutenant Adams' retaliation claim from *Blackmon-
Malloy*.

### c. Hostile Work Environment

Lieutenant Adams claims he was subjected to a racially
hostile work environment when: (1) "white management officials
allowed, encouraged, and participated with white Officers in
hostilities towards [him] in an effort to force him to request
an assignment to another division"; (2) he was "subsequently
involuntarily transferred"; (3) he was "ordered . . . to change
the performance rating of an undisciplined, disruptive K-9
Officer and to remove instructive entries regarding the negative
performance of other white Officers from their Unit personnel

47

records"; (4) he was "subjected to many unsubstantiated and
frivolous investigations by the Internal Affairs Division"; (5)
"management refused to investigate his charges against white
subordinate Officers who made untruthful and unsupported
allegations against him"; (6) the Department "published . . .
the inaccurate findings from an investigation of a complaint
that a white Officer made against [him]"; (7) he was "affected"
by "racist epithets [that] were commonly employed by the white
Officers"; and (8) he was "impact[ed]" by "overtly racist
actions" aimed "toward Black Officers, such as a hangman's
noose, a swastika, death threats, unprovoked traffic stops of
Black Officers by white Officers, and 'bear hunting' (false
write-ups)." FAC, ECF No. 278 ¶¶ 25-26, 28, 30-31; *see also* App.
II, ECF No. 497-4 at 1. Defendant argues that these "vague
allegations of statements that were not directed at Adams" and
the "six allegations of conduct that purportedly targeted Adams"
are not "sufficiently severe or pervasive" to establish a
hostile work environment claim. Adams MTD, ECF No. 515-1 at 9.
Looking at the totality of the circumstances, the Court
disagrees.

Starting with frequency, the FAC describes racist remarks
and conduct that was prevalent throughout the Department. It
specifies that "racist slurs, insults, and threats" had been
ongoing "[f]or many years," FAC, ECF No. 278 ¶ 17; detailing

48

specific incidences in 2000 and 2001 and stating that "white Officers repeatedly subjected multiple Black Officers," to this conduct "[d]uring the 180 days before the Black Officers filed their request for counseling with the Office of Compliance," *id.* ¶ 23. Although Defendant attempts to use the length of this conduct to "suggest a lack of pervasiveness," Adams Reply, ECF No. 550 at 14-15; the allegations undermine this argument. They describe an environment in which racially hostile comments and epithets were commonly used over a period of years. Thus, the Court disagrees that the allegations amount to "a handful of sporadic comments and actions," Adams MTD, ECF No. 515-1 at 9; and instead concludes that the objectionable conduct was indeed frequent.

Turning next to severity and offensiveness, the FAC describes many overtly racist epithets and incidents aimed at Black officers. It states that "[the N-word], 'Huk,' 'gangster' and other racist epithets were commonly employed by the white Officers of the U.S. Capitol Police." FAC, ECF No. 298 ¶ 25. It also claims that several supervisors expressed racial hostility, explaining that the General Counsel, who "had responsibility for giving advice on discipline and promotions in the department," used the N-word in early 2000 and afterwards "returned to work without incident." *Id.* ¶ 24. Commenting on the severity of racial epithets, the D.C. Circuit has observed that a "single

incident" of a supervisor using a "deeply offensive racial epithet when yelling at [an employee]" "might well have been sufficient to establish a hostile work environment." *Ayissi-Etoh*, 712 F.3d at 577.

Furthermore, beyond offensive comments, the FAC also alleges that "a hangman's noose, a swastika, death threats, unprovoked traffic stops of Black Officers by white Officers, and 'bear hunting' (false write-ups)" were employed against Black Officers. FAC, ECF No. 298 ¶ 26. This conduct evidences the "'physically threatening or humiliating'" occurrences that the Supreme Court has deemed indicative of a hostile work environment. *Faragher*, 524 U.S. at 787-88 (quoting *Harris*, 510 U.S. at 23).

Defendant attempts to undermine the severity of these comments and actions by arguing that the FAC "is silent as to whether Adams was working with the Department at the time these comments were purportedly made or even aware of these utterances prior to the filing of the Amended Complaint." Adams MTD, ECF No. 515-1 at 10. However, the FAC alleges that the "racial slurs were used even when other Black Officers were present, and word of the fact that white Officers could use racist language toward Black Officers with impunity spread throughout the ranks." FAC, ECF No. 278 ¶ 23. Furthermore, the FAC states that the "overtly racist actions . . . cast a pall of fear and intimidation over

other Black Officers who were aware of what had occurred." *Id.*
¶ 26. Exhibit 1 attached to the FAC lists over 100 officers who
were "affected" by the racist language and Exhibit 2 lists over
50 officers who were "aware" of the racist incidents. *See* FAC—
Ex. 1, ECF No. 278-1; FAC—Ex. 2, ECF No. 278-2. Finally, the FAC
states that Lieutenant Adams was one of the officers who was
both "affected" by the racist language and "aware" of the racist
incidents. *See* FAC—Ex. 1, ECF No. 278-1; FAC—Ex. 2, ECF No. 278-
2. Therefore, the Court may appropriately infer on this motion
to dismiss that even if the comments and conduct were not
directed at Lieutenant Adams, he was at the very least conscious
of and troubled by the incidents. Thus, while the Court agrees
that comments and incidents directed at a plaintiff are stronger
indications of a hostile work environment, the allegations
regarding the severity and frequency of the racist words and
actions perpetuated in these circumstances suggest a hostile
work environment even if such conduct was not solely directed at
Lieutenant Adams.

Bolstering that conclusion, the FAC describes several
incidents directed at Lieutenant Adams, which he argues further
indicate the Department's hostile work environment. Defendant
argues that these "six alleged harassing incidents" should be
discounted because Lieutenant Adams "fails to assert" the
incidents "occurred because of Adams' race." Adams MTD, ECF No.

515-1 at 15. Defendant is correct that "[c]onclusory statements that this conduct created a 'racially hostile work environment' . . . are not sufficient to adequately plead" that the conduct occurred because of Adams' race. *Id.*; *see Iqbal*, 556 U.S. at 678 (observing that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient to survive a 12(b)(6) motion to dismiss). However, the FAC offers more than mere conclusory statements. As described above, it describes how officers and supervisors in the Department frequently made racially disparaging remarks and how African American officers were threatened with racist actions as well. *See* FAC, ECF No. 278 ¶¶ 25-26. Additionally, many of the instances Lieutenant Adams complains about involve unfavorable treatment by "white officers." *See, e.g.*, FAC, ECF No. 278 ¶ 30 (alleging that "white management officials allowed, encouraged, and participated with white Officers in hostilities towards Plaintiff Adams"). Furthermore, in his description of the "many unsubstantiated and frivolous investigations by the Internal Affairs Division," he specifies that his own "charges against white subordinate Officers" were ignored." *Id.* ¶ 31. At this stage of litigation, Lieutenant Adams does not have to plead a *prima facie* case, but rather, he is only required to plead enough facts that support a claim of a racially hostile work environment. *See Holston*, 630 F. Supp. 3d at 59. Since the

FAC describes extensive racial hostility throughout the Department and states that Lieutenant Adams was treated poorly by, and in comparison to, white officers, the alleged facts permit an inference that the conduct against Lieutenant Adams was based on his race.

Defendant also attempts to minimize these actions by characterizing them as "every day personnel actions," arguing that they are insufficient to state a claim for a hostile work environment because Lieutenant Adams "did not assert any loss of terms or conditions of his employment." Adams MTD, ECF No. 515-1 at 12. In this argument, Defendant mistakenly holds Lieutenant Adams' hostile work environment claim to the standard necessary to prove an adverse employment action in the discrimination context. *Id.* (faulting Lieutenant Adams for not alleging "he suffered any loss of pay, demotion with a significant change of duties or any other tangible change to his employment term or conditions"). A hostile work environment claim looks to whether a pattern of discrimination "amount[s] to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788. It does not require proving that each or any instance of discrimination could be actionable on its own. *See Baird II*, 792 F.3d at 168 ("A hostile environment consists of several individual acts that 'may not be actionable on [their] own' but become actionable due to their 'cumulative effect.'" (quoting

*Morgan*, 536 U.S. at 115)). The question is whether the
"cumulative effect" of the conduct, is so severe or pervasive
that it has the effect of changing the "conditions of
. . . employment," *Baloch*, 550 F.3d at 1201 (internal quotation
marks omitted). The individual instances directed at Lieutenant
Adams, in the context of the general claims of racist language
and conduct, suggest this effect. Accordingly, the Court **DENIES**
Defendant's motion to dismiss Lieutenant Adams' hostile work
environment claim from *Blackmon-Malloy*.

### 2. *Adams I* (No. 4-943)

Lieutenant Adams initiated a *pro se* suit against Defendant
in June 2004 for retaliation based on his involvement in
*Blackmon-Malloy* and his complaints about discrimination. *See
Adams I* Compl. ¶ 1. In July 2005, this Court consolidated *Adams
I* with the main case. *See* Order, ECF No. 108 at 3.

The remaining claims from *Adams I* are for retaliation and
hostile work environment. *See* App. II, ECF No. 497-4 at 1.
Specifically, Lieutenant Adams claims that the Department
retaliated against him by: (1) denying him multiple training
opportunities; (2) threatening to transfer him; and (3)
involuntarily transferring him. *See Adams I* Compl. ¶¶ 8-13, 18.
He also claims that his Division Commander's negative remarks
about him created a hostile work environment. *See id.* ¶¶ 15, 18.

### a. Retaliation

Although Appendix II describes the denial of training opportunities as "[d]iscrimination," upon further inquiry, the Court concludes that the claims are actually for retaliation. In the previous opinion discussing the exhaustion of Lieutenant Adams' claims, this Court described the training claims as "non-selection" to the various training programs. *See* Suppl. 12(b)(1) Op., ECF No. 497 at 12. This Court agreed with Magistrate Judge Facciola's recommendation that those claims be allowed to proceed because Defendant "conceded jurisdiction." *Id.* However, in Defendant's briefing, it described the claims as "*specific claims of retaliation.*" Def.'s Mot. to Dismiss Breakdown Analysis of Pls., ECF No. 365-4 at 8. Furthermore, in the current briefing on this motion to dismiss, both parties treat the claims as for retaliation. *See* Adams MTD, ECF No. 515-1 at 18-19; Adams Opp'n, ECF No. 542 at 18.

However, because the exhaustion requirement under the CAA is claim-specific and jurisdictional, the Court must independently verify that Lieutenant Adams exhausted his claims for retaliation. *See Blackmon-Malloy III*, 575 F.3d at 705; *Ross v. U.S. Capitol Police*, 195 F. Supp. 3d 180, 199 (D.D.C. 2016) ("[S]uccessful completion of every CAA prerequisite regarding each claim is a *jurisdictional* prerequisite, which means that it cannot be waived by this Court, much less any party or agent of

a party."). Turning to the record, Lieutenant Adams' declaration supporting exhaustion states that he requested counseling for claims of "discrimination and Hostile work environment, as well as, retaliation and reprisal in response to [his] participation in the Blackmon-Malloy law suit against the Capitol Police Board." Pls.' Mem. of P. & A. in Opp'n to Mot. to Dismiss—Ex. 11 ("Adams Decl."), ECF No. 331-4 ¶ 13; *see also id.* ¶ 14 (detailing Lieutenant Adams' training claims). Since this declaration establishes that Lieutenant Adams notified the Department that he was complaining about retaliation and because the Court's previous opinion on jurisdiction establishes that Lieutenant Adams properly received his end of mediation notice for these claims, the Court is satisfied that Lieutenant Adams has met the CAA's exhaustion requirement for the claims on the basis of retaliation. *See Blackmon-Malloy III*, 575 F.3d at 713 (holding that "mediation means no more than that the employee timely requested counseling and mediation, that the employee did not thwart mediation by failing to give notice of his or her claim to the employing office upon request, that the mandated time periods have expired, and that the employee received end of counseling and mediation notices from the Office").

Turning to the retaliation analysis, Defendant argues that Lieutenant Adams "fails to allege he suffered a tangible harm as a result of the denial to these three training programs," and

therefore that his retaliation claims must be dismissed. Adams MTD, ECF No. 515-1 at 19. The Court agrees.

Under "Acts of Retaliation," the *Adams I* Complaint describes several "training opportunities," including opportunities at Johns Hopkins and the FBI National Academy, which Lieutenant Adams alleges he was denied the opportunity to attend. *See Adams I* Compl. ¶¶ 9-13. In this Circuit, several judges have concluded that denials of training opportunities— when not coupled with a "material change in . . . employment conditions, status, or benefits that results in tangible harm"— do not meet the required standard for "*material* adversity" for retaliation claims. *See Jimenez v. McAleenan*, 395 F. Supp. 3d 22, 39 (D.D.C. 2019) (internal quotation marks omitted) (collecting cases); *Morales v. Gotbaum*, 42 F. Supp. 3d 175, 202 (D.D.C. 2014) ("Other courts in this district have continuously held that the denial of training opportunities is only actionable if there is a resultant material change in . . . employment conditions, status, or benefits . . . that results in a tangible harm." (internal quotation marks omitted)).

Even construing the *pro se Adams I* Complaint liberally, the complaint fails to allege Lieutenant Adams suffered any tangible harm as a result of the denial of these training opportunities. Although the Court accepts that these opportunities may have been "career enhancing," it does not follow that the denial of

such opportunities produced an "objectively tangible harm."
Specifically, Lieutenant Adams fails to allege that denying him
the opportunities lead to a reduction in his pay, an inability
to apply for promotions, a reduction in his job
responsibilities, a hindering of his overall ability to perform
his job, or any other indication of "objectively tangible harm."
*See Forkkio*, 306 F.3d at 1132 (finding no materially adverse
action for a retaliation claim when the action "may have caused
[plaintiff] subjective injury, but it did not objectively harm
[her] working conditions or future employment prospects"); *cf.
Jones v. Wash. Metro. Area Transit Auth.*, No. 8-2193, 2011 WL
4536968, at *5 (D.D.C. Oct. 2, 2011) (granting defendant summary
judgment on a retaliation claim when "the challenged action—
denial of a single training class—did not even diminish
Plaintiff's job responsibilities, and . . . while it caused her
some inconvenience, it did not hamper her overall ability to
perform her job"). Accordingly, the Court **GRANTS** Defendant's
motion to dismiss Lieutenant Adams' retaliation claims from
*Adams I* that involve denial of training opportunities.

In its briefing, Defendant does not address Lieutenant
Adams' other retaliation claims in *Adams I*—that he was
retaliated against when his supervisor threatened to transfer
him and when he was subsequently involuntarily transferred. *See*
App. II, ECF No. 497-4 at 1. The only discussion in Defendant's

58

briefing around transfer is a challenge to Lieutenant Adams'
claims in *Adams II*, that Lieutenant Adams was denied a transfer
request in retaliation for his protected activity. *See* Adams
MTD, ECF No. 515-1 at 15; Adams Reply, ECF No. 550 at 22-23.
Accordingly, the Court concludes that Defendant does not
challenge the claims of retaliation related to the threat of
transfer and the subsequent involuntary transfer alleged in
*Adams I*.

### b. Hostile Work Environment

Lieutenant Adams claims that he was subjected to a hostile
work environment based on the "negative remarks of Division
Commander Callaway." Suppl. 12(b)(1) Op., ECF No. 497 at 12-13.
Defendant argues that Lieutenant Adams' claim should fail
because the "two negative comments do not satisfy the severe or
pervasive threshold required" for a hostile work environment
claim. Adams MTD, ECF No. 515-1 at 14-15. The Court agrees.

As an initial matter, the Court notes that this hostile
work environment claim is distinct from the racially hostile
work environment claim alleged in the main case. The *Adams I*
Complaint describes the incidents that Lieutenant Adams was
subjected to in retaliation for his complaint of discrimination,
but it does not allege additional claims of discrimination. *See*
*Adams I* Compl. ¶¶ 1, 7, 8-24. Thus, the hostile work environment
claim in *Adams I* is premised on retaliation whereas the hostile

work environment claim from *Blackmon-Malloy* was premised on racial discrimination. Additionally, as described in this Court's prior opinion about Lieutenant Adams' remaining claims, the *Adams I* claim for hostile work environment only described two incidents from the Fall of 2003. *See* Suppl. 12(b)(1) Op., ECF No. 497 at 13. These incidents occurred nearly two years after the racist remarks, actions, and individual incidents directed at Lieutenant Adams which comprised the *Blackmon-Malloy* hostile work environment claim. *See* FAC, ECF No. 278 ¶ 30-31. Without any connection between the two strings of incidents, the Court cannot conclude that they are "adequately linked," as to create one larger hostile work environment claim. *See Baird II*, 792 F.3d at 168. Therefore, the Court interprets the hostile work environment claim from *Adams I* as based on retaliation and separate from the hostile work environment claim in the main case.

Turning to the allegations of the claim, the two incidents Lieutenant Adams identifies as making up his claim are instances of negative remarks made by a superior. One of the remarks was that Lieutenant Adams "might be one of those black and white kinds [sic] of person, and doesn't have much gray area when it comes to these things." *Adams I* Compl. ¶ 15. This comment was made outside of Lieutenant Adams' presence and allegedly was made to insinuate that Lieutenant Adams "couldn't comprehend a

simple directive" and that he "was the only person who misinterpreted the Division Commander's directive." *Id.* The other remark was made to Lieutenant Adams when he "advised the Capitol Division Commander of concerns that Officers in his section expressed" and the Division Commander responded by stating, "If you don't like it, I will transfer your ass." *Id.* ¶ 18.

These two instances are not severe or pervasive enough to establish a hostile work environment. First, since Lieutenant Adams lists only two occasions in which he was negatively discussed, the conduct cannot be described as frequent. *See Baloch*, 550 F.3d at 1201 (noting that in the context of a hostile work environment claim, the assertion of "pervasive and constant abuse is undermined by the sporadic nature of the conflicts"). Second, the comments themselves were not severe. The first incident was a disparaging comment made about Lieutenant Adams and is more akin to the "petty insults, vindictive behavior, and angry recriminations" that the D.C. Circuit has held "are not actionable under Title VII." *Brooks v. Grundmann*, 748 F.3d 1273, 1277-78 (D.C. Cir. 2014) (internal quotation marks omitted). The second incident, where the Division Commander threatened to transfer Lieutenant Adams, is at most "an isolated expression of frustration," which the D.C. Circuit has also held "cannot rise to the level of severity

indicating hostility or abuse." *Id.* at 1277 (citing *Faragher*, 524 U.S. at 788). Accordingly, the Court **GRANTS** Defendant's motion to dismiss Lieutenant Adams' hostile work environment claim from *Adams I*.

### 3. *Adams II* (No. 5-491)

Lieutenant Adams initiated a second *pro se* suit against Defendant in March 2005, alleging new incidents of retaliation based on his involvement in *Blackmon-Malloy* and his complaints of discrimination. *See Adams II* Compl. ¶ 1. In July 2005, this Court consolidated *Adams II* with the main case. *See* Order, ECF No. 108 at 3.

The remaining claims from *Adams II* are for retaliation based on: (1) a Lieutenant with less seniority being promoted; (2) Lieutenant Adams being denied a promotion to Captain; and (3) Lieutenant Adams being denied a request to transfer. *See* App. II, ECF No. 497-4 at 1. Defendant only challenges the claim based on a request to transfer,[4] arguing that "nothing in the *Adams II* Complaint indicates that Adams suffered any tangible

---

[4] In its briefing, Defendant explicitly states that it is not challenging Lieutenant Adams' retaliation claim based on the denial of his promotion to Captain. *See* Adams MTD, ECF No. 515-1 at 20 n.1. Since Defendant fails to address Lieutenant Adams' other retaliation claim regarding a Lieutenant with less seniority being promoted, the Court concludes that Defendant is also not challenging that claim for retaliation.

harm due to these transfer requests not being granted." Adams
MTD, ECF No. 515-1 at 19. The Court agrees.

The *Adams II* Complaint alleges that the Department
retaliated "against [Lieutenant Adams] by refusing to grant
[his] request for reassignment while repeatedly assigning white
Lieutenants with less seniority in rank and experience, to
shifts of choice and other career enhancing positions."[5] *Adams II*
Compl. ¶ 8. As Defendant argues in its brief, these allegations
do not "provide any facts from which a court could infer that
[Lieutenant Adams] suffered a material adverse action" based on
the denial of his transfer request. Adams MTD, ECF No. 515-1 at
19. The material adversity requirement for retaliation claims is
an objective standard; and thus, the complaint must allege facts
that allow the Court to infer that the harm from conduct
complained about caused a plaintiff objective, tangible injury.
*See Burlington N.*, 548 U.S. at 68 ("We refer to reactions of a

---

[5] Recently, in *Chambers v. District of Columbia*, the D.C. Circuit
held that denying a request for a transfer could count as an
adverse employment action under the discrimination standard,
overruling previous Circuit precedent which required an
additional showing of an "objectively tangible harm" for a
discrimination claim. *See Chambers,* 35 F.4th at 872. In its
analysis, the D.C. Circuit explicitly left the retaliation
standard undisturbed after discussing the "fundamental
difference between the two provisions." *Id.* at 876; *see also*
*Bain v. Off. of the Att'y Gen.*, 648 F. Supp. 3d 19, 55 (D.D.C.
2022) ("The adverse action standard is different for retaliation
claims—a standard the D.C. Circuit expressly left alone in
*Chambers*.").

*reasonable* employee because we believe that the provision's standard for judging harm must be objective.").

Construing the *pro se* complaint liberally, the only allegation of harm is that Lieutenant Adams was denied "career enhancing positions" when the Department refused "to grant [Lieutenant Adams'] request for reassignment." Without further context, the Court cannot infer that this denial was an objective harm that could have dissuaded a reasonable worker from complaining about discrimination. *See Forkkio*, 306 F.3d at 1132 (holding that plaintiff "failed to establish an adverse action" when he alleged that conduct "may have caused him subjective injury, but it did not objectively harm his working conditions or future employment prospects"). Lieutenant Adams does not identify any negative change to his salary, benefits, duties, or other aspects of his employment based on the denial of his request. And without this context, the Court has no basis to infer that the transfer would have been objectively "career enhancing" rather than simply "career enhancing" in Lieutenant Adams' subjective view. Taking the allegations from the *Adams II* Complaint at face value, this conduct seems more akin to the "'snubbing' by supervisors and co-workers" that are "not actionable" in a claim of retaliation. *Burlington N.*, 548 U.S. at 68. Accordingly, the Court **GRANTS** Defendant's Motion to

Dismiss the *Adams II* claim for retaliation based on the denial of Lieutenant Adams' transfer request.[6]

### B. Sharon Blackmon-Malloy

Lieutenant Blackmon-Malloy's remaining claims against Defendant are for discrimination and retaliation. *See* App. II, ECF No. 497-4 at 1-2. Defendant seeks a partial motion to dismiss, challenging "three retaliation claims and one race discrimination claim asserted by [Lieutenant Blackmon-Malloy]." Def.'s Mem. of P. & A. in Supp. of Partial Mot. to Dismiss Pl. Sharon Blackmon-Malloy's Claims ("Blackmon-Malloy MTD"), ECF No. 514-1 at 6.

In her *pro se* brief, Lieutenant Blackmon-Malloy argues that "Defendant's 12(b)(6) Motion cannot be decided without presenting matters outside the pleadings, and therefore pursuant to Rule 12(d), it should be treated as a Rule 56 Motion for Summary Judgment." Pl. Sharon Blackmon-Malloy's Mem. in Opp'n to Def.'s Partial Mot. to Dismiss Pl. Sharon Blackmon-Malloy's Claims ("Blackmon-Malloy Opp'n"), ECF No. 533 at 4. Defendant

---

[6] Lieutenant Adams initiated a third *pro se* suit, *Adams III*, No. 6-653, in April 2006. The case was consolidated with the main case in June 2006. *See* Order, ECF No. 142. The sole remaining claim from that case is for retaliation based on Lieutenant Adams' non-selection to Captain. *See* App. II, ECF No. 497-4 at 1. As Defendant stated in its briefing that it does not challenge Lieutenant Adams' claims relating to his non-promotion to Captain, *see* Adams MTD, ECF No. 515-1 at 20 n.1; the *Adams III* retaliation claim is left undisturbed by Defendant's motion to dismiss.

does not address Lieutenant Blackmon-Malloy's request in its reply brief, but the Court concludes that such a conversion would be inappropriate under the current circumstances.

Federal Rule of Civil Procedure 12(d) requires a Court to convert a motion to dismiss into one for summary judgment if "matters outside the pleadings are presented to *and not excluded by the court*." Fed. R. Civ. P. 12(d) (emphasis added). In this case, Lieutenant Blackmon-Malloy presents additional information and exhibits outside the pleadings in her briefing. *See* Index of Exs. in Supp. of Pl.'s Mem. in Opp'n to Def.'s Partial Mot. to Dismiss Pl.'s Claims, ECF No. 533-1 at 1. The Court concludes that such materials should be excluded from consideration because Lieutenant Blackmon-Malloy's proposed course of action would further delay this already protracted litigation. *See Kim v. United States*, 632 F.3d 713, 719 (D.C. Cir. 2011) ("In converting the motion [from a 12(b)(6) motion to a motion for summary judgment], the district courts must provide the parties with notice and an opportunity to present evidence in support of their respective positions."). Thus, the Court will analyze Defendant's partial motion to dismiss under the applicable 12(b)(6) standard.

### 1. *Blackmon-Malloy* (No. 1-2221)

In the FAC, Lieutenant Blackmon-Malloy alleges that she was retaliated against when "unwarranted performance notes" were

66

placed "in her personnel jacket" and when a "CP-534 command discipline report" was issued to her after her complaints about the performance notes. FAC, ECF No. 278 ¶ 70.[7] Defendant argues that this retaliation claim must be dismissed because the FAC "does not allege any facts from which a factfinder could conclude that she suffered a materially adverse action." Blackmon-Malloy MTD, ECF No. 514-1 at 10. The Court agrees.

According to the FAC, Lieutenant Blackmon-Malloy received a total of six CP-550 performance notes, five of which were included in her previously "spotless personnel jacket," marring her previously "unblemished record." FAC, ECF No. 278 ¶ 70. Furthermore, Lieutenant Blackmon-Malloy alleges that she was issued a "CP-534 command discipline report" for her complaints about the performance notes. *Id.* The FAC provides no additional information about any repercussions that occurred due to the issuing of the performance notes, their existence in Lieutenant Blackmon-Malloy's personnel jacket, or the issuing of the command discipline report. It only states that Lieutenant

---

[7] The FAC also alleges that Lieutenant Blackmon-Malloy was discriminated against when her score on the 2000 Lieutenant's exam was changed, "which . . . resulted in her not being promoted." FAC, ECF No. 278 ¶ 47. This claim was reinstated after this Court granted Lieutenant Blackmon-Malloy's Motion for Reconsideration in 2021. *See* Suppl. 12(b)(1) Op., ECF No. 497 at 19-20. As Defendant does not address this claim in its briefing, the Court concludes that Defendant does not challenge this claim on the current partial motion to dismiss.

Blackmon-Malloy "unsuccessfully appealed the CP-534 command disciplinary report." *Id.*

From the information provided in the FAC, the Court cannot infer that any of these incidents rise to the level of a materially adverse action for a retaliation claim. The FAC did not describe the performance notes or command discipline report as having either "abusive language" or being attached to tangible, objective harm to her "position, grade level, salary, or promotion opportunities." *See Baloch*, 550 F.3d at 1199 (finding no materially adverse action when letters of counseling and reprimand "contained no abusive language" and negative performance evaluation did not affect plaintiff's "position, grade level, salary, or promotion opportunities"). The only harm the FAC identifies is a blemishing of Lieutenant Blackmon-Malloy's otherwise "spotless" employment record. This consequence identifies a subjective harm but fails to allege an objective harm—one that would dissuade a reasonable worker from making or supporting a charge of discrimination. *See Burlington N.*, 548 U.S. at 68; *Forkkio*, 306 F.3d at 1132 (holding that plaintiff "failed to establish an adverse action" when he alleged that conduct "may have caused him subjective injury, but it did not objectively harm his working conditions or future employment prospects").

In an attempt to avoid this conclusion, Lieutenant Blackmon-Malloy argues that "even if individually [the performance notes and discipline report] did not constitute retaliatory acts, collectively and in context, they should be adjudicated as part of a hostile work environment." Blackmon-Malloy Opp'n, ECF No. 533 at 8. In its reply brief, Defendant argues that a hostile work environment claim based on the performance notes and discipline report must also fail because the FAC fails to establish that the conduct "was so severe and pervasive as to alter [Lieutenant Blackmon-Malloy's] working conditions." Def.'s Reply in Supp. of Partial Mot. to Dismiss Pl. Sharon Blackmon-Malloy's Claims ("Blackmon-Malloy Reply"), ECF No. 545 at 9. The Court again agrees with Defendant.

As an initial matter, the Court notes that Lieutenant Blackmon-Malloy's attempt to recharacterize the incidents as a claim for hostile work environment may be jurisdictionally barred. *See Ruffin v. Cong. Budget Off.*, 79 F. Supp. 3d 246, 248-50 (D.D.C. 2015) (determining that plaintiff's invocation of mediation for "disparate treatment and unfair compensation because of race, sex, and reprisal" "would hardly provide fair notice that an abusive working environment was being claimed" and thus plaintiff failed to "carry his burden of proving exhaustion of—and with it, jurisdiction over—his hostile work environment claim"). Such an inquiry would require reviewing the

record to determine whether Lieutenant Blackmon-Malloy gave Defendant adequate notice that her complaints about the performance notes and command discipline report were allegations against her working environment in addition to allegations of discrete instances of retaliation. *See id.; Blackmon-Malloy III*, 575 F.3d at 713 (holding that the CAA's jurisdictional exhaustion provision requires plaintiffs to "give notice of his or her claim to the employing office"). However, because the Court concludes that Lieutenant Blackmon-Malloy's allegations would fail under the hostile work environment standard, it need not dig into the record to determine whether that claim is also jurisdictionally barred.

Several judges in this Circuit have observed that using "discrete acts, upon which the plaintiff bases his discrimination and retaliation claims, to support a hostile work environment claim is disfavored." *Townsend v. United States*, 236 F. Supp. 3d 280, 312 (D.D.C. 2017) (collecting cases). Furthermore, the D.C. Circuit has warned that "a plaintiff may not combine discrete acts to form a hostile work environment claim without meeting the required hostile work environment standard." *Baird v. Gotbaum* ("*Baird I*"), 662 F.3d 1246, 1252 (D.C. Cir. 2011); *see also Bain*, 648 F. Supp. 3d at 61 ("[A]n array of discrete discrimination and retaliation claims does not necessarily translate into a hostile work environment claim.").

Turning to the facts in the FAC, the conduct identified is not sufficient to meet the standard for a hostile work environment claim. A claim for hostile work environment, like a retaliation claim, also has an objective component—requiring a plaintiff to show "an environment that a reasonable person would find hostile or abusive." *Harris*, 510 U.S. at 21. The conduct must also be so "severe or pervasive" that the conditions of employment have been effectively changed. *Id.* In terms of severity, as the Court has already noted, the FAC fails to allege that the performance notes or command discipline report contained any abusive language or resulted in objective harm. The subjective harm of tainting Lieutenant Blackmon-Malloy's record is not sufficiently severe such that a "reasonable person would find [the environment] hostile or abusive." *See Baloch*, 550 F.3d at 1201 (holding that letters of counseling and reprimand were not "so 'severe' or 'pervasive' as to have changed the conditions of . . . employment" when they were "not supported by evidence of tangible workplace consequences, whether financial, physical, or professional"). Furthermore, the FAC does not allege any facts from which the Court can conclude that the conduct impeded Lieutenant Blackmon-Malloy's ability to perform her duties. *See id.* (noting that the hostile work environment inquiry analyzes "whether [the conduct] interferes with an employee's work performance"). While Lieutenant

Blackmon-Malloy argues that the frequency of the conduct—"six such disciplinary notices," Blackmon-Malloy Opp'n, ECF No. 533 at 8—should be enough to establish a hostile work environment, the analysis looks to the totality of the circumstances and frequency is just one of the considerations. *See Faragher*, 524 U.S. at 787-88. Accordingly, since the allegations in the FAC are insufficient to establish either a claim for retaliation or hostile work environment, the Court **GRANTS** Defendant's motion to dismiss Lieutenant Blackmon-Malloy's claims from the main case related to the performance notes and the command discipline report.

### 2. *Blackmon-Malloy II* (No. 2-1859)

Lieutenant Blackmon-Malloy initiated a second suit against Defendant in September 2002, alleging retaliation for "leading the *Blackmon-Malloy* employment discrimination class action" and other complaints of discrimination. *See Blackmon-Malloy II* Compl. ¶ 16. Specifically, Lieutenant Blackmon-Malloy alleges that several commanding officers "deliberately disregarded the protests of [then-]Sgt. Blackmon-Malloy over the blatant violation of the smoking policy on the seventh floor, and intentionally subjected her to secondhand smoke to the point that she became physically ill as a result." *Id.* ¶ 15. Defendant argues that Lieutenant Blackmon-Malloy's retaliation claim should fail because she does not "assert any facts indicating

that she was subject to a materially adverse action or that a causal link exists between her protected activity and the Department decision she challenges." Blackmon-Malloy MTD, ECF No. 514-1 at 12. The Court disagrees on both grounds.

On the element of material adversity, the *Blackmon-Malloy II* Complaint specifies that the conduct at issue is the fact that several supervising officers "deliberately disregarded" Lieutenant Blackmon-Malloy's repeated requests to enforce the existing no smoking policy, which then resulted in "intentionally subject[ing] her to secondhand smoke to the point that she became physically ill." *Blackmon-Malloy II* Compl. ¶¶ 9, 11, 12, 13, 15. In her briefing, Lieutenant Blackmon-Malloy attempts to recharacterize the retaliatory conduct at issue to "reassignment of her to an unhealthy environment." Blackmon-Malloy Opp'n, ECF No. 533 at 9. However, the *Blackmon-Malloy II* Complaint does not support such an interpretation. In discussing her assignment to the area at issue, the *Blackmon-Malloy II* Complaint only states that "[then-]Sgt. Blackmon-Malloy has worked on the seventh floor of the department's headquarters since her assignment to the Operations Command Center after the terrorist attacks on September 11, 2001." *Blackmon-Malloy II* Compl. ¶ 9. It provides no other details about Lieutenant Blackmon-Malloy's reassignment. Rather, it provides several paragraphs about Lieutenant Blackmon-Malloy's complaints to

three different supervising officers about the failure to enforce the no smoking policy. *Id.* ¶¶ 11-13. Thus, the text of the *Blackmon-Malloy II* Complaint does not support Lieutenant Blackmon-Malloy's current argument that she was complaining about her assignment to the area permeated with smoke as opposed to her superiors' refusals to enforce the no smoking policy. Regardless of whether Lieutenant Blackmon-Malloy is attempting to recharacterize her existing claim or initiate a new claim, "[i]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." *Arbitraje Casa de Cambio, S.A. de C.V.*, 297 F. Supp. 2d at 170 (internal quotation marks omitted).[8]

Turning to the conduct identified in the *Blackmon-Malloy II* Complaint, the Court concludes that refusing to enforce an existing policy, which causes an employee health issues so severe that she misses work for several days, is, at this juncture, a materially adverse action for a retaliation claim. An employee may establish that she experienced a materially adverse action when consequences of the action "affect[] the

---

[8] Because the Court holds that Lieutenant Blackmon-Malloy may not recharacterize her retaliation claim as one challenging her transfer to the Command Center, the Court need not address Defendant's additional arguments that the recharacterized claim has not been administratively exhausted and is factually insufficient to survive a motion to dismiss, *see* Blackmon-Malloy Reply, ECF No. 545 at 13-19.

terms, conditions, or privileges of employment or future
employment opportunities such that a reasonable trier of fact
could find objectively tangible harm." *Holcomb*, 433 F.3d at 902
(internal quotation marks omitted). The D.C. Circuit has
recognized that "we do not categorically reject a particular
personnel action as nonadverse simply because it does not fall
into a cognizable type," "[s]o long as a plaintiff meets the
statutory requirement of being 'aggrieved' by an employer's
action." *Id.*

Here, the conduct by the Department was its failure to
enforce its existing no smoking policy. Defendant argues that
Lieutenant Blackmon-Malloy "merely complains that the Department
declined to change a practice she found personally found
objectionable, but was otherwise lawful and not directed towards
her individually." Blackmon-Malloy MTD, ECF No. 514-1 at 13.
What this characterization fails to include is that the
"practice" of smoking on the floor where Lieutenant Blackmon-
Malloy worked was against the Department's pre-existing policy.
*See Blackmon-Malloy II* Compl. ¶¶ 9-10. Lieutenant Blackmon-
Malloy was not requesting that a practice she disfavored be
changed to suit her. She was requesting that the existing
policy—which was intended to prevent "non-smoking employees
[from being] involuntarily exposed to secondhand smoke", *id.*
¶ 9—be enforced. The denial of her repeated requests to enforce

an existing policy is itself the change in a privilege of her
employment. Furthermore, Lieutenant Blackmon-Malloy establishes
objective harm when she alleged that the failure of her
supervisors to enforce the policy caused her such health issues
that she "missed three days of work." *Id.* ¶ 14. The *Blackmon-
Malloy II* Complaint then alleges that Lieutenant Blackmon-Malloy
filed a "claim for Workers' Compensation that was accepted by
the U.S. Department of Labor" for those days of missed work. *Id.*
This allegation allows the Court to infer that Lieutenant
Blackmon-Malloy suffered a financial harm from her supervisors'
refusal to enforce the no smoking policy. *See Spector v.
District of Columbia*, No. 17-1884, 2020 WL 977983, at *11
(D.D.C. Feb. 28, 2020) (noting that a materially adverse action
can be found when defendant's retaliatory actions force an
employee to take a leave of absence "even if the employer later
provides backpay for the lost time, because the lost cashflow
can cause serious financial hardship"); *Burlington N.*, 548 U.S.
at 71-72. At this stage of litigation, the Court must resolve
all reasonable inferences in Lieutenant Blackmon-Malloy's favor
and the allegations adequately establish that Lieutenant
Blackmon-Malloy suffered an "objectively tangible harm."

The Court also concludes that the allegations in the
*Blackmon-Malloy II* Complaint permit a reasonable inference that
the Department's actions were causally linked to Lieutenant

Blackmon-Malloy's protected activity. The D.C. Circuit has noted that a Plaintiff has a "minimal burden" in pleading the causal element of a retaliation claim. *Holcomb*, 433 F.3d at 903. And a "close temporal relationship" may alone establish the connection. *See id*. The *Blackmon-Malloy II* Complaint alleges that Lieutenant Blackmon-Malloy's protected activity was "her participation in the EEO process" and "leading the *Blackmon-Malloy* employment discrimination class action." *Blackmon-Malloy II* Compl. ¶¶ 15-16. The main case's first complaint was filed on October 29, 2001. *See* Compl., ECF No.1. The *Blackmon-Malloy II* Complaint establishes that Lieutenant Blackmon-Malloy's concerns about the no smoking policy were voiced to her supervisors in "late September[] 2001." *Id.* ¶ 11. This Circuit generally follows a three-month rule of thumb in determining whether temporal proximity is sufficient to infer retaliatory motive. *See Harris v. Mayorkas* ("*Mayorkas*"), No. 21-1083, 2022 WL 3452316, at *14 (D.D.C. Aug. 18, 2022) ("When relying on temporal proximity alone to demonstrate causation, there is no bright-line rule, although three months is perceived as approaching the outer limit." (internal quotation marks omitted)). Therefore, the protected activity triggering the Department's decision to ignore Lieutenant Blackmon-Malloy's complaints about the no smoking policy would have been required to occur around or after late June 2001.

77

According to this Court's previous opinion adopting Magistrate Judge Facciola's recommendations on exhaustion of administrative remedies, Lieutenant Blackmon-Malloy exhausted her administrative remedies for incidents occurring in February and March of 2001. *See* 12(b)(1) Op., ECF No. 429 at 69; Magistrate R. & R., ECF No. 376 at 19. For Lieutenant Blackmon-Malloy to have adequately exhausted her remedies, the CAA requires that: (1) she requested counseling within 180 days after the incident, which would have been for a period of 30 days unless otherwise agreed to; (2) she filed a request for mediation within 15 days of receiving the notice of the end of her counseling period; (3) she mediated her claim for at least 30 days; and (4) waited at least 30 days after her end-of-mediation notice to file the suit in the main case. *See* *Blackmon-Malloy III*, 575 F.3d at 702 (describing the process and timing of the CAA's exhaustion requirements). These events would have to have all taken place within the six-month gap between the March 2001 incident and the October 2001 filing of the complaint. Given the length of time each step takes, it is reasonable for the Court to infer that Lieutenant Blackmon-Malloy was engaged in the process in or after June 2001. The Court therefore concludes that this temporal proximity is sufficient to establish a causal connection at the motion to dismiss stage.

78

Defendant's arguments otherwise are unpersuasive. The Department argues that a causal connection cannot be inferred because the smoking effected "all employees in that area . . . whether or not they engaged in protected activity" and that "the smoking was occurring before Plaintiff was assigned to the area." Blackmon-Malloy MTD, ECF No. 514-1 at 14. These arguments are misplaced because they distort the nature of the adverse action at issue. As noted above, the smoking itself is not the adverse action, but rather, the Department's alleged consistent failures to enforce the no smoking policy after Lieutenant Blackmon-Malloy's repeated requests to her supervisors. Thus, the proper comparison is not whether other employees were subjected to the smoke but whether other employees, who complained about the violation of the Department's policy, were ignored in the same way as Lieutenant Blackmon-Malloy. Similarly, the fact that the smoking occurred before Lieutenant Blackmon-Malloy was assigned to the area does not relate to the fact that her requests for the no smoking policy to be enforced were ignored. On the present motion to dismiss, Lieutenant Blackmon-Malloy has met her minimal burden of establishing a causal connection through the close temporal relationship discussed above.

Therefore, because the *Blackmon-Malloy II* Complaint adequately pleads that Lieutenant Blackmon-Malloy suffered

objectively tangible harm and that there was a sufficient causal connection between the Department's actions and Lieutenant Blackmon-Malloy's protected activity, the Court **DENIES** Defendant's motion to dismiss the retaliation claim.

### 3. *Young* (No. 4-320)

Several plaintiffs from the main case initiated another suit in February 2004, alleging discrimination and retaliation in the 2002 promotion process in the Department. This suit, *Young v. U.S. Capitol Police Bd.*, No. 4-320, was consolidated with the main case in July 2005. *See* Order, ECF No. 108 at 3. In the *Young* Complaint, Lieutenant Blackmon-Malloy alleges she was "a candidate for promotion to Lieutenant in the [2002] examination process," *Young* Compl. ¶ 5; and that the Department discriminated against her in its "preferential treatment of white candidates," *id.* ¶ 6. She claims that she and "other African American Lieutenant candidates did not receive the same benefit—promotion to Lieutenant—or the same special treatment" that a white candidate was provided. *Id.* ¶ 37. She claims that this act of "providing preferential treatment to successful white candidates in the administration of the [2002] exams for promotion to Sergeant and Lieutenant" was both an act of "disparate treatment on the basis of race" and an act of retaliation "against . . . African American Officers and

Sergeants for participating in and leading the *Blackmon-Malloy* class action." *Id.* ¶¶ 39-40.[9]

### a. Discrimination

As an initial matter, the Court notes that Appendix II and Magistrate Judge Facciola's Report and Recommendation only discuss the promotion claim as a claim for retaliation. *See* App. II, ECF No. 497-4 at 2; Magistrate R. & R., ECF No. 376 at 19. However, looking through the record, it appears that Lieutenant Blackmon-Malloy properly exhausted the claim for discrimination on the same factual basis. The *Young* Complaint states that Lieutenant Blackmon-Malloy received her End of Mediation Notice regarding the claims in *Young* on January 9, 2004. *Young* Compl. ¶ 4. Lieutenant Blackmon-Malloy's Declaration regarding mediation states that this mediation was based on her complaint

---

[9] In its briefing, Defendant argues that Lieutenant Blackmon-Malloy's allegations also "suggest[] that [her] discrimination claim is about the selection of [a white candidate for promotion to Lieutenant] over [her]." Blackmon-Malloy MTD, ECF No. 514-1 at 15. Defendant then argues that this claim is not "properly before this Court" because any claim regarding the "decision to promote [the white candidate]" was not properly exhausted under the CAA. *Id.* In her opposition brief, Lieutenant Blackmon-Malloy clarifies that her "contention" is about the "lieutenant's promotion exam" and its "discriminatory purpose." Blackmon-Malloy Opp'n, ECF No. 533 at 13. Thus, the Court understands Lieutenant Blackmon-Malloy's claims to be limited to allegations regarding the promotion exam process, not the promotion of a white candidate over her. Accordingly, the Court need not determine whether a claim around the eventual promotion of a white candidate has been administratively exhausted because that claim is not before this Court.

that the "promotion examination for the rank of Lieutenant was discriminatory, in that a white candidate . . . was allowed to take a different test . . . on a later date than the scheduled examination date." Pls.' Mem. of P. & A. in Opp'n to Mot. to Dismiss—Ex. 1 ("Blackmon-Malloy Decl."), ECF No. 331-2 ¶ 19. Defendant did not dispute this assertion in its briefing on exhaustion, but simply failed to mention the discrimination claim, conceding only that Lieutenant Blackmon-Malloy had "timely exhausted her claim of retaliation related to the . . . Lieutenant Promotion Examination." Reply in Supp. of Def.'s Mot. to Dismiss the Fourth Am. Compl., ECF No. 365 at 30. Therefore, since Defendant has never challenged Lieutenant Blackmon-Malloy's exhaustion of this claim for discrimination—including in the current briefing on this motion to dismiss—and because the Court has independently verified that Lieutenant Blackmon-Malloy notified Defendant of the basis of her claim during the mediation process, the Court will consider the discrimination claim. *See Kabakova v. Off. of the Architect of the Capitol*, No. 19-1276, 2020 WL 1866003, at *14 (D.D.C. Apr. 14, 2020) (holding a claim exhausted where "[t]he record establishes that plaintiff raised those claims in [mediation] and then saw that matter through to the end of mediation"); *Macon v. U.S. Capitol Police Bd.*, 258 F. Supp. 3d 94, 101 (D.D.C. 2017) (observing that a plaintiff has the "responsibility to set forth some evidence

that a particular claim was actually presented in counseling and mediation").

Turning to the substance of the discrimination claim, Defendant argues that Lieutenant Blackmon-Malloy's claim should be dismissed because she "has not identified any adverse employment action taken against her," Blackmon-Malloy MTD, ECF No. 514-1 at 18; and the allegations "lack[] any facts that would support an inference that Plaintiff's race is the reason" for the alleged discrimination, *id.* at 20. The Court agrees that the *Young* Complaint fails to state a claim for discrimination in the Lieutenant's promotion process because the alleged facts fail to support an inference that any disparate treatment was due to race.

The *Young* Complaint alleges racial discrimination in the Lieutenant's promotion process in two ways. First, it alleges that a "white Sergeant" was given "preferential treatment" when she was allowed to take both portions of the exam later in the year, giving her "several more months to prepare for the exam." *Young* Compl. ¶ 28. Second, it alleges that Lieutenant Blackmon-Malloy received an "inaccurate and unfair score on the Simulation Exercises," which "did not accurately reflect the full range of her abilities," and lead to her being ranked "17 out of the 25 Sergeants" who took the exam, with only ten candidates being promoted to Lieutenant. *Id.* ¶ 36. These

allegations, neither separately nor in unison allow the Court to infer that the Lieutenant's promotion exam process was the product of discrimination.

To survive a motion to dismiss, a Plaintiff need not establish a *prima facie* case of discrimination, but must allege facts that permit an inference of discrimination, such as "discriminatory statements by the employer or other attitudes suggesting the decision maker harbors discriminatory animus." *Holcomb*, 433 F.3d at 899 (internal citation omitted). Under certain circumstances, "an allegedly racially motivated deviation from standard procedure may raise an inference of discrimination at the motion-to-dismiss stage." *See Jones v. Ottenberg's Bakers, Inc.*, 999 F. Supp. 2d 185, 191 (D.D.C. 2013). And "[a] frequent means of pleading factual allegations sufficient to raise an inference of discrimination . . . is by showing that [the plaintiff] was treated differently from similarly situated employees who are not part of the protected class." *Keith v. U.S. Gov't Accountability Off.*, No. 21-2010, 2022 WL 3715776, at *3 (D.D.C. Aug. 29, 2022) (internal quotation marks omitted); *see also George*, 407 F.3d at 412.

In this case, the *Young* Complaint alleges that a white candidate was treated more favorably by being able to take both portions of the Lieutenant's promotion exam months after the other candidates were required to take the exam. The Complaint

also alleges that this decision was "against the department's past practice and the testing contractor's procedures and recommendation." *Young* Compl. ¶ 33. However, the Complaint fails to connect this purported favorable treatment to the candidate's race. In fact, the complaint has several other paragraphs detailing how this one particular candidate had "received special treatment" on several other occasions. *Id.* ¶¶ 29-31. The Complaint does not allege that candidates of other races requested to take the Lieutenant's exam at a later time and were denied or that other white candidates for the Lieutenant's exam received similar preferential treatment. Although this candidate was treated differently from Lieutenant Blackmon-Malloy, the *Young* Complaint also states that this candidate was the only one allowed to take the exam at a different date and that 24 other candidates—their races unknown—were required to take the test with Lieutenant Blackmon-Malloy. *See id.* ¶¶ 28, 36. Thus, these allegations fail to "nudge[] [the] claim[] across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

The same is true for the allegations based on Lieutenant Blackmon-Malloy's score on the exam. Lieutenant Blackmon-Malloy alleges that her score was "unfair," an "inaccurate" representation of her abilities, and "surprising considering that [she] received the highest score on the Skills Assessment's written exercise." *Young* Compl. ¶ 36. While all of these

allegations may be true, the *Young* Complaint fails to allege
that this "inaccurate and unfair score" was given to Lieutenant
Blackmon-Malloy because of her race. She only asserts that she
"never received individualized feedback about her performance on
the exam." *Id.* She does not allege that any similarly situated
candidates of other races were treated more favorably in
scoring. And, as noted above, the Complaint fails to put forth
any additional allegations that allow the Court to infer a
discriminatory motive.

Lieutenant Blackmon-Malloy argues that she should be
"afforded the opportunity to demonstrate, through discovery,
that the Department's decision to give special treatment on the
examination . . . was purposefully based on race and
retaliation." Blackmon-Malloy Opp'n, ECF No. 533 at 14. While
the Court is aware that Plaintiffs are often at an informational
disadvantage in establishing discriminatory motive before
discovery, *see Swierkiewicz*, 534 U.S. at 511-14; the standard to
survive a motion to dismiss still requires that plaintiffs plead
enough facts for the Court to infer discrimination. *See Twombly*,
550 U.S. at 570.

Additionally, although Lieutenant Blackmon-Malloy suggests
"two obvious non-discriminatory alternatives" to the testing
process, *see* Blackmon-Mallloy Opp'n, ECF No. 533 at 14; on a
motion to dismiss, the Court must only determine whether the

allegations on the face of the complaint permit an inference of discrimination—not whether a less discriminatory alternative existed. *See Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (emphasizing that district courts "may not second-guess an employer's personnel decision[s] absent demonstrably discriminatory motive" (internal quotation marks omitted)). Accordingly, the Court **GRANTS** Defendant's motion to dismiss Lieutenant Blackmon-Malloy's claim for discrimination in the Lieutenant's promotion exam process.[10]

### b. Retaliation

Defendant argues that Lieutenant Blackmon-Malloy's retaliation claim "is deficient in similar ways to her race discrimination claim," namely that she "fails to assert any facts indicating that she was subject to a materially adverse action or that a causal link exists between her protected activity and the Department decision she challenges." Blackmon-Malloy MTD, ECF No. 514-1 at 22. The Court agrees that the allegations in the *Young* Complaint fail to raise an inference of retaliatory motive by the Department.

---

[10] Because the Court agrees with Defendant on the issue of causal connection, the Court need not address Defendant's other argument that Lieutenant Blackmon-Malloy did not suffer an adverse employment action based on the facts alleged in the *Young* Complaint.

The allegations relating to retaliation in the *Young*
Complaint are sparse. The conduct at issue—the Lieutenant's
promotion process exams—took place in February and May 2003, *see*
*Young* Compl. ¶¶ 12, 14; with the make-up exams for a single
candidate being administered in September and October 2003, *see*
*id.* ¶ 28. At the motion to dismiss stage, a causal inference for
retaliation can be established with as little as a close
temporal relationship between the protected activity and alleged
retaliatory conduct. *See Holcomb*, 433 F.3d at 903. The *Young*
Complaint fails to establish even that connection. The promotion
exams at issue took place about 18 months to 2 years after the
*Blackmon-Malloy* suit was initiated in October 2001. *See* Compl.,
ECF No. 1. The *Young* Complaint does not allege any additional
protected conduct occurred during that gap, which might have
triggered retaliation, nor does it explain the long temporal gap
between the initiation of the suit and the conduct at issue. *Cf.*
*Holcomb*, 433 F.3d at 903 (concluding that because a plaintiff
"repeatedly engaged in protected activity during the period when
[the conduct at issue occurred]," establishing "close temporal
proximity" was not also required). Furthermore, the *Young*
Complaint does not provide any facts about whether other
candidates for promotion to Lieutenant engaged in protected
activity. Without this information, the Court cannot infer that
Lieutenant Blackmon-Malloy was treated differently from

88

similarly situated candidates because of her protected activity. Finally, the only other allegation related to retaliation from the *Young* Complaint is that the Department "retaliated against its African American Officers and Sergeants for participating in and leading the *Blackmon-Malloy* class action, by providing preferential treatment to successful white candidates in the administration of the . . . exams for promotion to Sergeant and Lieutenant." *Young* Compl. ¶ 40. This statement is a legal conclusion, which the Court need not credit and is not sufficient to survive a motion to dismiss. *See Papasan*, 478 U.S. at 286. Accordingly, the Court **GRANTS** Defendant's motion to dismiss Lieutenant Blackmon-Malloy's claim for retaliation based on the Lieutenant's promotion process.[11]

### C. Regina Bolden-Whitaker

Officer Bolden-Whitaker's sole remaining claim is for retaliation from a suit initiated by several Plaintiffs from the main case in December 2003. *See* App. II, ECF No. 497-4 at 2; *Bolden-Whitaker* Compl. ¶ 1. In that suit, *Bolden-Whitaker*, Officer Bolden-Whitaker alleged that the Department retaliated against her for her participation in the main case by suspending

---

[11] Because the Court agrees with Defendant on the issue of causal connection, the Court need not address Defendant's other argument that Lieutenant Blackmon-Malloy did not suffer a materially adverse action based on the facts alleged in the *Young* Complaint.

her and issuing her a CP-535 Request for Disciplinary Action
after Officer Bolden-Whitaker refused to sign a deputation form.
*See Bolden-Whitaker* Compl. ¶ 17. Defendant seeks dismissal of
this claim on the ground that the *Bolden-Whitaker* Complaint does
not state a claim for retaliation because any adverse action
"did not directly affect [Officer Bolden-Whitaker's] job title,
duties, salary, benefits or work hours in any material manner."
Mem. in Supp. of Def.'s Mot. to Dismiss the Compl. of Pl. Regina
Bolden-Whitaker ("Bolden-Whitaker MTD"), ECF No. 525-1 at 10.[12]
The Court agrees that Officer Bolden-Whitaker's claim should be
dismissed because she fails to adequately allege that she
suffered a materially adverse action.

Officer Bolden-Whitaker argues that both her suspension and
entering a "permanent CP-535 Request for Disciplinary Action
notice in her file" qualify as materially adverse actions for a
retaliation claim. Pl. Regina Bolden-Whitaker's Opp'n to Def.'s

---

[12] In its briefing, Defendant often cites cases regarding the
standard for discrimination and states that Officer Bolden-
Whitaker's claim should be dismissed because the allegations in
the *Bolden-Whitaker* Complaint do "not constitute an 'adverse
employment action' under the CAA." Bolden-Whitaker MTD, ECF No.
525-1 at 8. However, Defendant also makes clear in its briefing
that it is challenging Officer Bolden-Whitaker's "CAA claim of
retaliation." *Id.* at 10. Because the discrimination and
retaliation standards are similar and Defendant's arguments
generally have merit under the applicable retaliation standard,
the Court analyzes Officer Bolden-Whitaker's claim under the
retaliation standard and disregards any erroneous references to
the standard for discrimination.

Mot. to Dismiss the Compl. of Pl. Regina Bolden-Whitaker

("Bolden-Whitaker Opp'n"), ECF No. 540 at 5. Looking at the

suspension first, the *Bolden-Whitaker* Complaint alleges that

after Officer Bolden-Whitaker refused to sign the deputation

form, she "was immediately suspended" but "was reinstated" the

next day when the form was explained to her and she signed it.

*Bolden-Whitaker* Compl. ¶ 17. These allegations fail to establish

that Officer Bolden-Whitaker suffered an objectively tangible

harm from the suspension because it did not affect her

"position, grade level, salary, or promotion opportunities." *See*

*Baloch*, 550 F.3d at 1199; *Dickerson v. SecTek, Inc.*, 238 F.

Supp. 2d 66, 79, 86 n.18 (D.D.C. 2002) (concluding that a

"relatively brief" suspension without loss of pay "could not

have served as the basis for a retaliation claim"). Officer

Bolden-Whitaker was only suspended for part of one workday, and

she does not state in the *Bolden-Whitaker* Complaint that any

tangible harm came from her few hours of suspension.[13] Thus, the

---

[13] In her briefing, Officer Bolden-Whitaker also claims that the
suspension resulted in a "loss in pay when she was docked two
and a half hours between the time that she was suspended and the
time that her suspension was reversed." Bolden-Whitaker Opp'n,
ECF No. 540 at 6. As Defendant notes, this allegation was not
included in the *Bolden-Whitaker* Complaint and thus, on this
motion to dismiss, the Court may not consider the additional
allegation. *See St. Francis Xavier*, 117 F.3d at 624.
Accordingly, the Court will also not address Defendant's
argument in its reply brief that "the loss of two-and-one half
hours of pay for failing to follow an order is neither material
nor significant." Def.'s Reply in Further Supp. of Mot. to

*Bolden-Whitaker* Complaint fails to adequately allege that Officer Bolden-Whitaker's suspension in these circumstances would dissuade a reasonable worker from making or supporting a charge of discrimination. *See Burlington N.*, 548 U.S. at 68.

The same is true for the CP-535 Request for Disciplinary Action. The *Bolden-Whitaker* Complaint states that the form "becomes a part of an Officer's permanent record and can serve as the basis for termination for any future offense." *Bolden-Whitaker* Compl. ¶ 17. It also states that the form was "forwarded . . . to the Internal Affairs Division for investigation." *Id.* As noted previously, the mere initiation of an investigation, without a showing of an objectively tangible harm stemming from the prospect of that investigation, is not sufficient to qualify as a materially adverse action. *See Velikonja*, 466 F.3d at 124; *Douglas v. Donovan*, 559 F.3d 549, 553 (D.C. Cir. 2009) ("For employment actions that do not obviously result in a significant change in employment status . . . an employee must go the further step of demonstrating how the decision nonetheless cause such an objectively tangible harm.").

Furthermore, any allegations of harm stemming from a Defendant's actions must not be "unduly speculative." *Douglas*,

---

Dismiss the Compl. of Pl. Regina Bolden-Whitaker ("Bolden-Whitaker Reply"), ECF No. 548 at 9.

559 F.3d at 553. Officer Bolden-Whitaker fails to allege any harm from the CP-535 that does not require speculation. Her allegations of harm stem from the potential impact of the CP-535 in combination with a potential "future offense." In order to trigger harm, Officer Bolden-Whitaker would not only have to commit a future offense; the CP-535 would have to be used against her in that future proceeding. The *Bolden-Whitaker* Complaint never specifies under which circumstances the CP-535 will be used against her if she commits a future offense, only that it "can." Such dual levels of speculation are far from the "direct, measurable, and immediate effect" upon an employee that the D.C. Circuit has determined may qualify as objectively tangible harm. *Id.* (internal quotation marks omitted).

Officer Bolden-Whitaker urges the Court to allow her to take discovery to determine whether the "assignment of her job duties and her potential for promotion" were affected by the CP-535. Bolden-Whitaker Opp'n, ECF No. 540 at 6. But this logic flips the standard for a motion to dismiss. The face of the complaint must allege that Officer Bolden-Whitaker suffered an objectively tangible harm in order to proceed to discovery. *See Twombly*, 550 U.S. at 570.

Officer Bolden-Whitaker also argues that the Court should consider the "humiliation and damage to her record" as a materially adverse action. Bolden-Whitaker Opp'n, ECF No. 540 at

5. However, the retaliation standard employs an objective approach to separate actionable retaliation from "trivial" harms. *See Burlington N.*, 548 U.S. at 68; *Forkkio*, 306 F.3d at 1132 (holding that plaintiff "failed to establish an adverse action" when he alleged that conduct "may have caused him subjective injury, but it did not objectively harm his working conditions or future employment prospects"). Nothing in the *Bolden-Whitaker* Complaint suggests that the CP-535 caused Officer Bolden-Whitaker an objectively tangible harm. She only alleges that the note could cause her harm in the future were she to be disciplined again.

Thus, because the *Bolden-Whitaker* Complaint fails to adequately allege that Officer Bolden-Whitaker suffered a materially adverse action based on either her suspension or the entering of a CP-535 note in her file, the Court **GRANTS** Defendant's motion to dismiss Officer Bolden-Whitaker's claim for retaliation.[14]

---

[14] In its reply brief, Defendant also argues that Officer Bolden-Whitaker "did not engage in statutorily protected activity that resulted in her discipline; it was her refusal to sign a required deputation form and she admits this." Bolden-Whitaker Reply, ECF No. 548 at 6. This argument seems to address a separate element of a retaliation claim—the requirement of a causal connection between the materially adverse action and the plaintiff's protected activity. *See Baloch*, 550 F.3d at 1198. Because Defendant does not develop this argument and because this argument is only brought up in its reply brief, the Court declines to address it. *See Nat'l Acad. of Scis.*, 974 F.2d at 196.

**D. Tyrone Brooks**

According to Appendix II, Officer Brooks' sole remaining claim in this case is for retaliation from *Young*. *See* App. II, ECF No. 497-4 at 2. In August 2021, Officer Brooks, proceeding *pro se*, filed a motion to "correct entry" regarding his claim, arguing that the remaining claim is for both discrimination and retaliation.[15] Brooks Correction Mot., ECF No. 505 at 4-5. Defendant filed a response to Officer Brooks' motion, stating that it "takes no position" on whether the Court should grant the motion because its briefing on the current motion to dismiss addresses both discrimination and retaliation. *See* Def.'s Notice to the Ct., ECF No. 587 at 1-2.

---

[15] Certain parts of Officer Brooks' motion suggest that he is asking the Court to replace its description of his claim as one for retaliation with a description that the claim is for discrimination. *See, e.g.*, Brooks Correction Mot., ECF No. 505 at 5 (asking that the Court grant his motion and correct the description of his claim to read "discrimination in non-promotion in the 2002 Sergeant's examination based on race (African American)."). However, in Officer Brooks' subsequent briefing on this motion to dismiss, he argues that the claim should be understood as a claim for both discrimination and retaliation. *See, e.g.*, Pl. Tyrone D. Brooks' Mem. of P. & A. in Opp'n to Def.'s Mot. to Dismiss Pl. Brooks' Claims ("Brooks Opp'n"), ECF No. 576-1 at 12 ("Plaintiff Brooks met the required factors in establishing unlawful retaliation."). Because Officer Brooks filed both of these briefs *pro se*, the Court is obligated to construe them liberally. *See Erickson*, 551 U.S. at 94. As part of this task, the Court will interpret Officer Brooks' Correction Motion as a request to add the description that his claim from *Young* is also a claim for discrimination.

In support of its motion to dismiss, Defendant argues that Officer Brooks has failed to establish discrimination in the 2002 promotion process because Officer Brooks did not suffer an adverse employment action and the *Young* Complaint fails to establish a causal link between the promotion process and Officer Brooks' race. *See* Def.'s Mem. of P. & A. in Supp. of Mot. to Dismiss Pl. Tyrone Brooks' Claims ("Brooks MTD"), ECF No. 512-1 at 11-14. As for the retaliation claim, Defendant similarly challenges the existence of a materially adverse action and a causal connection between the promotion process and Officer Brooks' protected conduct. *Id.* at 11-12. The Court begins by addressing Officer Brooks' discrimination claim, including his motion to correct the entry of his claim after the Court's previous opinion.

### 1. Discrimination

In his motion to "correct entry," Officer Brooks argues that the Court made a "typographical error" in its previous opinion and that the error should be corrected to "accurately reflect his surviving claim of non-promotion based on race." Brooks Correction Mot., ECF No. 505 at 2. Officer Brooks specifies that he is "not asking the Court to reconsider its adoption of the Magistrate Judge's recommendation that his claim . . . proceed but only to correct the inaccurate description of the claim." *Id.* at 4-5. Construing the *pro se* briefing

liberally, the Court concludes that Officer Brooks' requested relief is simply that the Court interpret his claim regarding the 2002 promotion process as a claim for discrimination as well as retaliation. The Court agrees that the claim should be so understood.

Although Defendant does not object to reconstruing Officer Brooks' claim, the administrative exhaustion requirement in the CAA is claim-specific and jurisdictional and thus cannot be waived only with the Defendant's consent. *See Blackmon-Malloy III*, 575 F.3d at 705; *Ross*, 195 F. Supp. 3d at 199 ("[S]uccessful completion of every CAA prerequisite regarding each claim is a *jurisdictional* prerequisite, which means that it cannot be waived by this Court, much less any party or agent of a party."). Nevertheless, Officer Brooks has pointed to enough facts in the existing record to persuade the Court that his claim for discrimination was properly exhausted.

First, within the briefing surrounding the exhaustion question, Officer Brooks submitted a declaration claiming that he complained about the "discriminatory/retaliatory act" of the "decision to allow white officers to take [the Sergeant's] exam at a later date." Pls.' Mot. for Recons. of the Ct.'s Sept. 30, 2004 Mem. Op. & Order—Ex. 32 ("Brooks Decl."), ECF No. 96-33 ¶ 4. This description of his complaint would have put the Department on notice that Officer Brooks was complaining about

discrimination and not just retaliation. *See Macon*, 258 F. Supp. 3d at 101. Furthermore, in its briefing regarding exhaustion, Defendant noted that Officer Brooks was among "several plaintiffs" who "filed declarations challenging the 2002 Sergeant Promotions process" and that his claim was timely since he "stated he received the end of mediation notice on December 3, 2003." Reply in Supp. of Def.'s Mot. to Dismiss the Fourth Am. Compl., ECF No. 365 at 28. However, in that briefing, Defendant described Officer Brooks' claim as only for retaliation and not both discrimination and retaliation. *See id.* at 26-28. In his Report and Recommendation, Magistrate Judge Facciola concluded that the claim should proceed "because the defendant appears to concede jurisdiction." Magistrate R. & R., ECF No. 376 at 23. However, he adopted the Defendant's implicit characterization of the claim as one solely for retaliation. *Id.* Since the Court has now independently verified that Officer Brooks properly exhausted his claim as one for discrimination as well as retaliation and because the description of the claim as simply one for retaliation appears to have been an unintentional oversight—which Defendant does not defend—the Court will **GRANT** Officer Brooks' motion to correct the entry of the claim and reconstrue it as a claim for both discrimination and retaliation.

However, turning to the merits of the claim, the Court also concludes that Officer Brooks' claim for discrimination should be dismissed because the *Young* Complaint fails to support an inference that the 2002 Sergeant's promotion process was tainted with racial discrimination. The *Young* Complaint alleges that the Sergeant's promotion process benefitted two white candidates by allowing them to take a portion of the exam late. *Young* Compl. ¶¶ 16, 20. It further alleges that the process harmed Officer Brooks and "numerous other African American Sergeant candidates[, who] did not receive the same benefit—promotion to Sergeant—or the same special treatment." *Id.* ¶ 27.[16] Although the *Young* Complaint states that some of the beneficiaries of the late testing date were white and he—a non-beneficiary of that testing date—is African American, in the context of the full *Young* Complaint, those allegations alone do not establish an inference of discrimination by the Department.

---

[16] Defendant argues that any claim based on the promotion of one of the white candidates was not properly exhausted and thus is not properly before this Court. *See* Brooks MTD, ECF No. 512-1 at 8-10. In his briefing, Officer Brooks clarifies that his allegations are that "the Department unlawfully discriminated against him based on his race . . . when it gave white applicants an unfair advantage by allowing them to take the simulation exercises in the exam at a later date than other officers." Brooks Opp'n, ECF No. 576-1 at 10. Because Officer Brooks is not challenging the promotion of other candidates, but is instead challenging the promotion process itself as discriminatory, the Court need not address Defendant's claim that a challenge to the promotion of other candidates was not properly exhausted.

First, Officer Brooks' allegations do not suggest that he was treated differently from non-African American candidates. *See George*, 407 F.3d at 412 (noting that plaintiffs often establish the inference of discrimination by "demonstrating that [they were] treated differently from similarly situated employees who are not part of the protected class"). White candidates for promotion to Sergeant were also required to take the test with Officer Brooks. *See id.* ¶ 19 (stating that a white female officer joined several plaintiffs in complaining about the potential benefits candidates could receive by taking the test at a later date). In fact, the *Young* Complaint suggests that most white candidates were required to take the test on the regularly scheduled date because it only states that two white candidates were given the benefit of taking the exam later. *See id.* Furthermore, the *Young* Complaint does not allege that any African American candidates sought to take the test later but were denied this purported benefit.

Similarly, the *Young* Complaint does not suggest that white candidates as a class were favored in the promotion process. Only two white candidates were identified in the *Young* Complaint as being allowed to take the exam at a later date, but another white candidate was previously denied the same purported benefit in a previous testing cycle. *Id.* This allegation suggests that while some white candidates have benefitted from a later testing

date, others have not, undercutting allegations that the Department's "intent" was to favor white candidates. Furthermore, the *Young* Complaint states that the Department created a new exam in response to Officer Brooks and other candidates' complaints about an unfair advantage, *Young* Compl. ¶ 20; which again undercuts allegations that any favoritism was intentional.

Although the *Young* Complaint alleges that "the Officer with the highest score on the . . . exam" is an African American female officer who was not promoted, this allegation also fails to suggest a causal connection between the administration of the exam and a racial bias by the Department. *See id.* ¶ 26. The *Young* Complaint specifies that the "preferential treatment" given to two white candidates is the underlying conduct in this discrimination claim. *Id.* ¶ 20. The fact that an African American candidate with a very high score on the exam was not promoted does not speak to any discrimination in the administration of the exam. The *Young* Complaint does not make any attempt to connect these two facts and does not even address when the African American candidate took the exam. *See id.* (alleging that the white candidates "and a few other Sergeant candidates" took the exam at the later date in September 2003).

Similar reasoning leads the Court to reject Officer Brooks' argument that the "causal link here is white officers regularly

received promotional opportunities without the added workplace
stress of having to fend off discrimination and other racist
illegal acts committed against black officers and employees
involving employment practices made unlawful under Title VII."
Brooks Opp'n, ECF No. 576-1 at 12. Even if the Court were to
accept that Black officers faced additional "workplace stress,"
this argument would not provide any support for the *Young*
Complaint's allegations that the 2002 Sergeant's promotion
process was discriminatory. The causal connection necessary to
establish a claim of discrimination requires factual allegations
that permit an inference that the complained about conduct was
the *product* of racial discrimination. *See Baloch*, 550 F.3d at
1196. The "workplace stress" of black officers and "promotional
opportunities" for white officers seem to be alleged byproducts
of the Department's actions, not their cause. Furthermore, these
general conclusions fail to directly address the complained
about conduct at issue—the 2002 Sergeant's promotion process—and
therefore provide no support for any argument about a causal
connection between that conduct and Officer Brooks' race.

Finally, the *Young* Complaint alleges no additional facts
that would allow the Court to draw an inference of
discrimination. It does allege that "Defendant, under Chief
Terrance W. Gainer's direction, has bent the rules in order to
promote favored white candidates." *Id.* ¶ 15. But this conclusory

102

allegation has no factual content and thus is not sufficient to establish an inference of intentional racial discrimination on this motion to dismiss. *See Papasan*, 478 U.S. at 286. The *Young* Complaint does not provide any facts that the officials responsible for testing exhibited racial animus through racist remarks or actions. *See Alston*, 208 F. Supp. 3d at 301-02.

Accordingly, the Court **GRANTS** Defendant's motion to dismiss Officer Brooks' discrimination claim because the allegations in the *Young* Complaint fail to permit an inference that any disparate treatment in the 2002 Sergeant's promotion process was based on Officer Brooks' race.[17]

### 2. Retaliation

The Court reaches a similar conclusion on Officer Brooks' claim for retaliation. Nothing in the *Young* Complaint ties the allegedly retaliatory 2002 Sergeant's promotion process to Officer Brooks' protected activity. The Sergeant's promotion process exams were administered to the majority of candidates in February and May 2003, *Young* Compl. ¶¶ 12-13; with makeup exams being administered that September, *id.* ¶¶ 19-20. The *Blackmon-Malloy* suit was initiated in October 2001. *See* Compl., ECF No.

---

[17] Because the Court agrees with Defendant on the issue of causal connection, the Court need not address Defendant's other argument that Officer Brooks did not suffer an adverse employment action based on the facts alleged in the *Young* Complaint.

1. Thus, the exams were administered well over a year after the *Blackmon-Malloy* case was initiated in the district court. As previously explained, courts in this circuit have generally relied on a three-month rule to establish causation on the basis of temporal proximity alone. *See Mayorkas*, 2022 WL 3452316, at *14 ("When relying on temporal proximity alone to demonstrate causation, there is no bright-line rule, although three months is perceived as approaching the outer limit."). The *Young* Complaint fails to explain this gap in time between the protected conduct and the alleged retaliatory actions or to allege that any other protected activity triggered the retaliation. Therefore, the Court cannot infer causation through temporal proximity.

Furthermore, as noted in the previous section, the majority of candidates for promotion were also required to take the test at the same time as Officer Brooks, negating any inference that Officer Brooks was singled out for his protected activity. *Young* Compl. ¶ 19. Officer Brooks questions "[w]hat would have happened to Plaintiff (black officer) engaging in protected activity if he had been a white officer not engaging in protected activity?" Brooks Opp'n, ECF No. 576-1 at 14. But the *Young* Complaint suggests an answer when it states that a white officer who did not engage in protected activity was required to take the Sergeant's examination at the same time as Officer

Brooks and joined Officer Brooks in complaining about potential unfairness. *See Young* Compl. ¶ 19.

Finally, the *Young* Complaint is silent as to whether any officers who participated in protected activity were allowed to take the exam at a later date or requested to but were denied. And, also as described above, the *Young* Complaint specifies that the Department created a new test in response to accusations of unfairness. *Id.* ¶ 20. Overall, these allegations fail to tie the 2002 promotion exam administration to Officer Brooks' protected activity. He was not treated differently from other candidates who did not previously complain of discrimination and the conduct at issue—the exams—took place over a year after Officer Brooks' identified protected activity. Therefore, the Court **GRANTS** Defendant's motion to dismiss Officer Brooks' retaliation claim based on the 2002 Sergeant's promotion process.[18]

### E. Arnold Fields

According to Appendix II, Officer Fields has claims of retaliation and hostile work environment remaining from three cases—*Fields I*, *Fields II*, and *Bolden-Whitaker*. *See* App. II, ECF No. 497-4 at 2. On the current motion to dismiss, the parties

---

[18] Because the Court agrees with Defendant on the issue of causal connection, the Court need not address Defendant's other argument that Officer Brooks did not suffer a materially adverse action based on the facts alleged in the *Young* Complaint.

have briefed the claims for retaliation and hostile work environment but have also interpreted the claims from the three cases as claims for discrimination. *See* Def.'s Mem. of P. & A. in Supp. of Mot. to Dismiss Pl. Arnold Fields' Claims ("Fields MTD"), ECF No. 516-1 at 11, 17, 20; Pl. Arnold Fields' Mem. of P. & A. in Opp'n to Def.'s Mot. to Dismiss ("Fields Opp'n"), ECF No. 536-1 at 20, 24. Because the administrative exhaustion requirement from the CAA is claim-specific and jurisdictional, the Court must first determine whether the record supports exhaustion for Officer Fields' claims of discrimination. *See* *Blackmon-Malloy III*, 575 F.3d at 705; *Ross*, 195 F. Supp. 3d at 199 (observing that the CAA's "*jurisdictional* prerequisites" for "each claim" may not be waived by "any party").

Beginning with the previous descriptions of Officer Fields' claims, the record does not reveal that the omission of Officer Fields' claims for discrimination was an oversight or a typographical error. In Magistrate Judge Facciola's Report and Recommendation, he describes the claims from the three cases as claims "for hostile work environment and retaliation." Magistrate R. & R., ECF No. 376 at 24. This description was taken from Magistrate Judge Facciola's 2007 Report and Recommendation, which Officer Fields cited to and agreed with in his 2011 opposition to Defendant's motion to dismiss. *See* R. & R., ECF No. 151 at 17; Pls.' Mem. of P. & A. in Opp'n to Mot. to

106

Dismiss, ECF No. 331 at 29. At the end of the most recent Report and Recommendation for Officer Fields' claims, Magistrate Judge Facciola specifies that his recommendation "means that Fields should be able to go forward with his claims for hostile work environment and retaliation, but not discrimination." Magistrate R. & R., ECF No. 375 at 24. In his objection to the Report and Recommendation, Officer Fields specified that he "concur[red] in the Report and Recommendation with regard to Officer Fields' claims in [*Fields I, Fields II*, and *Bolden-Whitaker*]." Pls.' Objs. to the R. & R. of the Magistrate Judge, ECF No. 386 at 39. Thus, the record suggests that Magistrate Judge Facciola specifically understood Officer Fields' claims as being only for hostile work environment and retaliation and that Officer Fields concurred in this description of his claims.

Additionally, the Court has not independently found in the record any indication that Officer Fields exhausted his claims for discrimination. In the declaration that Officer Fields submitted to the Court in support of exhaustion, he stated for each of the three cases at issue that he complained about "incidents involving harassment and retaliation" and that he "timely requested counseling and was counseled for this and other incidents constituting a hostile work environment and retaliation." Pls.' Mot. for Recons. of the Ct.'s Sept. 30, 2004

Mem. Op. & Order—Ex. 18 ("Fields Decl."), ECF No. 96-19 ¶¶ 7-9.[19]
Since claims of discrimination are distinct from claims of a
hostile work environment, the Court cannot infer that Officer
Fields' description of "harassment" and "other incidents
constituting a hostile work environment" put Defendant on notice
that Officer Fields was also making independent claims of
discrimination. *See Macon*, 258 F. Supp. 3d at 101.

Therefore, because the Court has determined that the
omission of Officer Fields' claims of discrimination was not an
oversight and there is no evidence in the record to conclude
that Officer Fields properly exhausted these claims, the Court
will not consider the parties' arguments regarding claims of
discrimination. Consequently, the Court now turns to Officer
Fields' claims of retaliation and hostile work environment from
*Fields I*, *Fields II*, and *Bolden-Whitaker*.

---

[19] The *Bolden-Whitaker* Complaint claims that Officer Fields
"successfully completed additional counseling and mediation
related to the Defendant's decisions to discipline [him]" and he
received his "End of Mediation Notice[] on October 22, 2004."
*Bolden-Whitaker* Compl. ¶ 5. However, Officer Fields' declaration
was dated December 15, 2004, almost two months after his alleged
additional End of Mediation notice and the declaration did not
mention, much less describe, any allegations from the additional
mediation process.  Fields Decl., ECF No. 96-19 ¶¶ 7-9. Thus,
the Court does not have sufficient information to determine
whether this additional mediation session included complaints
about discrimination.

### 1. *Fields I* (2-1346)

In July 2002, Officer Fields filed suit against Defendant alleging retaliation and a hostile work environment based on several events that happened in the Summer and Fall of 2001. *See Fields I* Compl. ¶¶ 7-9. Attached to the *Fields I* Complaint were two documents supporting the allegations in the Complaint. The first document was a memorandum from Officer Fields to Chief James Varey, Division Commander Inspector Price Goldston, and the Black Police Officer's Association with the subject "Refutation of Annual Performance Evaluation." *See Fields I* Compl.—Ex. 1, *Fields I*, No. 2-1346 ("*Fields I*—Ex. 1"), ECF No. 1-1. It described the events regarding the Summer 2001 incidents, which Officer Fields summarized again in the *Fields I* Complaint. *See id*. The second document was also a memorandum, but without any recipients indicated. *See Fields I* Compl.—Ex. 2, *Fields I*, No. 2-1346 ("*Fields I*—Ex. 2"), ECF No. 1-4. It described the Fall 2001 incidents which Officer Fields stated were "retaliation" for the first memorandum. *See id.* The Court takes the allegations from the *Fields I* Complaint and the attached documents as a whole in its consideration of Officer Fields' claims for retaliation and hostile work environment. *See St. Francis Xavier*, 117 F.3d at 624.

### a. Retaliation

Defendant seeks to dismiss Officer Fields' retaliation claim from *Fields I* on the basis that the *Fields I* Complaint "fails to identify any tangible harm [Officer Fields] suffered" and "has not provided any facts that would support a reasonable inference that the conduct challenged occurred due to [Officer Fields'] . . . protected activity." Fields MTD, ECF No. 516-1 at 14, 16. The Court agrees that the *Fields I* Complaint fails to adequately plead that any of the incidents described were materially adverse actions sufficient to sustain a claim for retaliation.

Officer Fields describes six instances that he claims are "specific, detailed allegations . . . which, if proven, could provide the basis for relief" for a retaliation claim. Fields Opp'n, ECF No. 536-1 at 20. None of the instances describe a "substantial change" in Officer Fields' "working conditions" such that a jury could find "objective[] harm." *Forkkio*, 306 F.3d at 1132.

The first incident, which occurred in June 2001, consisted of a superior officer—Sergeant Miller—reprimanding Officer Fields for "following general policies and procedures." *Fields I* Compl. ¶ 7. In the reprimand, Sergeant Miller stated that Officer Fields "needed to be more open and stop closing people out," that Sergeant Miller "stopped this situation from going to

Internal Affairs," and "made a disparaging remark about Officer Fields' commitment to his job and stated that [Sergeant Miller] reviewed [Officer Fields'] personnel file and discovered that Officer Fields had an incident when he previously was assigned to House Detail." *Id.* In the first document attached to the *Fields I* Complaint, Officer Fields describes this conduct as "harassment" but does not allege that any tangible consequences resulted from the reprimand. *Fields* I—Ex. 1 at 1-2. In *Baloch*, the D.C. Circuit determined that letters of reprimand without abusive language and "profanity-laden yelling" were not materially adverse actions sufficient to sustain a claim of retaliation. *Baloch*, 550 F.3d at 1199 ("The Supreme Court . . . has emphasized that sporadic verbal altercations or disagreements do not qualify as adverse actions for purposes of retaliation claims."). Although Officer Fields emphasizes the reasoning behind the reprimand as retaliatory, he neglects to allege that any tangible harm occurred as a result of the incident. Thus, the June 2001 reprimand cannot serve as a basis for a retaliation claim because the *Fields I* Complaint does not allege any objective harm flowed from the incident.

The second incident Officer Fields describes is that in early August 2001 Sergeant Miller asked for documentation related to sick leave Officer Fields took although that information "was contained in [Officer Fields'] personnel

folder." *Fields I* Compl. ¶ 7. Officer Fields does not allege that any tangible consequences resulted from this interaction either. In his brief, he merely faults Sergeant Miller for "baselessly challeng[ing] Ofc. Fields' medical document, which is more than the usual tribulations of the workplace." Fields Opp'n, ECF No. 536-1 at 16. Although Officer Fields once again focuses on Sergeant Miller's purported reasons for challenging Officer Fields' leave, Officer Fields neglects to show that such challenge harmed him. District courts are "near unanimous in concluding that close scrutiny, monitoring, or tracking of an employee's whereabouts—without more—simply does not rise to the level of a materially adverse retaliatory action sufficient to survive a motion to dismiss." *Aldrich v. Burwell*, 197 F. Supp. 3d 124, 132 (D.D.C. 2016) (collecting cases). Generally, courts have followed this model even when the enforcement of such policies has been selective. *See id.* at 134 ("even if [the employer's scrutiny of plaintiff's attendance] differed from the scrutiny given to his colleagues, such scrutiny does not, without more, constitute an adverse . . . action, as it does not produce[] an injury or harm" (internal quotation marks omitted)). As Officer Fields has failed to allege that the questioning of his medical documentation was more than monitoring—even if selectively—his adherence to policies, the

Court concludes that this incident also cannot sustain a claim for retaliation.

The third incident, also from August 2001, involved Officer Fields' annual performance evaluation. The *Fields I* Complaint alleges that the evaluation contained "highly prejudicial and biased content, which was entirely unrelated to [Officer Fields'] job performance," including stating that Officer Fields "did not possess the requisite interpersonal skills needed for his position." *Fields I* Compl. ¶ 7. In the first document attached to the *Fields I* Complaint, Officer Fields alleges that the evaluation "was tainted, cohered, personally opinionated, biased and prejudicially motivated against [him]." *Fields I*—Ex. 1 at 3. In describing tangible harm, the *Fields I* Complaint alleges that the "unfair and inaccurate performance evaluation, result[ed] in lower earnings, impaired career growth, and caus[ed] [Officer Fields] emotional distress and other harm." *Fields I* Compl. ¶ 8. Under this circuit's precedent, "[i]n order for a performance evaluation to be materially adverse, it must affect the employee's 'position, grade level, salary, or promotion opportunities.'" *Taylor*, 571 F.3d at 1321 (quoting *Baloch*, 550 F.3d at 1199). Officer Fields argues that his performance evaluation satisfies this burden because it "resulted in lower earnings [and] impaired career growth." Fields Opp'n, ECF No. 536-1 at 17 (internal quotation marks

omitted). However, "bare conclusory allegation[s] that [an employee] was denied promotional and bonus opportunities" as a result of a Defendant's "unlawful conduct in violating Title VII's prohibition against retaliation" is not sufficient to "discharge [an employee's] burden to show the evaluations were attached to financial harms." *Taylor*, 571 F.3d at 1321 (internal quotation marks omitted); *see also Roberts v. Scalia*, No. 19-474, 2020 WL 1892057, at *10-*11 (D.D.C. Apr. 16, 2020) (applying the ruling in *Taylor* on a motion to dismiss). The *Fields I* Complaint's conclusions that Officer Fields was harmed monetarily and in terms of promotion opportunities are not supported by any facts in the complaint. The Complaint does not tie the performance evaluation to the loss of any bonus or the denial of a financial award and it does not allege any facts that would allow the Court to agree that Officer Fields had "impaired career" growth. The *Fields I* Complaint assumes that such consequences occurred, but without factual allegations to support such an inference, the conclusions are too speculative to conclude that Officer Fields suffered actual, objective harm. *See Salazar*, 831 F. Supp. 2d at 144 (holding that plaintiff's "bare, conclusory allegation" that a performance evaluation caused "missed salary increases, bonus award, or promotional opportunities" was "purely speculative"). Therefore, the Court

concludes that the performance evaluation is also not sufficient to sustain a claim of retaliation.

The fourth and fifth incidents include being reassigned to "weekend duty and perimeter duty during the fall and winter months" and being "rescheduled to work on [an] approved day off." *Fields I* Compl. ¶ 7. The *Fields I* Complaint does not allege that these actions affected Officer Fields' "position, grade level, salary, or promotion opportunities." *See Baloch*, 550 F.3d at 1199. Rather, he argues that the allegations show that there was "an insidious, targeted assignment of duties that created two classes of employees, in violation of Title VII." Fields Opp'n, ECF No. 536-1 at 19. Once again, Officer Fields focuses on the reason for the actions instead of the consequences. Although Officer Fields may be correct that he was targeted for assignments, the fact that the assignments themselves did not cause him tangible harm by affecting his position, grade level, salary, or promotion opportunities negates his assertion that the assignments were materially adverse actions.

Furthermore, nothing in the *Fields I* Complaint suggests that the assignments were particularly difficult or undesirable such that objective harm could be found. *See Burlington N.*, 548 U.S. at 68; *Bain*, 648 F. Supp. 3d at 56 ("[N]ot every undesired change in work assignments or workload constitutes a materially

adverse action in the retaliation context. . . . [S]hortened deadlines or increased work must be frequent or particularly onerous to be material." (internal quotation marks omitted)); *Morales*, 42 F. Supp. 3d at 198 (finding no materially adverse action where plaintiff was not "frequently or permanently subjected to unduly burdensome or arduous assignments"). Thus, the Court concludes that the subject and timing of the work assignments as alleged in the *Fields I* Complaint are insufficient to establish a claim of retaliation.

The last incident centers around Officer Fields calling in sick on the day he was scheduled to have off but was reassigned to work. The Monday after he called in sick, Officer Fields was again questioned about the medical documentation related to his previous sick leave and was informed that he was being "placed on a CP550 (Personnel Performance Notes: Events/Incidents and Explanations)" because he had "requested unscheduled leave on [his] scheduled work days off." *Fields* I—Ex. 2 at 1-2. Officer Fields claims that he informed Human Resources that he was a "'targeted victim' of retaliatory practices by other sergeants" and that the Human Resources representative stated that she would speak to the Division Commander about the situation. *Id.* at 2. Officer Fields does not allege any additional outcomes related to this incident. Although Officer Fields points out that he asked a Sergeant about the CP550 and was told that "they

116

were trying to make [him] angry, and that [he] should know who was behind this," *id.*, these allegations again go to the motivation behind the conduct and not the consequences of the conduct itself. Therefore, Officer Fields has failed to allege a materially adverse action because he has not tied the complained about conduct to any tangible harm he suffered.

Overall, because none of the six incidents described in the *Fields I* Complaint adequately allege Officer Fields suffered a materially adverse action, the Court **GRANTS** Defendant's motion to dismiss Officer Fields' claim for retaliation from *Fields I*.[20]

### b. Hostile Work Environment

The *Fields I* Complaint also alleges that the six incidents "have subjected [Officer Fields] to a racially hostile work environment." *Fields I* Compl. ¶ 8. Defendant disagrees and argues that the *Fields I* Complaint "fails to allege any offensive or hostile conduct engaged in by the Department that was so severe or pervasive or abusive as to alter the terms or conditions of [Officer Fields'] employment." Fields MTD, ECF No. 516-1 at 12. The Court agrees with Defendant.

---

[20] Because the Court agrees with Defendant on the issue of materially adverse action, the Court need not address Defendant's other argument that the *Fields I* Complaint failed to plead facts that could support an inference that the Department's conduct was causally connected to Officer Fields' protected activity.

Looking to the totality of the circumstances, Officer Fields fails to allege that the Department engaged in conduct that was so "severe or pervasive" that a reasonable person would find the environment "hostile or abusive." *See Harris*, 510 U.S. at 21. Officer Fields describes the conduct at issue as "management's overreaction to and over scrutiny of routine tasks; baseless threats to refer Ofc. Fields to Internal Affairs for investigation; baseless negative performance reviews; disparaging remarks; ignoring Ofc. Fields' concerns and complaints; scrutinizing Ofc. Fields' limited use of sick leave without cause; groundlessly disputing Ofc. Fields' medical documentation; assigning Ofc. Fields to less desirable shifts on the weekends and outdoor duties during the less desirable colder seasons; and manufacturing negative personnel notes against [him]." Fields Opp'n, ECF No. 536-1 at 15. Officer Fields argues that "[e]ach instance . . . describes a 'working condition' altered because of Ofc. Fields race" and "[e]ach instance cumulatively resulted in damage to Ofc. Fields professional and financial . . . prospects, as well as affecting him personally." *Id.*

Although Officer Fields may have felt that his working conditions were altered and tainted with discrimination, "conduct must be extreme to amount to a change in the terms and conditions of employment" and therefore to be actionable as a

hostile work environment. *Faragher*, 524 U.S. at 788. The *Fields I* Complaint fails to allege such extreme conduct, but instead describes a cluster of "workplace reprimands—and punishment flowing from them—that are well within the bounds of 'ordinary tribulations of the workplace.'" *Aldrich*, 197 F. Supp. 3d at 138 (quoting *Faragher*, 524 U.S. at 788); *see also Wade v. District of Columbia*, 780 F. Supp. 2d 1, 19 (D.D.C. 2011) (collecting cases where "courts have generally rejected hostile work environment claims that are based on work-related actions by supervisors"). Officer Fields takes issue with the reasoning behind his superiors' actions—emphasizing the "over" scrutiny of tasks and "baseless" allegations—but such conduct on its own is not hostile or abusive. *See Brooks*, 748 F.3d at 1276 ("[S]elective enforcement of a . . . policy does not necessarily indicate conduct giving rise to a hostile work environment claim."); *Childs-Pierce v. Util. Workers Union of Am.*, 383 F. Supp. 2d 60, 79 (D.D.C. 2005) (holding that incidents of requesting verifying documents, including medical documentation to verify sick leave, alongside other events "simply [were] not, individually or collectively, sufficiently severe or pervasive to constitute a hostile work environment claim").

Even if Sergeant Miller's intentions were "truly insidious" and indicative of "Sgt. Miller's animus against Ofc. Fields because of his race"—as Officer Fields describes in his

briefing, Fields Opp'n, ECF No. 536-1 at 15-16; such allegations
do not speak to the severity of the conduct itself, only the
severity of the motivation behind the conduct. Officer Fields
does not allege that his superiors, including Sergeant Miller,
intimidated, ridiculed, or insulted him, much less than his
entire workplace was "permeated" with such conduct. *See Harris*,
510 U.S. at 21. Similarly, the *Fields I* Complaint does not
allege that any reprimand or performance evaluation contained
abusive language or otherwise changed Officer Fields' employment
by being anything other than what he characterizes as "unfair."
Fields Opp'n, ECF No. 536-1 at 16-17; *see Baloch*, 550 F.3d at
1201 (determining no hostile work environment where "the
disciplinary actions and workplace conflicts were not so
'severe' or 'pervasive' as to have changed the conditions of
[plaintiff's] employment"). Furthermore, as discussed above,
although Officer Fields asserts that his "professional and
financial" prospects were harmed, he fails to provide any facts
that would allow the Court to agree with such a conclusion.
Although Officer Fields is correct that he does not have to
prove a hostile work environment claim on this motion to
dismiss, the *Fields I* allegations—assumed as true—are
insufficient to plead a claim for hostile work environment
because they do not describe conduct that created an objectively
hostile or abusive environment. *See Faragher*, 524 U.S. at 788.

Accordingly, the Court **GRANTS** Defendant's motion to dismiss Officer Fields' hostile work environment claim from *Fields I*.

### 2. *Fields II* (3-1505)

#### a. Retaliation

Defendant argues that Officer Fields' retaliation claims from *Fields II* should be dismissed because Officer Fields "does not provide any facts indicating that he was tangibly harmed in any way as a result of the alleged actions by his supervisors," Fields MTD, ECF No. 516-1 at 19; and because Officer Fields "fails to allege any connection between the conduct he challenges in this action and his protected activity," *id.* at 20. Although Defendant describes Officer Fields' claims as for discrete acts of retaliation, Officer Fields' briefing in reply and the details of the *Fields II* Complaint suggest that Officer Fields either has never made or is abandoning any discrete claims of retaliation, and rather is only arguing that he was subjected to a retaliatory hostile work environment.

Beginning with the text of the complaint, the *Fields II* Complaint alleges four causes of action. *See Fields II* Compl. ¶¶ 35-38. Each cause of action states that the underlying issue is that Defendant "subjected [Officer Fields] to a hostile, abusive work environment." *Id.* None of the causes of action allege discrete complaints of retaliation. However, Counts I and III claim that the hostile work environment is based on

121

"Defendant unlawfully retaliat[ing] against Plaintiff because of his prior EEO activity, his leading role as a proposed class agent in the *Blackmon-Malloy* case, and his own complaints of retaliation and discrimination against Defendant." *Id.* ¶¶ 35, 37. Finally, these two hostile work environment counts allege multiple incidents that make up the claim. For Count I, the *Fields II* Complaint alleges that "investigating [Officer Fields] for not being on duty" and "subsequently lower[ing] an element of his performance appraisal" were the two acts culminating in a hostile work environment. *Id.* ¶ 35. For Count III, the *Fields II* Complaint alleges that the three acts of "withholding tools necessary to perform his job duties," "changing his scheduled break times without notice," and "taking an inordinate amount of time (approximately three months) to determine that a baseless charge filed against him . . . was actually unfounded" make up the hostile work environment claim. *Id.* ¶ 37. Nowhere does the *Fields II* Complaint allege that these actions were also discrete instances of retaliation.

Officer Fields' current briefing on this motion to dismiss seems to also indicate that his claims are for a retaliatory hostile work environment. Although throughout his briefing Officer Fields often conflates the standards for discrete acts of retaliation and hostile work environment claims, he is more specific in his arguments regarding the *Fields II* Complaint. In

his section asserting that Defendant's actions altered the terms
and conditions of his employment, Officer Fields discusses
"materially adverse working condition[s]," but cites cases and
explains in parentheticals the standards relevant for hostile
work environment claims. *See* Fields Opp'n, ECF No. 536-1 at 22.
Additionally, Officer Fields specifies that the "negative
commentary" from the 2003 performance evaluation "contributes to
the basis of a hostile work environment (even if not actionable
on its own)." *Id.* Finally, and perhaps most telling, in the
section describing how Defendant "took adverse and materially
adverse action," Officer Fields accuses Defendant of "err[ing]
by attempting to isolate incidents." *Id.* at 23. He argues that
the incidents should be assessed as a whole since the "events
come together to compound Defendant's harassment of Ofc. Fields
and create the hostile work environment." *Id.* at 23-24. Because
Officer Fields does not defend the incidents in isolation as
discrete acts of retaliation, but rather faults Defendant for
examining the incidents separately, this suggests that Officer
Fields either has never attempted or on his briefing is
abandoning any retaliation claims based on discrete acts of
retaliation.

### b. Hostile Work Environment

The D.C. Circuit has recognized that a hostile work
environment claim can be based on a theory of discrimination or

retaliation. *See Baird I*, 662 F.3d at 1252; *Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006) ("In this circuit, a hostile work environment can amount to retaliation under Title VII."). Under either the theory, the conduct must be "sufficiently severe or pervasive" and "adequately connected to each other" such that they are all "part of the same unlawful employment practice." *Baird I*, 662 F.3d at 1252 ("acts giving rise to a hostile work environment claim must collectively meet the independent requirements of that claim . . . and must be adequately connected to each other . . . as opposed to being an array of unrelated discriminatory or retaliatory acts"); *Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 79 (D.D.C. 2013) ("Courts in our circuit typically apply the same legal standard as that used in the discriminatory harassment context to determine whether retaliatory harassment is actionable.").

Defendant argues that Officer Fields' hostile work environment claims must be dismissed because the *Fields II* Complaint fails to "provide any facts indicating that the [complained about conduct was] abusive, or that such conduct led his workplace to be objectively permeated with extreme intimidation, embarrassment and ridicule so severe and pervasive that it altered the terms, conditions, or benefits of his employment." Fields MTD, ECF No. 516-1 at 18. Looking at the

totality of the allegations and circumstances described in the *Fields II* Complaint, the Court agrees.

As described above, the *Fields II* Complaint alleges four counts—two counts of discriminatory hostile work environment and two counts of retaliatory hostile work environment. *See Fields II* Compl. ¶¶ 35-38. The first two counts allege that Defendant created a hostile work environment for Officer Fields in late 2002 to early 2003 by investigating him regarding his absence on October 12, 2002 and subsequently lowering an element of his performance appraisal. *Id.* ¶¶ 35-36. The last two counts allege that Defendant created a hostile work environment for Officer Fields in Fall 2004 when it withheld necessary working tools from Officer Fields, changed his scheduled break times without notice, and took an "inordinate amount of time" to resolve a "baseless charge" filed against him. *Id.* ¶¶ 37-38. The *Fields II* Complaint separates these incidents both in its factual description of the allegations and in the counts themselves. Furthermore, it makes no attempt to connect these two, separate strings of incidents—which took place almost two years apart—to make one larger hostile work environment claim. Therefore, the Court will analyze the batches of incidents separately as two distinct fact patterns alleging hostile work environments.

Looking first to the conduct that occurred in 2002, the incidents do not illustrate conduct "sufficiently severe or

pervasive to alter the conditions of the victim's employment."
*Baird I*, 662 F.3d at 1250 (internal quotation marks omitted).
Beginning with the investigation, Officer Fields alleges that he
properly took leave for October 12, 2002, but he was told on
October 24, 2002 that he was being investigated for his
"whereabouts" on the 12th and that if he was "not truthful about
this information, the Department [would] have the right to
terminate [his] employment." *Fields II* Compl. ¶¶ 12-13. He
further alleges that after he told the inquiring sergeant that
he "properly requested leave" and that another officer
"confirmed" that request, the sergeant stated that "there was no
need for further investigation." *Id.* ¶ 14. However, the *Fields
II* Complaint alleges that Officer Fields asked to see the
captain on duty regarding the leave issue and was spoken to by
that captain "in a hostile tone" and that Officer Fields told
that captain during their meeting that the captain was a
"racist," to which the captain replied that Officer Fields
"should watch his tone." *Id.* ¶¶ 15-16. A few weeks later,
Officer Fields alleges that he was being punished for calling
the captain a racist by being issued a CP-534 and "deprived
. . . 24 hours of pay." *Id.* ¶ 17. The next week the issue was
turned over to Internal Affairs. *Id.* ¶ 18. Over two months later
in January 2003, Officer Fields was informed that "all charges
under the CP-534 had been dismissed, and that he was being given

a notation (CP-550) in his personnel file." *Id.* ¶ 20. The second incident connected to this hostile work environment claim is the allegation that Officer Fields was rated "below average" in "Acceptance of Responsibility" in his early 2003 evaluation as "retaliation for his protesting the discriminatory investigation of his . . . leave usage on October 12, 2002." *Id.* ¶ 19.

Officer Fields claims that these incidents amount to a hostile work environment because the Department questioned Officer Fields' "*properly authorized* leave usage—a recurring form of harassment" and that the investigation around leave usage "was conducted under opaque and inconsistent protocols." Fields Opp'n, ECF No. 536-1 at 21-22. The fact that Officer Fields' leave was "properly authorized" is not indicative of whether he suffered severe or pervasive treatment when the Department questioned usage of such leave. As discussed in the *Fields I* analysis, hypervigilance or selective enforcement of a policy is not enough to establish a hostile work environment. *See Brooks*, 748 F.3d at 1276. Nothing in the *Fields II* Complaint suggests that the inquiry into his leave was permeated with "discriminatory intimidation, ridicule, and insult." *Baloch*, 550 F.3d at 1201 (internal quotation marks omitted). Officer Fields alleges that he was spoken to in a "hostile manner" on one occasion by a captain, but this one instance certainly cannot be characterized as "pervasive" or even "severe." Furthermore,

although Officer Fields complains about "opaque and inconsistent" protocols in the investigation, such conduct is not an indication of "extreme" actions that "amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788. Finally, Officer Fields takes issue with the "counseling note" that "was issued in connection with [the October 12, 2002 leave] investigation, despite the fact that the investigation concluded that Ofc. Fields had properly used his leave after all." Fields Opp'n, ECF No. 536-1 at 22. However, the counseling note is another example of "workplace reprimands—and punishment flowing from them—that are well within the bounds of 'ordinary tribulations of the workplace.'" *Aldrich*, 197 F. Supp. 3d at 138 (quoting *Faragher*, 524 U.S. at 788). Although Officer Fields may dispute the reasoning behind the counseling note, suggesting that it was unnecessary because the investigation concluded that he did not abuse leave, that argument does not establish that the note itself was severe or indicative of objective hostility or abuse.

Even Officer Fields' allegations that the "negative commentary" in his 2003 evaluation was "completely manufactured," speaks to the reasoning behind the conduct and not the severity of the conduct itself. The *Fields II* Complaint does not allege that there was any hostile or abusive language in the evaluation. On the contrary, the *Fields II* Complaint

describes four different instances of praise of Officer Fields'
conduct within that same evaluation. *See Fields II* Compl. ¶ 19.
Thus, the one instance of "negative commentary" appears to be
more akin to "job-related constructive criticism" rather than an
example of when Officer Fields was insulted or demeaned by the
Department. *See Baloch*, 550 F.3d at 1199; *id.* at 1201
(determining that letters of counseling and reprimands were not
evidence of a hostile work environment because the "allegations
of insult [were] undercut by the legitimate reasons and
constructive criticism" offered within); *Jimenez*, 395 F. Supp.
3d at 36 (collecting cases where "criticisms of . . . work and
other negative comments" failed to establish "a significant
level of offensiveness" for hostile work environment claims);
*Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) ("Nor
can . . . lowered performance evaluations, and close scrutiny of
assignments by management be characterized as sufficiently
intimidating or offensive in an ordinary workplace context.").
While Officer Fields may not agree with the characterization in
the evaluation and may have felt personally offended by the
comments, nothing in the *Fields II* Complaint alleges insult or
abuse to a degree that a reasonable person would characterize
Officer Fields' environment as hostile or abusive.

　　　The Court reaches the same conclusion regarding the second
set of incidents from Fall 2004. In the *Fields II* Complaint,

Officer Fields alleges that a fellow officer "withheld [Officer Fields'] keys at the beginning of his shift so that he was delayed in arriving at his assigned post," which "deliberately and without justification interfered with the performance of [Officer Fields'] official duties." *Fields II* Compl. ¶ 22. In detailing the incidents, he describes that "[o]n at least two occasions," Officer Fields "had to request that [the fellow officer] place the keys on the counter," which was different from the custom "of placing them on the desktop . . . for [Officer Fields] to retrieve." *Id.* In another incident, Officer Fields alleges that the same fellow officer "changed [Officer Fields'] scheduled breaks without his knowledge or consent" "two days in a row" such that "his breaks were . . . close together." *Id.* ¶¶ 23, 26. After Officer Fields complained about this conduct, the fellow officer lodged a complaint against Officer Fields for harassment and he was "threated by the Officers investigating the complaint with a disciplinary charge under Category C1 of Conduct Unbecoming," although Officer Fields was eventually sent a letter several months later that the complaint against him "was deemed unfounded" and he was not punished. *Id.* ¶¶ 29, 31, 33.

As part of the totality of the circumstances analysis, a hostile work environment claim considers whether conduct "unreasonably interferes with an employee's work performance."

130

*Morgan*, 536 U.S. at 115 (quoting *Harris*, 510 U.S. at 23).
Officer Fields alleges that a fellow officer withholding his
keys and scheduling his breaks close together "illegally altered
the conditions of [his] work." Fields Opp'n, ECF No. 536-1 at
22. But the *Fields II* Complaint alleges no facts that Officer
Fields' work performance or ability to do his job was
"unreasonably" hindered by the conduct. The *Fields II* Complaint
only states that on two occasions Officer Fields was required to
take the extra step of requesting keys instead of having them
already placed on his desk. *Fields II* Compl. ¶ 22. Although
Officer Fields needed the keys for his shift, the *Fields II*
Complaint does not allege that he was unable to procure the
keys, that there was any difficulty in procuring them, or that
there were any other consequences except that he "was delayed in
arriving at his assigned post." *Id.* Thus, this conduct did not
amount to a "discriminatory change[] in the terms and conditions
of employment," *Faragher*, 524 U.S. at 788 (internal quotation
marks omitted), but was at most an inconvenience.

The same is true for the scheduling of Officer Fields'
breaks. In the *Fields II* Complaint, he does not allege that
scheduling his breaks closer together caused an interference
with his work. He also does not allege that such last-minute
changes caused him to miss either a break or his work duties.
Thus, although inconvenient, the changing of Officer Fields'

131

breaks on two days is not conduct "severe" or "pervasive" enough
to contribute to or amount to a hostile work environment. *See
Faragher*, 524 U.S. at 788 ("We have made it clear that conduct
must be extreme to amount to a change in the terms and
conditions of employment . . . .").

Finally, Officer Fields alleges that the "manufactured,
baseless complaint" he "had to endure" when he complained about
his schedule, included "the serious charge of 'Conduct
Unbecoming,'" which altogether with "the additional sham
investigation further altered Ofc. Fields' working conditions."
Fields Opp'n, ECF No. 536-1 at 23. Similar to the previously
discussed 2002 investigation, Officer Fields faults the 2004
investigation for being "manufactured" and "baseless," but he
does not address the severity of the investigation itself.
Nothing in the *Fields II* Complaint alleges that this
investigation was conducted in a hostile or abusive manner, that
he was intimidated or ridiculed throughout the process, or any
other type of conduct from which a reasonable person could infer
a hostile work environment occurred in connection with the
investigation. Officer Fields fixates on the fact that he was
threatened with "the serious charge" of "Conduct Unbecoming,"
but as noted above, workplace reprimands and punishments are not
themselves indicative of a hostile work environment. *See
Aldrich*, 197 F. Supp. 3d at 138; *Wade*, 780 F. Supp. 2d at 19

("[C]ourts have generally rejected hostile work environment claims that are based on work-related actions by supervisors."). Furthermore, although Officer Fields emphasizes that the complaint behind the investigation was "baseless," this allegation again speaks to the motivation behind the investigation and not the severity of the investigation itself.

Therefore, because neither of the two sets of incidents described in the *Fields II* Complaint allege facts from which an objective person could find that Officer Fields' environment was hostile or abusive, the Court **GRANTS** Defendant's motion to dismiss Officer Fields' claims for hostile work environment.

### 3. *Bolden-Whitaker* (3-2644)

Defendant argues that Officer Fields cannot sustain a claim for retaliation or hostile work environment based on the allegations in *Bolden-Whitaker* because "he does not identify any change in the terms of condition of his employment, any hostile or offensive conduct altering his work environment, or any other tangible harm he suffered" as a result of the Department's conduct. Fields MTD, ECF No. 516-1 at 20-21. The Court agrees.

#### a. Retaliation

The *Bolden-Whitaker* Complaint alleges that Officer Fields was retaliated against by the Department in March 2003 when he failed to respond to an emergency evacuation alarm. *Bolden-Whitaker* Compl. ¶ 18. Specifically, an alarm sounded while

Officer Fields was on break and he and other officers did not hear the alarm. *Id.* When his superior notified the officers of the alarm, Officer Fields reported to his required station. *Id.* Two days later, Officer Fields was called to a meeting and was asked to provide a "written statement describing his actions during the evacuation" but he "asked to be questioned orally instead," to which his supervisors agreed, and he was subsequently questioned. *Id.* The following month, Officer Fields received two CP-535 Requests for Disciplinary Action "charging [him] with misconduct" for "violating the rules of conduct by failing to respond to an emergency evacuation" and for "disobeying an order to provide a written statement." *Id.* The next July, over a year and three months after the emergency evacuation incident, Officer Fields was issued a "formal CP-534 Command Discipline Report," which "penalized him by taking 24 hours of accrued paid leave, worth $852.24." *Id.* Three months later in October 2004, the Department "sustained the CP-534 Command Discipline Report" but adjusted the penalty to "Filed with Warning." *Id.* The *Bolden-Whitaker* Complaint also alleges that the "threat of discipline loomed large against Officer Fields for more than one and a half years" and he was not informed of the final result of the charge until "three days after mediation ended on his OOC Complaint." *Id.*

Officer Fields argues that the Department "let the specter of imposing discipline linger over Ofc. Fields for more than 18 months, materially and adversely altering the conditions of his work." Fields Opp'n, ECF No. 536-1 at 25. However, materially adverse actions require objectively tangible harm, such as an effect on an employee's "position, grade level, salary, or promotion opportunities." *Baloch*, 550 F.3d at 1199. Officer Fields does not allege that having to wait for a final decision regarding the investigation against him affected any of these aspects of his employment. Rather, he emphasizes in the *Bolden-Whitaker* Complaint only that the "threat of discipline loomed large against [him]." *Bolden-Whitaker* Compl. ¶ 18. While this uncertainty may have caused subjective harm to Officer Fields specifically, the *Bolden-Whitaker* Complaint fails to allege that Officer Fields suffered objective harm—harm that would dissuade a reasonable worker from sustaining or lodging a complaint of discrimination. *See Burlington N.*, 548 U.S. at 68; *Aldrich*, 197 F. Supp. 3d at 134-35 ("And while Plaintiff might have *subjectively* found the requirement to be condescending or even infantilizing, her personal response cannot transform an otherwise minor annoyance[] . . . into an action that would have dissuaded a reasonable worker from making or supporting a charge of discrimination." (internal quotation marks omitted)).

No other allegations in the complaint suffice to show that
Officer Fields suffered an objectively tangible harm. The
investigation culminated in a final CP-534 Command Discipline
Report, which was supposed to penalize Officer Fields with
losing $852.24 worth of accrued paid leave, but Officer Fields
never received this penalty and instead the report was
sustained, and the penalty was "adjusted . . . to 'Filed with
Warning.'" *Bolden-Whitaker* Compl. ¶ 18. As the proposed harm
never occurred, the Court cannot find the proposition of such
harm sufficient to sustain the claim for retaliation. *See
Baloch*, 550 F.3d at 1199 (observing that "courts have been
unwilling to find adverse action where the [proposed penalty] is
not actually served"). Similarly, the filing of the report
itself cannot be considered a materially adverse action because
the final consequence was a warning, with no other tangible
harms described in the *Bolden-Whitaker* Complaint. Therefore, the
Court **GRANTS** Defendant's motion to dismiss Officer Fields'
claim for retaliation from *Bolden-Whitaker*.

### b. Hostile Work Environment

As an initial matter, in his briefing, Officer Fields
suggests that the Court should consider his allegations for
hostile work environment in *Bolden-Whitaker* collectively with
his claims for hostile work environment from *Fields I* and *Fields
II*. He alleges that Defendant "again issued manufactured,

baseless discipline to Ofc. Fields, and that it had subjected Ofc. Fields to a third investigation in a two-year span *for no legitimate reason*." Fields Opp'n, ECF No. 536-1 at 24-25. However, the *Bolden-Whitaker* Complaint does not support Officer Fields' argument. The *Bolden-Whitaker* Complaint does not incorporate the facts from either *Fields I* or *Fields II* into its claim. Instead, in reference to the two suits, it merely states that Officer Fields "has had to file two individual retaliation complaints in this U.S. District Court against Defendant since the filing of the *Blackmon-Malloy* proposed class action." *Bolden-Whitaker* Compl. ¶ 18. The *Bolden-Whitaker* Complaint also alleges that "Defendant has further retaliated against Officer Fields for his participation in these complaints" and then describes the factual accounts from *Bolden-Whitaker. Id.* This statement alone is insufficient to put Defendant on notice that Officer Fields is making a hostile work environment claim dependent on the cumulative factual accounts in all three suits. *See Twombly*, 550 U.S. at 555 (observing that the Federal Rules of Civil Procedure require a "short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests" (internal quotation marks omitted)).

Furthermore, because the *Bolden-Whitaker* Complaint does not itself describe or otherwise incorporate the facts from the other complaints, it fails to allege that these actions and incidents—occurring years apart—are actually part of a common pattern indicating a hostile work environment. *See Baird II*, 792 F.3d at 168 (noting that a hostile work environment must allege that multiple incidents are "adequately linked"). Officer Fields attempts to connect these incidents in his briefing, claiming that they show a pattern of using investigations to harass him. *See id.* at 168-69 (observing that separate incidents may be "adequately linked" when they "involve the same type of employment actions"). However, the *Bolden-Whitaker* Complaint does not state facts which support such a linkage and Officer Fields may not use his briefing to amend his complaint. *See Arbitraje Casa de Cambio, S.A. de C.V.*, 297 F. Supp. 2d at 170. Therefore, the Court will not look at the three suits in tandem to determine whether Officer Fields was subjected to a hostile work environment, but will confine its analysis of the hostile work environment claim to the allegations from *Bolden-Whitaker*.

The *Bolden-Whitaker* Complaint does not allege that from March 2003 to October 2004—when Officer Fields was subjected to the investigation regarding the emergency evacuation incident, *see Bolden-Whitaker* Compl. ¶ 18; he experienced conduct that can be objectively described as hostile or abusive. Officer Fields

does not describe a single incident where he was subjected to "discriminatory intimidation, ridicule, and insult." *See Harris*, 510 U.S. at 21 (internal quotation marks omitted). The *Bolden-Whitaker* Complaint instead only describes instances where Officer Fields was directed to complete a task, questioned, or given an update about the pending investigation. *See Bolden-Whitaker* Compl. ¶ 18. The sparse details describing these instances do not allege that the demeanor of the investigating or supervising officers was abusive, hostile, or even rude.

The *Bolden-Whitaker* Complaint alleges that the "threat of discipline loomed large against Officer Fields" throughout the investigation, *id.*, but it fails to allege any facts that suggest that the Department engaged in extreme intimidating or threatening conduct. While Officer Fields may have felt subjectively threatened by the impact of the investigation, this is insufficient to establish that the work environment was objectively hostile. Furthermore, the conduct as a whole boils down to a workplace punishment and the process by which that punishment was determined. While the process itself may have been lengthy, this alone is not enough to amount to the "extreme" conduct necessary to sustain a hostile work environment claim. *See Faragher,* 524 U.S. at 788; *Aldrich*, 197 F. Supp. 3d at 134. Therefore, the Court **GRANTS** Defendant's

motion to dismiss Officer Fields' claim of hostile work
environment from *Bolden-Whitaker*.

### F. Tammie Green

According to Appendix II, Officer Green's only remaining
claim is for "[r]etaliation stemming from the . . . Sergeant's
exam" from *Young*. *See* App. II, ECF No. 497-4 at 2. On this
current motion to dismiss, both parties brief the claim as for
both discrimination and retaliation. *See* Def.'s Mem. of P. & A.
in Supp. of Mot. to Dismiss Pl. Tammie D. Green's Claims ("Green
MTD"), ECF No. 511-1 at 10-14; Pl. Tammie D. Green's Mem. of P.
& A. in Opp'n to Def.'s Mot. to Dismiss Pl. Green's Claims
("Green Opp'n"), ECF No. 575-1 at 10-12. As the CAA exhaustion
requirement is claim-specific and jurisdictional, the Court must
first determine whether Officer Green's Sergeant promotion
process claim for discrimination has been exhausted. *See*
*Blackmon-Malloy III*, 575 F.3d at 705; *Ross*, 195 F. Supp. 3d at
199.

The existing record establishes that Officer Green's claim
for discrimination was properly exhausted and the omission of
the claim from the final description of claims allowed to
proceed was an administrative oversight. Beginning with that
oversight, Magistrate Judge Facciola's most recent Report and
Recommendation noted that Officer Green had a "claim of
discrimination in the . . . promotion process," which was

140

previously dismissed for her failure to attend mediation in person. Magistrate R. & R., ECF No. 376 at 25-26. Magistrate Judge Facciola then noted that the "timeliness of Officer Green's retaliation claim under [*Young*] is disputed," and thus he requested supplemental briefing "clarifying what claim(s), if any, Officer Green is asserting." *Id.* at 26. In Officer Green's response to Magistrate Judge Facciola's order, she clarifies that her claims from *Young* were for "disparate treatment in the administration of the . . . Sergeants' examination, motivated by racial discrimination and by retaliation for Officer Green's . . . participation in the main case." Pls.' Clarification Pursuant to Magistrate Judge's R. & R. of Dec. 14, 2012, ECF No. 379 at 4. In Defendant's response, the Department conceded that the retaliation claim from *Young* "challenging the Second Stage of the . . . Sergeant Promotions Process where she finished 70 out of 94 candidates . . . was exhausted," but was silent regarding Officer Green's discrimination claim based on the same facts. Def.'s Resp. to Pl.'s Clarification on Chart C to R. & R., ECF No. 385 at 4. In Magistrate Judge Facciola's supplemental Report and Recommendation, he noted that Officer Green's claims from *Young* were "claims of 'disparate treatment' in the . . . Sergeants' exam, racial discrimination, and retaliation for her participation in the main case." Magistrate Suppl. R. & R., ECF No. 389 at 3. However, in his conclusion,

Magistrate Judge Facciola only stated that "plaintiffs submitted
sufficient documentation to support a finding of timeliness on
Officer Green's retaliation claim stemming from the . . .
Sergeants' exam," but was also silent about the discrimination
claim. *Id.* at 4. In Plaintiffs' objections to Magistrate Judge
Facciola's Report, they clarified that Officer Green's claim was
"characterize[d] as retaliation, but was in fact racial
discrimination as well as retaliation[,] challenging the
. . . promotion process." Pls.' Objs. to Suppl. R. & R. of
Magistrate Judge, ECF No. 390 at 3 n.1. In its final decision on
exhaustion, the Court then adopted Magistrate Judge Facciola's
recommendation to allow Officer Green to proceed on the
retaliation claim but was silent as to the discrimination claim.
*See* 12(b)(1) Op., ECF No. 429 at 76-77. Thus, the Court
concludes that Magistrate Judge Facciola (and subsequently this
Court) did not dismiss Officer Green's discrimination claim
regarding the Sergeant's promotion process for lack of evidence
of exhaustion, but rather that claim was inadvertently
overlooked.

Finally, the Court has identified independent evidence from
the record verifying that Officer Green's claim for
discrimination was properly exhausted. In a declaration Officer
Green submitted when the Court was first assessing jurisdiction,
she stated that for her *Young* claims, she complained about the

"discriminatory/retaliatory act" of the "decision to allow white officers to take exam at a later date." Pls.' Mot. for Recons. of the Ct.'s Sept. 30, 2004 Mem. Op. & Order—Ex. 41 ("Green Decl."), ECF No. 96-42 ¶ 12. This description would have put the Department on notice that Officer Green was complaining about discrimination in the Sergeant's promotion process and thus, is sufficient evidence that she properly exhausted that claim. *See Macon*, 258 F. Supp. 3d at 101. The Court now turns to the merits of Officer Green's discrimination and retaliation claims regarding the Sergeant's promotion process.

### 1. Discrimination

Defendant argues that Officer Green's discrimination claim should be dismissed because the *Young* Complaint "has not identified any adverse employment action taken against [Officer Green]," Green MTD, ECF No. 511-1 at 11; and "provides no facts that would support an inference that [Officer Green's] race is the reason [she] was required to take the simulated exercise portion of the exam in May 2003, while some officers were permitted to take it at a later date," *id.* at 14.[21] The Court

---

[21] Defendant also argues that any claim based on the promotion of one of the white candidates was not exhausted and therefore is not properly before this Court. *See* Green MTD, ECF No. 511-1 at 8-10. In her briefing, Officer Green clarifies that her claim is that "the Department unlawfully discriminated against her based on her race (African American) when it gave white applicants an unfair advantage by allowing them to take the simulation exercises in the exam at a later date than other officers."

agrees that Officer Green's discrimination claim should be dismissed because the *Young* Complaint fails to adequately plead a causal link between her race and any discrimination in the Sergeant's promotion process.

The *Young* Complaint identifies Officer Green as one of the candidates for promotion to Sergeant in the 2002 promotion process. *See Young* Compl. ¶ 5. Since Officer Green's allegations are identical to those of the other Sergeant candidates identified in the complaint, the Court adopts its earlier reasoning regarding the discrimination claim, *see supra* Section V.D.1; briefly summarizes that reasoning here; and addresses Officer Green's counter arguments.

The *Young* Complaint fails to establish an inference of discrimination for several reasons. First, it alleges that white candidates were required to take the simulated portion of the Sergeant's examination at the same time as Officer Green and were denied previous requests for a later testing date. *See Young* Compl. ¶ 19. Second, it is also silent as to whether any non-white candidates were denied the opportunity to take the simulated portion of the exam at a later date. Instead, it only establishes that two white candidates "and a few other Sergeant

---

Green Opp'n, ECF No. 575-1 at 10. Thus, because Officer Green is not challenging the promotions themselves but only the promotion process, the Court need not address Defendant's exhaustion argument.

candidates" were allowed to take the test at a later date. *Id.* ¶ 20. Thus, the allegations from *Young* establish that Officer Green, as an African American officer, was treated similarly to other white officers, undercutting allegations that she was singled out for discrimination based on race. Additionally, the fact that white candidates were previously denied the purported "benefit" also undercuts Officer Green's claim that the Department intended to favor white candidates.

Finally, no other allegations in the *Young* Complaint are sufficient to establish an inference of discrimination. The *Young* Complaint does not provide facts which suggest that officials running the Sergeant's promotion process had any racial bias. In fact, the *Young* Complaint alleges that when Chief Gainer was confronted with concerns that allowing some officers to take the test a few days later could create an unfair advantage, he announced that a new test would be developed to try to thwart any potential advantages. *Id.* Furthermore, although the *Young* Complaint states that Chief Gainer "bent the rules in order to promote favored white candidates . . . to the determinant and disadvantage of . . . African American Officers and Sergeants seeking promotion," *id.* ¶ 15; these conclusory allegations are devoid of factual support and are therefore insufficient to establish an inference of intentional racial discrimination. *See Papasan*, 478 U.S. at 286.

145

Officer Green resists the Court's conclusion regarding causation and argues that the "causal link here is white officers regularly received promotional opportunities without the added workplace stress of having to fend off discrimination and other racist illegal acts committed against black officers and employees involving employment practices made unlawful under Title VII." Green Opp'n, ECF No. 575-1 at 12. This argument presupposes that the Department committed such unlawful discriminatory and retaliatory acts. It does not establish that such events occurred. It also fails to address the specific conduct at issue—the 2002 promotion process. Thus, since Officer Green points to no facts from the *Young* Complaint that raise her allegations "above the speculative level," *see Twombly*, 550 U.S. at 555; the Court cannot agree that the allegations are sufficient to survive a motion to dismiss. Accordingly, the Court **GRANTS** Defendant's motion to dismiss Officer Green's discrimination claim because the *Young* Complaint fails to adequately plead that the Sergeant's promotion process was causally connected to Officer Green's race.[22]

---

[22] Because the Court agrees with Defendant on the issue of causal connection, the Court need not address Defendant's other argument that Officer Green did not suffer an adverse employment action based on the facts alleged in the *Young* Complaint.

### 2. Retaliation

Defendant argues that Officer Green's retaliation claim should be dismissed because the *Young* Complaint does not adequately allege that Officer Green "suffered any tangible harm," Green MTD, ECF No. 511-1 at 15; and it fails to link Officer Green's "protected activity of being a plaintiff in *Blackmon-Malloy* with the Department's requiring Plaintiff and other candidates competing in the . . . sergeant promotion process to complete the simulated exercise in May 2003," *id.* at 16. The Court agrees that Officer Green's retaliation claim should be dismissed because the *Young* Complaint fails to adequately plead a causal connection between the promotion process and Officer Green's protected activity.

The facts underlying Officer Green's retaliation claim are identical to those underlying her discrimination claim and thus are also identical to those alleged by the other candidates identified in the complaint. Accordingly, the Court again adopts its earlier reasoning regarding the retaliation claim, *see supra* Section V.D.2; briefly summarizes that reasoning here; and addresses Officer Green's counter arguments.

First, the simulated portion of the Sergeant's exam was administered over a year after the *Blackmon-Malloy* case was initiated. *See* Compl., ECF No. 1; *Young* Compl. ¶ 13. This gap in time undercuts an inference of retaliation through temporal

147

proximity. *See Mayorkas*, 2022 WL 3452316, at *14 ("When relying on temporal proximity alone to demonstrate causation, there is no bright-line rule, although three months is perceived as approaching the outer limit.").

Furthermore, the *Young* Complaint establishes that Officer Green was not treated differently from other candidates for promotion who did not participate in protected activity. In her briefing, Officer Green asks what would have happened to her "if she had been a white officer not engaging in protected activity?" Green Opp'n, ECF No. 575-1 at 14. The *Young* Complaint answers this question by stating that a white female officer, who did not engage in protected activity, was also required to take the examination at the same time as Officer Green and thus was not given the purported "benefit" of a later examination date. *See Young* Compl. ¶ 19. Since Officer Green points to no additional facts in the *Young* Complaint that causally connect the Sergeant's promotion process to her protected activity, the Court **GRANTS** Defendant's motion to dismiss Officer Green's retaliation claim.

### G. Ave Maria Harris

This Court previously determined that only Officer Harris' claims for retaliation and hostile work environment from *Bolden-Whitaker* could proceed. *See* App. II, ECF No. 497-4 at 2. According to the *Bolden-Whitaker* Complaint, both claims are

based on an incident that occurred in late March 2003. *Bolden-Whitaker* Compl. ¶ 19. While on her lunch break, Officer Harris did not hear an evacuation alarm and was notified of the evacuation by a superior officer. *Id.* Once she was made aware of the evacuation, Officer Harris reported to her superior officers, was not given any tasks, and returned to her regular post after her break. *Id.*

Two days later, Officer Harris was "interrogated in an intimidating manner" by two sergeants. *Id.* Over a month later, Officer Harris was informed that a CP-535 Request for Disciplinary Action was being submitted against her for her actions during the March evacuation. *Id.* Two months later in July 2003, the CP-535 was signed "accusing Officer Harris of violating the rules of conduct by failing to respond to an emergency evacuation." *Id.* A year later, Officer Harris was issued a CP-534 Command Discipline Report which "penalized her by taking 24 hours of accrued paid leave, worth $852.24." *Id.* About three months after that, and "the same day mediation ended" on Officer Harris' current claims, the CP-534 Command Discipline Report was "officially sustained" but the penalty was "adjusted . . . to 'Filed with Warning.'" *Id.* The *Bolden-Whitaker* Complaint emphasizes that the "threat of discipline loomed large against Officer Harris for more than one and a half years." *Id.*

### 1. Retaliation

Defendant argues that Officer Harris' retaliation claim must be dismissed because she "has failed to plead a sufficient adverse action to support her claim[]." Mem. in Supp. of Def.'s Mot. to Dismiss the Compl. of Pl. Ave Maria Harris ("Harris MTD"), ECF No. 524-1 at 11.[23] The Court agrees.

A materially adverse action sufficient to sustain a claim for retaliation requires an objectively tangible harm, usually one that affects an employee's "position, grade level, salary, or promotion opportunities." *Baloch*, 550 F.3d at 1199. In the *Bolden-Whitaker* Complaint, Officer Harris alleges that she was supposed to be penalized with forfeiting over $800 of accrued paid leave. *Bolden-Whitaker* Compl. ¶ 19. However, the *Bolden-Whitaker* Complaint also claims that this penalty was never served and was instead changed to a warning. *Id.* As discussed in relation to Officer Fields' similar claims from *Bolden-Whitaker*, *see supra* Section V.E.3.a; a penalty that is never served is insufficient to satisfy the material adversity requirement for a

---

[23] At times in its briefing, Defendant confuses Officer Harris' claim as one for both discrimination and retaliation. *See, e.g.*, Harris MTD, ECF No. 524-1 at 11 ("Under these standards, Plaintiff has failed to plead a sufficient adverse action to support her claims of discrimination and retaliation."). However, in her brief in opposition, Officer Harris does not argue that she has any pending claims for discrimination. Thus, the Court will disregard Defendant's arguments about discrimination and only assess Officer Harris' claims for retaliation and hostile work environment.

retaliation claim. *See Baloch*, 550 F.3d at 1199; *Kangethe v. District of Columbia*, 206 F. Supp. 3d 661, 669 (D.D.C. 2016) ("Plaintiffs who do not actually serve proposed punishments do not suffer the sort of objective, material harm that is required to constitute an 'adverse action' in this Circuit.").

Turning to other potentially adverse actions, the *Bolden-Whitaker* Complaint only alleges that Officer Harris was "interrogated in an intimidating manner" soon after the incident and that she later was issued a Command Discipline Report, with the penalty of a warning. *Id.* The interrogation itself cannot be a materially adverse action because it also did not affect Officer Harris' "position, grade level, salary, or promotional opportunities," or otherwise objectively harm her. *Baloch*, 550 F.3d at 1199. Although Officer Harris may take issue with the tone of the inquiry, even harsh criticisms without other adverse effects are insufficient to establish objectively tangible harm. *See Baloch*, 550 F.3d at 1199 ("sporadic verbal altercations or disagreements do not qualify as adverse actions for purposes of retaliation claims").

For the same reasons, the Command Discipline Report and the associated warning penalty are also insufficient to establish materially adverse action. Although Officer Harris claims that the report "was an indelible blot on her otherwise clean record," *see* Pl. Ave Maria Harris's Opp'n to Def.'s Mot. to

Dismiss the Compl. of Pl. Ave Maria Harris ("Harris Opp'n"), ECF No. 538 at 5; this allegation only speaks to subjective harm. *See Forkkio*, 306 F.3d at 1130-31 ("Purely subjective injuries, such as . . . public humiliation or loss of reputation . . . are not adverse actions."). In her briefing, Officer Harris emphasizes that the "delayed . . . decision on imposing a proposed two-day suspension for more than one and a half years" was "a deliberate strategy to keep Officer Harris in fear." Harris Opp'n, ECF No. 538 at 6-7.[24] However, even assuming *arguendo* that Officer Harris correctly characterizes the Department's intent, such an argument goes to the motivation behind the action but not its severity.

Similarly, the *Bolden-Whitaker* Complaint emphasizes that the "threat of discipline loomed large" during that time. *Bolden-Whitaker* Compl. ¶ 19. But Officer Harris fails to allege any facts that connect the delay in resolving the issue to any objective harm that she suffered. She does not claim that the

---

[24] Officer Harris' brief in opposition arguably abandons her discrete retaliation claim, by only arguing that she "has stated a viable claim of harassment," Harris Opp'n, ECF No. 538 at 5; and that she experienced a "retaliatory hostile work environment," *id.* at 7. However, Defendant does not argue in its reply brief that any discrete claims of retaliation were abandoned. *See* Def.'s Reply in Further Supp. of Def.'s Mot. to Dismiss the Compl. of Pl. Ave Maria Harris, ECF No. 547 at 3-5. Furthermore, the task of construing Officer Harris' *pro se* briefing liberally counsels in favor of considering the claim. *See Erickson*, 551 U.S. at 94. The Court will therefore consider the claim for discrete acts of retaliation.

delay caused her any financial harm or that she was ineligible for promotion during that time period. *See Burlington N.*, 548 U.S. at 72-73 (holding that "an indefinite suspension without pay" could support a retaliation claim "even if the suspended employee eventually received backpay"); *Velikonja*, 466 F.3d at 124 (finding objective harm for a retaliation claim when a "lengthy investigation" "prevented [the plaintiff] from receiving promotions during the pendency of the investigation"). Although the *Bolden-Whitaker* Complaint establishes that Officer Harris was personally affected by the delay in resolving the issue, it does not allege facts that establish that she suffered a materially adverse action—one that could well dissuade a reasonable worker from making or supporting a charge of discrimination. *See Burlington N.*, 548 U.S. at 68.

Accordingly, because Officer Harris has failed to establish that she suffered a materially adverse action based on Defendant's conduct, the Court **GRANTS** Defendant's motion to dismiss Officer Harris' claim for retaliation.

### 2. Hostile Work Environment

Defendant argues that because Officer Harris' claim is "premised on a disciplinary measure that was reduced to a warning," her allegations "do not demonstrate workplace harassment and are neither sufficiently pervasive nor severe to

plausibly state a hostile work environment claim." Harris MTD,
ECF No. 524-1 at 14. The Court again agrees.

The allegations in *Bolden-Whitaker* establish that the
investigation into Officer Harris' actions related to the March
2003 evacuation took about a year and a half to be resolved.
*Bolden-Whitaker* Compl. ¶ 19. They allege that during that time
she was subjected to "interrogat[ion]" about that day and she
was informed several times about the charges and penalties that
would be levied against her. *Id.* However, nowhere in this series
of facts does Officer Harris allege "extreme" conduct that would
"amount to a change in the terms and conditions of [her]
employment." *Faragher*, 524 U.S. at 788. Officer Harris does not
allege that the investigation negatively affected her work
performance or her ability to perform her assigned tasks. *See
Baird II*, 792 F.3d at 169 (observing that determining whether an
environment is sufficiently severe or pervasive to establish a
hostile work environment includes considering "whether it
unreasonably interferes with an employee's work performance").
She also does not allege that the investigation was permeated
with abuse or hostility. The *Bolden-Whitaker* Complaint does
allege that Officer Harris was "interrogated in an intimidating
manner" by two superior officers on one occasion, *Bolden-
Whitaker* Compl. ¶ 19; but it provides no facts from which the
Court could agree that the interrogation was "intimidating" from

154

an objective perspective. Furthermore, "isolated incidents (unless extremely serious)" are insufficient to sustain a claim of hostile work environment, *see Faragher*, 524 U.S. at 788; and the *Bolden-Whitaker* Complaint describes no other instances of similar conduct, much less a pattern of such intimidation.

In her briefing, Officer Harris alleges that during the year and a half, the same superior officer "who had initiated [the] pending disciplinary charges" "repeatedly appeared at her duty station in order to intimidate her while she was on duty, even though he was assigned to a different building." Harris Opp'n, ECF No. 538 at 5. As an initial matter, the Court notes that these allegations are not included in the *Bolden-Whitaker* Complaint and thus cannot be considered on this motion to dismiss. *See St. Francis Xavier*, 117 F.3d at 624; *Arbitraje Casa de Cambio, S.A. de C.V.*, 297 F. Supp. 2d at 170 ("It is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." (internal quotation marks omitted)). However, even assuming that the conduct could be considered, the allegations still fail to establish the severity or pervasiveness required for a hostile work environment claim. Officer Harris does not provide any facts from which the Court could determine that the supervision was "abusive" or "hostile." She does not allege that this officer's presence hindered her work performance or even that this officer spoke to her when he

155

"kept showing up at her duty station for no legitimate non-retaliatory reason." Harris Opp'n, ECF No. 538 at 7.

Officer Harris offers the Supreme Court case *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), to support her claim; but in that case, the claims were for "sex discrimination and sexual harassment" and the Supreme Court described the conduct at issue as a plaintiff being "singled out for intense stalking by one of her supervisors." *Id.* at 96 (internal quotation marks omitted). Officer Harris' allegations do not establish similar conduct. Even if this supervisor "repeatedly and deliberately left his duty station to show up on Plaintiff Harris['] post and scrutinize her for no articulated legitimate non-discriminatory reason," Harris Opp'n, ECF No. 538 at 7; the conduct as described is not objectively offensive, severe, hostile, or abusive. It did not interfere with Officer Harris' work performance and considering the totality of the circumstances does not establish "an environment that a reasonable person would find hostile or abusive." *Harris*, 510 U.S. at 21. Accordingly, because the facts alleged in the *Bolden-Whitaker* Complaint fail to establish that Officer Harris was subjected to severe or pervasive behavior, the Court **GRANTS** Defendant's motion to dismiss Officer Harris' hostile work environment claim.

**H. Larry Ikard**

Sergeant Ikard's remaining claims are for discrimination, retaliation, and hostile work environment from the main case, *Blackmon-Malloy*. *See* App. II, ECF No. 497-4 at 2.

As an initial matter, the Court notes that neither party has briefed Sergeant Ikard's retaliation claim. In the previous opinion on jurisdiction, the Court agreed with Sergeant Ikard's argument that he "should be able to pursue his [K-9 Officer] non-promotion claim as an act of retaliation, not only as an act of discrimination." 12(b)(1) Op., ECF No. 429 at 78. On this current motion to dismiss, Defendant urges the Court to dismiss the "non-promotion claim" because "the Fourth Amended Complaint does not contain the claim that Plaintiff was not promoted due to racial discrimination." Mem. in Supp. of Def.'s Mot. to Dismiss the Compl. of Pl. Regina Ikard, Personal Rep. of the Estate of Larry Ikard ("Ikard MTD"), ECF No. 527-1 at 8. However, Defendant fails to address the connected claim for retaliation. *See id.* In his response, Sergeant Ikard only defends his non-promotion claim on discrimination grounds. *See* Pl. Regina Ikard's Mem. of P. & A. in Opp'n to Def.'s Mot. to Dismiss ("Ikard Opp'n"), ECF No. 537-1 at 9. In Defendant's reply, it states generally that the "Fourth Amended Complaint does not contain the claim that [Sergeant] Ikard was not promoted to the K-9 Unit," thus failing to distinguish the claim

157

on the basis of discrimination or retaliation. Def.'s Reply in Further Supp. of Mot. to Dismiss the Compl. of Pl. Regina Ikard, Personal Rep. of the Estate of Larry Ikard ("Ikard Reply"), ECF No. 544 at 11. Since Defendant in its briefing did not state that it was seeking dismissal of Sergeant Ikard's retaliation claim, the Court concludes that this claim is not being challenged on this motion to dismiss. Thus, the Court will only analyze Sergeant Ikard's claims for discriminatory non-promotion and hostile work environment.

### 1. Discrimination

To establish a *prima facie* case of discriminatory non-promotion, a plaintiff must show that "(1) she is a member of a protected class; (2) she applied for and was qualified for an available position; (3) despite her qualifications, she was rejected; and (4) either someone filled the position or it remained vacant and the employer continued to seek applicants." *Holcomb*, 433 F.3d at 895. As with all other discrimination claims, a plaintiff is not required to establish a *prima facie* case in order to survive a motion to dismiss, but must "allege facts that, if true, would establish the elements of each claim." *Greer v. Bd. of Trs. of the Univ. of the Dist. of Columbia*, 113 F. Supp. 3d 297, 310 (D.D.C. 2015) (internal quotation marks omitted).

Defendant argues that Sergeant Ikard's discriminatory non-promotion claim should be dismissed because no such claim exists in the FAC. *See* Ikard MTD, ECF No. 527-1 at 8. Sergeant Ikard denies this assertion and states that paragraph 53 of the FAC "alleges that the 2000 Sergeant's examination process unfairly discriminated against multiple Black Officers, including Sgt. Ikard by name" and that "Sgt. Ikard was unfairly denied a promotion to the K-9 unit in the 1999-2000 promotional process, a separate discriminatory act[, which] was preserved in Magistrate Judge Facciola's Report and Recommendation." Ikard Opp'n, ECF No. 537-1 at 9. The Court agrees with Sergeant Ikard regarding only the K-9 Unit non-promotion claim.

Beginning with Sergeant Ikard's 2000 Sergeant's examination process claim, the Court concludes that no such claim remains in this case. Magistrate Judge Facciola's Report and Recommendation does not include any mention of a 2000 Sergeant's examination process claim asserted by Sergeant Ikard. *See* Magistrate R. & R., ECF No. 376 at 27-28. And Sergeant Ikard's objection to the Report and Recommendation is also silent as to a 2000 Sergeant's examination process claim. *See* Pls.' Objs. to the R. & R. of the Magistrate Judge, ECF No. 386 at 41-42. Accordingly, in the previous opinion on jurisdiction, this Court only discussed Sergeant Ikard's non-promotion claims regarding "not being promoted to a K-9 officer position." 12(b)(1) Op., ECF No. 429

at 79. And in Appendix II, which lists Sergeant Ikard's remaining claims, this Court did not include any claims based on the 2000 Sergeant's examination process. *See* App. II, ECF No. 497-4 at 2. Thus, the Court concludes that any claim asserted by Sergeant Ikard based on the 2000 Sergeant's examination process is no longer part of the current case since Sergeant Ikard failed to assert it during this Court's examination of jurisdiction. *See* 12(b)(1) Op., ECF No. 429 at 79 (holding "Sgt. Ikard's remaining claims" not listed in Appendix II dismissed).

Turning to the K-9 unit non-promotion claim, the Court agrees with Sergeant Ikard that such a claim does exist in the FAC. Paragraph 80 of the FAC states that "[a]ll allegations of fact in Plaintiffs' Joint Second Amended Complaint . . . which are not specifically set forth in this Complaint and which are not inconsistent with this Complaint, are hereby incorporated by reference and made a part of this Complaint." FAC, ECF No. 278 ¶ 80. Paragraph 27 of the Second Amended Complaint describes how "[i]n November 1999, Officer Ikard responded to a vacancy announcement for K-9 Officers" and "[d]espite his qualifications for the position, Officer Ikard was not treated fairly during the selection process." SAC, ECF No. 51 ¶ 27. It describes how Sergeant Ikard "successfully completed" the "Patrol Officer's Field Training Program to test his physical agility and endurance" during the selection process for the K-9 Officer

position but a "white Officer, who was ultimately selected for the K-9 vacancy, did not." *Id.* The Second Amended Complaint also alleges that Sergeant Ikard's interviewer "spent a considerable amount of time praising the white Officers who also had applied for the same position, rather than asking Officer Ikard about his own skills and abilities." *Id.* The allegations also state that "[b]y May 2001, all vacancies in the K-9 Unit had been filled." *Id.*

Defendant appears to have overlooked the details of the claim that were incorporated into the FAC. In Defendant's initial motion, it states "[t]here is not a single fact or allegation in the pleading which in any way sets forth a claim for non-promotion." Ikard MTD, ECF No. 527-1 at 8. In his opposition, Sergeant Ikard states that the claim was for being "unfairly denied a promotion to the K-9 unit in the 1999-2000 promotional process" and that the claim "was preserved in Magistrate Judge Facciola's Report and Recommendation." Ikard Opp'n, ECF No. 537-1 at 9. In the reply, Defendant again reiterates its understanding that "[t]he Fourth Amended Complaint does not contain the claim that [Sergeant] Ikard was not promoted to the K-9 Unit" because "[t]here is not a single fact or allegation in the pleading that in any way sets forth a claim for this non-promotion." Ikard Reply, ECF No. 544 at 11. Although Sergeant Ikard did not cite to paragraph 80 of the FAC

in his opposition or discuss the details of the claim from the Second Amended Complaint, the allegations from those two documents state clear facts that Sergeant Ikard is asserting a non-promotion claim based on his failure to promote to the K-9 Unit.

As a consequence of Defendant's apparent misunderstanding, it has failed to challenge any specific aspects of Sergeant Ikard's discriminatory non-promotion claim. Therefore, the Court has no basis on which to consider Defendant's motion to dismiss. Accordingly, the Court **DENIES** Defendant's motion to dismiss Sergeant Ikard's discriminatory non-promotion claim.

### 2. Hostile Work Environment

Defendant argues that Sergeant Ikard's allegations do not establish a hostile work environment because they "do not demonstrate workplace harassment and are neither sufficiently pervasive nor severe enough to plausibly state a hostile work environment claim." Ikard MTD, ECF No. 527-1 at 10. Sergeant Ikard points to the naming of dogs in the K-9 unit "Ike" and "Huk" and the constant use of "racial epithets" throughout the Department as evidence of the "regular abuse, insults, and dehumanizing language and actions" he and other African American officers were subjected to by the Department. Ikard Opp'n, ECF No. 537-1 at 11-13. Looking at the totality of the circumstances alleged in the FAC, the Court agrees with Sergeant Ikard.

162

Beginning with the racial comments, the FAC alleges that Officer Ikard was "subjected to a racially hostile work environment in which white Officers referred to African Americans, whether fellow Officers or members of the public, as 'Huks' or 'gangsters,' and characterized the D.C. Metropolitan Police Department as the 'ghetto police.'" FAC, ECF No. 278 ¶ 18. It also alleged that Officer Ikard "observed that white Officers who had friendly conversations with African Americans were labeled as 'Huk Lovers,' 'Friends of Gangsters' or . . . simply 'FOGs.'" *Id.* ¶ 20. The FAC also alleges that there were "reports that the [N-word] was used freely" in the K-9 Unit, *id.* ¶ 21, and that the same epithet was used by General Counsel John Caulfield, "who had responsibility for giving advice on discipline and promotions in the department" and who "returned to work without incident" after using the word, *id.* ¶ 24. The FAC summarized that these "racist epithets" were "commonly employed by the white Officers of the U.S. Capitol Police" and that officers, including Officer Ikard "were affected." *Id.* ¶ 25.

Similar to the allegations by Lieutenant Adams for hostile work environment, *see supra* Section V.A.1.c, these allegations establish both frequent and severe conduct. They claim that the epithets were "commonly employed by the white Officers." FAC, ECF No. 278 ¶ 25. And the D.C. Circuit noted that even a "single

incident" of a supervisor using a "deeply offensive racial epithet when yelling at [an employee]" may be severe enough to establish a hostile work environment. *Ayissi-Etoh*, 712 F.3d at 577.[25]

Defendant tries to avoid this conclusion by characterizing the allegations as "a few alleged comments made during [Sergeant Ikard's] entire employment with Defendant." Ikard MTD, ECF No. 527-1 at 10-11. But the allegations directly state that the comments themselves, which included a variety of overt racial epithets, were employed on multiple occasions by several officers. FAC, ECF No. 278 ¶¶ 18-21, 25. Furthermore, the FAC alleges that Sergeant Ikard "was subjected to" and "observed" these comments. *Id.* ¶¶ 18, 20. Defendant argues that "mere knowledge of alleged comments does not amount to a hostile work environment claim," Ikard MTD, ECF No. 527-1 at 9-10; citing a case that determined a plaintiff's knowledge of racial epithets used to describe him was not sufficiently severe or pervasive conduct when the "alleged use of a racial slur was not made in plaintiff's presence," *Hampton v. Vilsack*, 760 F. Supp. 2d 38, 56 (D.D.C. 2011). However, the allegations in the FAC state that the racial epithets in this case were made in Sergeant Ikard's

---

[25] Although the Court in *Ayissi-Etoh* was analyzing a hostile work environment claim under § 1981, "courts use the same framework [as is used in Title VII cases] for determining whether unlawful discrimination occurred." *Ayissi-Etoh*, 712 F.3d at 576.

presence on numerous occasions. Thus, the Court rejects

Defendant's argument that "nothing in the Complaint indicates

that Plaintiff . . . witnessed such conduct, or otherwise was

adversely affected by such conduct," Ikard Reply, ECF No. 544 at

11; because the allegations in the FAC directly belie

Defendant's characterization.

Turning to the naming of the dogs in the K-9 Unit, the FAC

alleges that "[w]hen Officer Ikard worked in the K-9 Unit," "the

department procured a black-colored German Shepherd dog named

'Ike,' and the white Officers of the K-9 unit would shout 'Ike'

at it and yell at it, to demean and humiliate Officer Ikard."[26]

FAC, ECF No. 278 ¶ 19. Sergeant Ikard clarifies that the conduct

_____

[26] In its reply brief, Defendant states that Sergeant Ikard's
claim about one of the K-9 Unit dogs being named "Ike" is "not a
claim that has been identified in Appendix II." Ikard Reply, ECF
No. 544 at 7. Defendant makes no arguments as to why the
allegations should not be considered and has waived any
potential arguments by not including them in the initial motion
to dismiss. *See Nat'l Acad. of Scis.*, 974 F.2d at 196.
Furthermore, looking to the record, the Court's opinion on
jurisdiction allowed Sergeant Ikard's claim "regarding the name
given to a dog in the K-9 unit . . . to proceed" without
limiting the claim based on a particular dog's name. *See*
12(b)(1) Op., ECF No. 429 at 77-78. Appendix II also cites
paragraphs 18-20 of the FAC as the basis for Sergeant Ikard's
claim, *see* App. II, ECF No. 497-4 at 2; and paragraph 19
describes the naming of both the dogs Ike and Huk, *see* FAC, ECF
No. 278 ¶ 19. Finally, looking to Sergeant Ikard's declaration
regarding exhaustion, he stated that he complained about the
naming of the dog "Ike" during his counseling and mediation
sessions. *See* Pls.' Mot. for Recon. of the Ct.'s Sept. 30, 2004
Mem. Op. & Order—Ex. 78, ECF No. 96-79 at 4-5. Therefore, the
Court will consider the allegations regarding both naming
concerns.

was intentionally demeaning because his nickname was "Ike." *See id.* ¶ 18; Ikard Opp'n, ECF No. 537-1 at 11. Furthermore, the FAC alleges that another "black-colored dog [was] named 'Huk,'" which so "outrage[d]" the Black officers that the department "changed the dog's name."[27] FAC, ECF No. 278 ¶ 19. Defendant recharacterizes the conduct as "essentially that officers in the K-9 unit called a dog named 'Ike' by its name" and that therefore "[n]o reasonable inference can be drawn that white officers called the dog Ike 'to demean and humiliate' [Sergeant Ikard]." Ikard Reply, ECF No. 544 at 7. Looking to the totality of the circumstances, the Court disagrees.

As discussed above, the FAC alleges that officers throughout the Department—particularly in the K-9 unit—had a history of "freely" using racial epithets. *See* FAC, ECF No. 278

---

[27] Again, in its reply brief, Defendant argues that naming the dog "Huk" cannot be the basis for a hostile work environment claim because "Defendant took steps to discontinue the alleged offending behavior and engaged in prompt remedial action, changing the dog's name." Ikard Reply, ECF No. 544 at 7. To support this argument, Defendant cites *Faragher v. City of Boca Raton*, 524 U.S. at 779-800, for the proposition that "[w]hen an employer promptly corrects a situation it is not a basis for a hostile work environment claim." Ikard Reply, ECF No. 544 at 7. Since this argument was not put forth in Defendant's original motion to dismiss, it would be unfair to Sergeant Ikard for the Court to consider the argument without his opportunity to respond. Furthermore, because Defendant is making a legal argument, the Court determines that considering such an argument without the benefit of opposing briefing on the legal issue would be ill-advised. *See Nat'l Acad. of Scis.*, 974 F.2d at 196. For these reasons, the Court will not consider Defendant's argument.

¶ 21. Given that "Huk" was one of the epithets that was prevalent throughout the Department, *id*. ¶ 18; it is reasonable to infer that the naming was not accidental or benign. Additionally, the "outrage from Black Officers," *id.* at ¶ 19; which eventually caused the name to be changed, further evidences the offensive and demeaning impact of the name.

Therefore, given the context of the Department at the time, shouting and yelling "Ike" at the newly procured police dog in the K-9 unit suggests more than simply "call[ing] the dog by its name." Ikard Reply, ECF No. 544 at 8. Based on the allegations in the FAC, the K-9 unit twice procured dogs and used their names to upset and insult Black officers. The pattern in this behavior cuts against the Department's implicit argument that such actions were innocuous. Furthermore, the allegations in the FAC suggest that this taunting was frequent "[w]hen Officer Ikard worked in the K-9 Unit." *Id.* ¶ 19. These allegations suggest that Sergeant Ikard's work environment in the K-9 unit was permeated with "discriminatory intimidation, ridicule, and insult." *Baloch*, 550 F.3d at 1201 (internal quotation marks omitted).

Accordingly, looking at the totality of the circumstances, the Court concludes that the combination of the free use of racial epithets throughout the Department, and by the K-9 unit in particular, with the targeted taunting of Sergeant Ikard

through the name of the police dog is sufficient to establish a work environment that a "reasonable person would find hostile or abusive." *Harris*, 510 U.S. at 21. The Court therefore **DENIES** Defendant's motion to dismiss Sergeant Ikard's hostile work environment claim.

### I. Governor Latson

According to Appendix II, Officer Latson's sole remaining claim is from *Blackmon-Malloy* for "[n]on promotion." *See* App. II, ECF No. 497-4 at 2-3. In August 2021, Officer Latson filed a *pro se* motion to "correct entry," arguing that Appendix II incorrectly stated that his claim was from *Blackmon-Malloy*, when it was actually alleged in *Young*. *See* Latson Correction Mot., ECF No. 506 at 2. Furthermore, in the briefing on this motion to dismiss, Defendant argues that "[t]o the extent [Officer Latson] challenges the Department's decision to promote [another officer] and not [Officer Latson] in February 2004, that issue is not properly before this Court as [Officer Latson] did not timely exhaust administrative procedures before asserting such a claim." Def.'s Mem. of P. & A. in Supp. of Mot. to Dismiss Pl. Governor Latson, Jr.'s Claims ("Latson MTD"), ECF No. 510-1 at 8. Since both of these concerns regard how to construe Officer Latson's claim, the Court will address them before turning to the merits of the claim.

Beginning with Officer Latson's *pro se* motion, the Court agrees that the claim is from *Young* and there is no impediment to construing it as such. Tracing the claim back to its origins, the Court's opinion on jurisdiction adopted Magistrate Judge Facciola's Report and Recommendation for Officer Latson's claims. *See* 12(b)(1) Op., ECF No. 429 at 81. Magistrate Judge Facciola's Report and Recommendation sifted through the "confus[ing] matters" presented by the parties and decided to "construe the *Fourth Amended Complaint* to assert a non-promotion claim on behalf of Officer Latson," which he recommended should be the only claim to proceed. Magistrate R. & R., ECF No. 376 at 28-29. In describing the claim, Magistrate Judge Facciola stated that the claim is from page 20 of the FAC, which alleges that "Governor Latson [was] among the Plaintiffs discriminated against in the 2002 promotional process." *Id.* at 28. Looking at the FAC, paragraph 55 on page 20 states that this claim regarding the "2002 promotional process" is from *Young*. *See* FAC, ECF No. 278 ¶ 55. Furthermore, both parties' briefing address the facts of the claim as they are alleged in *Young* and Defendant informed the Court that it "takes no position" on the motion, *see* Def.'s Notice to the Ct., ECF No. 587 at 1. Accordingly, the Court **GRANTS** Officer Latson's motion to the extent that it asks the Court to construe his remaining claim as based on the factual allegations in *Young*.

Second, after further review of Officer Latson's claim, the Court now understands Officer Latson's "[n]on promotion claim" to be a claim about the promotion process rather than his non selection for a promotion. Officer Latson's claim from *Young* is identical to the claims brought by Officer Brooks, Officer Green, and the other candidates for promotion to Sergeant in the 2002 process. *See Young* Compl. ¶ 5. In his briefing on this motion to dismiss, Officer Latson clarifies that his allegations from *Young* are that "the Department unlawfully discriminated against him based on his race . . . when it gave white applicants an unfair advantage by allowing them to take the simulation exercises in the exam at a later date than other officers." Pl. Governor Latson, Jr.'s Mem. of P. & A. in Opp'n to Def.'s Mot. to Dismiss Pl. Latson's Claims ("Latson Opp'n"), ECF No. 574-1 at 10. Again, tracing the claim back to its root, Magistrate Judge Facciola's Report and Recommendation concluded that Officer Latson's claim about being one of "the Plaintiffs discriminated against in the 2002 promotional process," which was stated on page 20 of the *Blackmon-Malloy* Complaint, "appears to be the claim for non-promotion." Magistrate R. & R., ECF No. 376 at 28. Thus, Officer Latson has consistently complained about the 2002 promotion process and that argument was equated with a "[n]on promotion claim" by Magistrate Judge Facciola. With this understanding, the Court need not decide whether

Defendant is correct that Officer Latson did not exhaust a claim around "the Department's decision to promote [another officer] and not [Officer Latson]" because Officer Latson is not asserting such a claim.

Furthermore, in Magistrate Judge Facciola's Report and Recommendation, he recommended that "Officer Latson's claim . . . survive," without distinguishing the claim on the basis of discrimination or retaliation. Magistrate R. & R., ECF No. 376 at 29. This Court adopted that recommendation and the parties have briefed the claim as one for both discrimination and retaliation. *See* 12(b)(1) Op., ECF No. 429 at 81; Latson MTD, ECF No. 510-1 at 11-16; Latson Opp'n, ECF No. 574-1 at 10-14. Looking to the record on exhaustion, it appears Officer Latson exhausted his claim about the promotion process for both discrimination and retaliation. *See* Pls.' Mot. for Recons. of the Ct.'s Sept. 30, 2004 Mem. Op. & Order—Ex. 51 ("Latson Decl."), ECF No. 96-52 ¶ 3 (describing "discriminatory/retaliatory act complained of" as "learn[ing] of decision to allow white officers to take exam at a later date"). Accordingly, this Court will analyze Officer Latson's claim as for discrimination and retaliation in the 2002 Sergeant's promotion process as alleged in *Young*.

Turning to the merits of Officer Latson's claim, Defendant argues that the claim for discrimination fails because the *Young*

Complaint does not allege Officer Latson suffered an adverse employment action and the allegations fail to establish a causal connection between the Department's conduct and Officer Latson's race. *See* Latson MTD, ECF No. 510-1 at 11-14. Similarly, Defendant argues that the claim for retaliation fails because the *Young* Complaint does not allege Officer Latson suffered a materially adverse action and the allegations fail to establish a causal connection between the Department's conduct and Officer Latson's protected activity. *Id.* at 15-16. The Court agrees with Defendant that the allegations in *Young* fail to establish a causal connection between the Department's conduct and either Officer Latson's race or his protected activity.[28]

Since Officer Latson's allegations are identical to those of the other Sergeant candidates identified in the *Young* Complaint, the Court adopts its earlier reasoning regarding the discrimination and retaliation claims, *see supra* Section V.D.1-V.D.2; briefly summarizes that reasoning below; and addresses Officer Latson's counter arguments.

---

[28] Because the Court agrees with Defendant on the issues of causal connection, the Court need not address Defendant's other arguments that Officer Latson did not suffer an adverse employment action or a materially adverse action based on the facts alleged in the *Young* Complaint.

### 1. Discrimination

The facts alleged in *Young* undercut an inference of discrimination based on race because Officer Latson was treated similarly to most of the white candidates who were also not allowed to take part of the Sergeant's examination at a later date. *See Young* Compl. ¶ 19. Furthermore, the purported "benefit" of getting to take a portion of the Sergeant's exam at a later date was previously denied to a white candidate, undercutting allegations that white candidates as a group were intentionally favored. *Id.* ¶ 20. Finally, the *Young* Complaint fails to establish an inference of discrimination with any other allegations, especially given that the Complaint describes how Chief Gainer altered the makeup examination process after officers raised concerns about potential unfair advantage. *Id.*

In Officer Latson's brief, he argues that the "causal link here is white officers regularly received promotional opportunities without the added workplace stress of having to fend off discrimination and other racist illegal acts committed against black officers and employees involving employment practices made unlawful under Title VII." Latson Opp'n, ECF No. 574-1 at 12. The Court is unpersuaded because Officer Latson's argument presupposes that the Department committed "racist illegal acts" without factual allegations in the *Young* Complaint to support such accusations of intentional discrimination.

173

Furthermore, the assertion never addresses the conduct at issue—
the 2002 promotion exam process and therefore is not probative
of racial animus in that process.

### 2. Retaliation

The Court reaches the same conclusion regarding Officer
Latson's claim for retaliation. The allegations are insufficient
to suggest a causal connection between Officer Latson's
protected activity and the Department's actions based on
temporal proximity because the over year-long gap between the
two events is not explained. *See* Compl., ECF No. 1; *Young* Compl.
¶ 19; *Mayorkas*, 2022 WL 3452316, at *14 ("When relying on
temporal proximity alone to demonstrate causation, there is no
bright-line rule, although three months is perceived as
approaching the outer limit.").

Furthermore, Officer Latson was treated similarly to other
white officers who had not engaged in protected activity, thus
further undercutting a causal connection for retaliation. *See*
*Young* Compl. ¶ 19. Officer Latson also asks the Court, "What
would have happened to Plaintiff (black officer) engaging in
protected activity if he had been a white officer not engaging
in protected activity?" Latson Opp'n, ECF No. 574-1 at 14. The
*Young* Complaint's own allegations suggest an answer as a white
officer, who did not participate in the *Blackmon-Malloy* suit,
was treated identically to Officer Latson in the process—she was

174

also required to take the Sergeant's examination at the scheduled time. *See Young* Compl. ¶ 19.

For the reasons above, the Court **GRANTS** Defendant's motion to dismiss Officer Latson's claims.

**J. Kevin Matthews, Sr.**

According to Appendix II, Officer Matthews' sole remaining claim is for "[d]iscipline received on February 13, 2001" from *Blackmon-Malloy*. App. II, ECF No. 497-4 at 3. Defendant argues that the claim should be dismissed because "the complaint does not even set forth what [Officer Matthews'] claim is, or what he is alleging with respect to the discipline he received."[29] Mem. in Supp. of Def.'s Mot. to Dismiss the Compl. of Pl. Kevin Matthews, Sr. ("Matthews MTD"), ECF No. 526-1 at 5. It also argues that the claim should be dismissed because the "conduct of which [Officer Matthews] complains does not constitute 'an adverse employment action.'" *Id.* at 6. In opposition, Officer Matthews argues that he has "present[ed] this Court with enough facts to state facially plausible claims," that his claim is for discrimination and retaliation, and that a hostile work

---

[29] In its reply brief, Defendant also argues that the discrimination claim should fail because the allegations do not support an inference of discrimination. *See* Def.'s Reply in Supp. of Def's Mot. to Dismiss Kevin Matthews, Sr.'s Claims (ECF No. 526) ("Matthews Reply"), ECF No. 585 at 4. As this argument was not put forth in the original motion to dismiss, out of fairness to *pro se* litigant Officer Matthews, the Court declines to consider it. *See Nat'l Acad. of Scis.*, 974 F.2d at 196.

environment claim should be "added to the unfair discipline claim." *See* Pl. Kevin Matthews Sr., Mem. of P. & A. in Opp'n to Def.'s Mot. to Dismiss Pl. Matthews' Claims ("Matthews Opp'n"), ECF No. 572-1 at 5, 9. Looking at the whole record, the Court agrees with Defendant that Officer Matthews' claim should be dismissed and that no other claims that Officer Matthews asserts in his briefing should be allowed to proceed.

Beginning with the discipline claim described in Appendix II, the Court agrees with Defendant that no such claim exists within the FAC. Officer Matthews is not discussed within the allegations in the FAC. Rather, he is named in several exhibits attached to the FAC. *See* FAC—Ex. 1, ECF No. 278-1 at 1; FAC—Ex. 2, ECF No. 278-2 at 1; FAC—Ex. 3, ECF No. 278-3 at 1; FAC—Ex. 4, ECF No. 278-4 at 1; FAC—Ex. 5, ECF No. 278-5 at 1; FAC—Ex. 9, ECF No. 278-9 at 1; FAC—Ex. 10, ECF No. 278-10 at 1; FAC—Ex. 11, ECF No. 278-11 at 1. However, Magistrate Judge Facciola concluded that Officer Matthews was merely listed among the affected officers "without any factual background for these claims or evidence that administrative remedies as to those claims were exhausted." Magistrate R. & R., ECF No. 376 at 29. Magistrate Judge Facciola therefore recommended that those claims be dismissed and "only the claim for discipline on February 13, 2001 go forward," but Magistrate Judge Facciola did

not cite to any portion of any complaint that described those allegations. *Id.*

In paragraph 80 of the FAC, the Plaintiffs "incorporated by reference and made a part of [the Fourth Amended] Complaint" "[a]ll allegations of fact in Plaintiffs' Joint Second Amended Complaint . . . which are not specifically set forth in [the Fourth Amended] Complaint and which are not inconsistent with [the Fourth Amended] Complaint." FAC, ECF No. 278 ¶ 80. Turning to the Joint Second Amended Complaint, Officer Matthews is mentioned once on page 49, within an extensive list of Plaintiffs who allegedly "have provable claims of discrimination with respect to matters alleged in [the Joint Second Amended] Complaint," SAC, ECF No. 51 at 47. However, similar to the FAC, the Joint Second Amended Complaint does not provide any detail regarding Officer Matthews' allegations. Although Officer Matthews is not required to plead a *prima facie* case in order to survive a motion to dismiss, *see Swierkiewicz*, 534 U.S. at 515; he must provide enough "fair notice of what [his] claims are and the grounds upon which they rest," *id.* at 514. This requirement entails "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Officer Matthews' allegations in neither the FAC (including its attached exhibits) nor the incorporated Joint Second Amended Complaint satisfy this

requirement. They merely state that he is one of many officers who have claims of discrimination but provide no facts about the specifics of Officer Matthews' claims.

The only places in the record that the Court can find any factual details related to Officer Matthews' discipline allegations are in documents that may not be considered on this motion to dismiss. First, in Officer Matthews' current briefing, he presents the Court with facts regarding the February 13, 2001 discipline. *See* Matthews Opp'n, ECF No. 572 at 5. He also attaches two exhibits with additional factual information. *See* Index of Exs. in Supp. of Pl. Kevin M. Matthews Sr. Mem. in Opp'n to Def.'s Mot. to Dismiss Pl.'s Claims, ECF No. 572-2 at 1. But it is well-settled that even *pro se* litigants may not amend their pleadings through their briefing. *See Arbitraje Casa de Cambio, S.A. de C.V.*, 297 F. Supp. 2d at 170 ("It is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." (internal quotation marks omitted)); *Ferrell*, 2023 WL 2043148, at *8 (applying the principle to a *pro se* litigant).

Second, one of the documents that Officer Matthews attached to his current briefing was attached as an exhibit to Defendant's previous motion to dismiss from 2010. *See* Mem. in Supp. of Def.'s Mot. to Dismiss the Fourth Am. Compl.—Ex. 28, ECF No. 308-8 at 17-18. Additionally, Officer Matthews'

declaration, which describes the February 2001 discipline
incident while establishing adequate administrative exhaustion,
was attached as an exhibit to Plaintiff's Motion for
Reconsideration on this Court's Order on a Motion to Dismiss
from 2005. *See* Pls.' Mot. for Recons. of the Ct.'s Sept. 30,
2004 Mem. Op. & Order—Ex. 21 ("Matthews Decl."), ECF No. 96-22
¶ 4. The same declaration was reattached more recently to
Plaintiffs' opposition to Defendant's earlier motion to dismiss,
which Plaintiffs filed in 2011. *See* Errata—Exs. to Pls.' Opp'n
to Def.'s Mot. to Dismiss the Fourth Am. Compl.—Ex. 62, ECF No.
332-2 at 68-70. However, although both of these documents
provide factual information, none of them were attached to or
incorporated into the operative complaint. They were submitted
to the Court in order to establish exhaustion and overcome
Defendant's motion to dismiss for lack of subject matter
jurisdiction. Although they properly served that purpose, those
same documents cannot be used to overcome the current motion to
dismiss because the Court is circumscribed in what it may
consider on a 12(b)(6) motion. *See St. Francis Xavier*, 117 F.3d
at 624 (observing that a court "may consider *only* the facts
alleged in the complaint, any documents either attached to or
incorporated in the complaint and matters of which [courts] may
take judicial notice" (emphasis added)). Therefore, because the
factual allegations regarding Officer Matthews' February 2001

discipline claim are not in the FAC, nor in any documents that can be considered on this motion, the Court **GRANTS** Defendant's motion to dismiss Officer Matthews' claim.

Turning now to the additional claims Officer Matthews argues he has adequately presented, his briefing states that he was subjected to "retaliation[] and a hostile working environment" in addition to his previous "unfair discipline" claim. Matthews Opp'n, ECF No. 572-1 at 4. As an initial matter and as discussed above, the FAC does not contain any factual allegations regarding any claim that Officer Matthews alleges. That failure is reason alone to reject Officer Matthews' argument that these claims should be considered. Nevertheless, the Court addresses Officer Matthews arguments in support of the claims for completeness.

Beginning with retaliation, Defendant argues that such a claim "must fail" because Officer Matthews "has asserted no facts . . . indicating that he engaged in protected activity before the February 2001 discipline, and that such protected activity may be causally linked to the events of February 2001." Matthews Reply, ECF No. 585 at 1 n.1. The Court agrees. In his briefing, Officer Matthews claims that he was "retaliated against and removed from his regular assignment due to plaintiff['s] protected activity." Matthews Opp'n, ECF No. 572-1 at 8. However, he also admits that his "retaliation and unfair

discipline claims occurred prior to the administrative class wide complaint filing in the [Office of Compliance]." *Id.* And he then fails to allege that any protected activity occurred before this purported retaliation. Because retaliation, by its very nature, requires the protected activity to occur before the complained about conduct, the fact that the conduct in this case preceded the initiation of the *Blackmon-Malloy* suit by over six months—and no other triggering instance of protected activity was identified—renders Officer Matthews' claim for retaliation untenable. *See Holcomb*, 433 F.3d at 903 (holding that an adverse action may be "causally related" to protected activity when the "action took place shortly *after* that activity" (internal quotation marks omitted) (emphasis added)).

Officer Matthews also cites several allegations from the FAC to allege a claim for hostile work environment. Specifically, he discusses General Counsel Caulfield's use of a racial slur and the "unfair disciplinary process which primarily impacted black officers." Matthews Opp'n, ECF No. 572 at 6-7. As discussed previously, Officer Matthews was listed as an officer who was affected by the racist words and actions of the police department in multiple exhibits attached to the FAC, but the Court—adopting Magistrate Judge Facciola's recommendation—dismissed those claims because the FAC did not describe the factual allegations from Officer Matthews or the exhaustion of

such claims. *See* 12(b)(1) Op., ECF No. 429 at 87; Magistrate R. & R., ECF No. 376 at 29. Furthermore, according to Officer Matthews' declaration in support of exhaustion, he stated that he complained of a "hostile work environment" but only mentioned the February 2001 discipline incident and another discipline incident that occurred in 1985. *See* Matthews Decl., ECF No. 96-22 at ¶ 4. Nowhere in that declaration does Officer Matthews address Mr. Caulfield's racial slur or any other discriminatory activity that he observed or experienced from the Department. *See id.* Thus, the Court stands by its previous ruling that Officer Matthews' hostile work environment claim was not properly exhausted.

### K. Danny McElroy

According to Appendix II, Officer McElroy has two surviving claims—one from *Blackmon-Malloy* for improper discipline and one from *Young* for non-promotion. *See* App. II, ECF No. 497-4 at 3. Defendant argues that both claims should be dismissed, asserting that the FAC "provides no facts in support of [Officer McElroy's] claim that he was disciplined more harshly than others," Def.'s Mem. of P. & A. in Supp. of Mot. to Dismiss Pl. Danny McElroy's Claims ("McElroy MTD"), ECF No. 518-1 at 9; and that the *Young* Complaint fails to state a plausible claim for discrimination or retaliation because the facts do not allege an adverse employment action, materially adverse action, causal

link between the Defendant's conduct and Officer McElroy's race,
or a causal link between Defendant's conduct and Officer
McElroy's protected activity, *id.* at 12-18. Officer McElroy
asserts that his remaining claims are supported by sufficient
allegations from the operative complaints and he also implicitly
argues that his remaining claims should be considered as claims
for hostile work environment. *See* Pl. Danny L. McElroy's Mem. of
P. & A. in Opp'n to Def.'s Mot. to Dismiss Pl. McElroy's Claims
("McElroy Opp'n"), ECF No. 569-1 at 13-20. The Court agrees with
Defendant that Officer McElroy's remaining claims should be
dismissed and that any hostile work environment claims are not
properly before the Court.

### 1. *Blackmon-Malloy* (1-2221)

Defendant argues that Officer McElroy's claim for improper
discipline should be dismissed because the FAC "generally
alleges that [Officer McElroy] received discipline, but he
provides no information as to when he was disciplined, who
issued the discipline, the basis of the discipline, or the
nature of the discipline." McElroy MTD, ECF No. 518-1 at 9.
Officer McElroy counters that the "factual allegation[s] are
stated herein in this instant motion," and he also cites a
declaration submitted in 2005. McElroy Opp'n, ECF No. 569-1 at
13. The Court agrees with Defendant that Officer McElroy's claim
should be dismissed because none of the factual allegations

Officer McElroy asserts in either his briefing or other related documents can be considered on this motion to dismiss and the details in the FAC are insufficient to survive a 12(b)(6) motion.

The details of Officer McElroy's claim are not provided in the FAC. Rather, Officer McElroy's claim is asserted in the FAC by listing Officer McElroy's name in Exhibit 10 as one of the "Black Officers who [was] more severely disciplined than white Officers." FAC, ECF No. 278 ¶ 68; FAC—Ex. 10, ECF No. 278-10 at 1. But neither the FAC nor the attached Exhibit 10 provide factual details about the alleged discipline. The same is true for the incorporated Joint Second Amended Complaint. Officer McElroy is listed as one of the "Plaintiffs, who . . . have provable claims of discrimination with respect to matters alleged in [the Joint Second Amended] Complaint," *see* SAC, ECF No. 51 ¶ 46; but no details about Officer McElroy's allegations are included. Although Officer McElroy is not required to plead a *prima facie* case in order to survive a motion to dismiss, *see Swierkiewicz*, 534 U.S. at 515; he must provide enough "fair notice of what [his] claims are and the grounds upon which they rest," *id.* at 514. This requirement entails "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The allegations in the FAC fail to meet this standard. The single

184

sentence regarding Officer McElroy only asserts that he was one of many officers who was "more severely disciplined than white Officers," but it provides no details about when the discipline occurred, which white officers were disciplined less severely, or any other details about the circumstances regarding the claim. Thus, the FAC could not put Defendant on "fair notice" about the "grounds upon which" Officer McElroy's claim rests. *Swierkiewicz*, 524 U.S. at 514. Furthermore, the mere conclusory statement that Officer McElroy was disciplined more harshly is not enough for the Court to determine whether Officer McElroy has a "claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

Officer McElroy directs the Court's attention to two documents, which he argues provide the factual basis for his claim, but those documents may not be considered on this motion to dismiss. First, although Officer McElroy gives a detailed account of the allegedly discriminatory discipline in his briefing, *see* McElroy Opp'n, ECF No. 569-1 at 5-6; it is well-settled that even a *pro se* plaintiff may not amend his complaint through briefing. *See Ferrell*, 2023 WL 2043148, at *8. Second, Officer McElroy's declaration, which describes his claim, was submitted as an attached exhibit to Plaintiffs' motion for reconsideration of the Court's previous decision to dismiss certain claims for lack of subject matter jurisdiction, which

Plaintiffs submitted in 2005. *See* Pls.' Mot. for Recons. of the
Ct.'s Sept. 30, 2004 Mem. Op. & Order—Ex. 22 ("McElroy Decl."),
ECF No. 96-23 ¶ 4. Although the declaration is in the record, it
was not attached to, incorporated in, or referenced in any of
the operative complaints. Thus, it is outside the scope of
documents that the Court may consider on this 12(b)(6) motion to
dismiss. *See St. Francis Xavier*, 117 F.3d at 624. Since the
Court was unable to find any factual detail about Officer
McElroy's claim within the circumscribed documents it is allowed
to consider on this motion, the Court **GRANTS** Defendant's motion
to dismiss Officer McElroy's claim from *Blackmon-Malloy.*

In Officer McElroy's brief, he states that he was
"subjected to a hostile work environment, received unwarranted
discipline, and [was] discriminated against in March 2001."
McElroy Opp'n, ECF No. 569-1 at 5. He also cites the relevant
legal standard for hostile work environment claims in his
argument. *See id.* at 8.

To the extent that Officer McElroy is asking the Court to
construe his improper discipline claim as one for a hostile work
environment, the Court declines to do so. First, Officer McElroy
has not established that he properly exhausted any hostile work
environment claims. *See Blackmon-Malloy III*, 575 F.3d at 702;
*Macon*, 258 F. Supp. 3d at 101 (observing that the plaintiff has
the "responsibility to set forth some evidence that a particular

186

claim was actually presented in counseling and mediation").
Second, the general statement in the FAC that Officer McElroy
was one of the "Black Officers who [was] more severely
disciplined than white Officers," FAC, ECF No. 278 ¶ 68;
provides only one conclusory statement, devoid of any specific
factual allegations that "plausibly give[s] rise to an
entitlement of relief." *Iqbal*, 556 U.S. at 679; *see id.* at 678
("Threadbare recitals of the elements of a cause of action,
supported by mere conclusory statements, do not suffice [to
survive a motion to dismiss]."). The statement provides no facts
from which the Court could determine whether Officer McElroy's
environment was hostile or abusive. Thus, the Court will not
construe Officer McElroy's claim as one for a hostile work
environment.

### 2. *Young* (4-320)

Appendix II lists Officer McElroy's remaining claim from
*Young* as a claim for "[n]on-promotion." App. II, ECF No. 497-4
at 3. Defendant argues that "[t]o the extent [Officer McElroy]
challenges the Department's decision to promote [another
officer] and not [Officer McElroy] . . . that issue is not
properly before this Court as [Officer McElroy] did not timely
exhaust administrative procedures before asserting such a
claim." McElroy MTD, ECF No. 518-1 at 10. In Officer McElroy's
briefing, he clarifies that his claim is for Defendant's

"intentionally administer[ing] a flawed and illegal and discriminatory promotion examination which favored and provided an advantage to two white candidates in the . . . Sergeant and Lieutenant examination." McElroy Opp'n, ECF No. 569-1 at 8. Thus, Officer McElroy's claim is about discrimination in the examination process rather than his non-selection as Sergeant. Since Officer McElroy is not basing his claim around his non-selection as Sergeant, the Court need not address Defendant's argument that such a claim would not be properly exhausted.

However, because this Court's previous opinion on jurisdiction, understood Officer McElroy's claim to be one for non promotion, as opposed to discrimination and retaliation in the promotion process, the Court must ensure that Officer McElroy's claim—understood on the proper basis—was adequately exhausted. *See Blackmon-Malloy III*, 575 F.3d at 705; *Ross*, 195 F. Supp. 3d at 199 (observing that the CAA's "*jurisdictional* prerequisites" may not be waived by "any party"). Looking to the record, Officer McElroy's declaration, described the claim as a "discriminatory/retaliatory act" when he "learned of decision to allow white officers to take exam at a later date." McElroy Decl., ECF No. 96-23 ¶ 12. This description establishes that Officer McElroy put Defendant on notice during his mediation sessions that he was complaining about both discrimination and retaliation in the promotion process. *See Macon*, 258 F. Supp. 3d

at 101. Accordingly, the Court has confirmed that Officer McElroy properly exhausted the claims at issue on this motion.

Turning to the merits of Officer McElroy's claim, the Court notes that his allegations are identical to those of the other Sergeant candidates identified in the *Young* Complaint. *See Young* Compl. ¶ 5. Accordingly, the Court adopts its earlier reasoning regarding the discrimination and retaliation claims, *see supra* Section V.D.1-V.D.2; briefly summarizes that reasoning here; and addresses Officer McElroy's counter arguments.

### a. Discrimination

Officer McElroy's allegations from *Young* fail to create an inference that the Department's 2002 promotion process was the product of racial discrimination. Officer McElroy and other African American officers were treated similarly to most of the white candidates in that they were all required to take the Sergeant's examinations on the scheduled dates. *See Young* Compl. ¶ 19. Any "benefit" some white candidates received from being able to take the examination later does not alone suggest racial favoritism because the *Young* Complaint also alleges that white candidates were previously denied the same "benefit." *Id.* ¶ 20. Additionally, the Court is not otherwise persuaded that intentional racial discrimination was present within the process because when Chief Gainer was approached about potential advantages candidates may receive from taking the examination

189

later, he changed the examination process in an effort to address such claims. *See id.*

Officer McElroy argues that the "causal link here is white officers benefitted from a less stressful work environment, regularly received training, and specialized assignments to advance their career opportunities." McElroy Opp'n, ECF No. 569-1 at 17. None of these allegations were included in the *Young* Complaint and moreover, they do not address the circumstances of the claim—the 2002 promotion process. While Officer McElroy may be correct that white officers received all these benefits, a necessary element of his discrimination claim is a showing that Defendant intentionally caused discrimination. *See Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) ("Title VII prohibits . . . intentional discrimination []known as 'disparate treatment'"). At the motion to dismiss stage, a Plaintiff must at the very least allege facts that raise an inference of such intentional discrimination. *See Tressler v. Nat'l R.R. Passenger Corp.*, 819 F. Supp. 2d 1, 5 (D.D.C. 2011) ("To succeed on a Title VII discrimination claim, a plaintiff has the initial burden of establishing . . . that . . . the unfavorable action gives rise to an inference of discrimination. To survive a motion to dismiss, however, a Title VII plaintiff need not plead each element of his prima facie case, but must allege facts that, if true, would establish the elements of each claim of his

complaint." (internal quotation marks and citation omitted)).

Stating that white officers generally had better opportunities,

without connecting such incidents with the complained about

conduct, does not alone raise this inference and therefore does

not persuade the Court that Officer McElroy has stated a valid

claim for discrimination.[30]

### b. Retaliation

The Court also agrees with Defendant that Officer McElroy's

claim for retaliation fails for lack of a causal connection. The

common way of establishing a causal connection between a

plaintiff's protected activity and a defendant's retaliatory

action—temporal proximity—cannot be established by the

allegations in *Young* because of the over year-long gap between

the two events. *See* Compl., ECF No. 1; *Young* Compl. ¶ 19. The

*Young* Complaint does not identify any other protected activity

that would shorten the timeline to the usual three-month period

courts in this circuit recognize as generally sufficient to

infer causation. *See Mayorkas*, 2022 WL 3452316, at *14.

Furthermore, the *Young* Complaint establishes that officers

who had not engaged in protected activity were treated similarly

---

[30] Because the Court agrees with Defendant on the issue of causal
connection, the Court need not address Defendant's other
argument that Officer McElroy did not suffer an adverse
employment action based on the facts alleged in the *Young*
Complaint.

to Officer McElroy as they were required to take the Sergeant's examination at the originally scheduled time. *See Young* Compl. ¶ 19. And as noted above, Chief Gainer changed the substance of the test in response to accusations of unfairness, *see id.* ¶ 20; undercutting an inference that the second examination was intended to benefit officers who did not engage in protected activity.

Identical to the arguments made by other plaintiffs, Officer McElroy also asks this Court, "What would have happened to Plaintiff (black officer) engaging in protected activity if he had been a white officer not engaging in protected activity?" McElroy Opp'n, No. 569-1 at 19. The *Young* Complaint suggests an answer when it states that a white officer, who joined Officer McElroy and Officer Brett Mills in complaining about the unfairness of the exam to Chief Gainer, was also required to take the exam at the scheduled time. *See Young* Compl. ¶ 19.

Finally, several times in Officer McElroy's brief, he alleges that he was subjected to a hostile work environment in connection with the promotion process. *See, e.g.*, McElroy Opp'n, ECF No. 569-1 at 17 ("Plaintiff McElroy was forced to work in a Hostile Work Environment, subjected to an unfair and discriminatory second Sergeant Skills Assessment Exercise due to plaintiff['s] race and protected activity."). To the extent that Officer McElroy is asking the Court to construe his claim from

*Young* as one for hostile work environment, the Court concludes that such a claim was not set forth in the *Young* Complaint. The *Young* Complaint does not list hostile work environment as any of the two causes of action; those are only for "disparate treatment" and retaliation based on the 2002 promotion process. *See Young* Compl. ¶¶ 39-40. Nor does it suggest such an allegation in the facts of the Complaint. Since Officer McElroy may not amend the complaint through his briefing, *see Arbitraje Casa de Cambio, S.A. de C.V.*, 297 F. Supp. 2d at 170; the Court may not consider his new claim for a hostile work environment. Furthermore, as Defendant also points out, no hostile work environment claims from Officer McElroy survived the Court's prior opinion regarding subject matter jurisdiction. *See* 12(b)(1) Op., ECF No. 429 at 87-88. Therefore, Officer McElroy has also not established that such claims have been properly exhausted. Accordingly, the Court **GRANTS** Defendant's motion to dismiss Officer McElroy's claims from *Young*.

### L. Luther Peterson

In the previous opinion on jurisdiction, this Court allowed only Officer Peterson's "claim for discriminatory discipline" from *Blackmon-Malloy* to proceed. 12(b)(1) Op., ECF No. 429 at 116. On the current motion, Defendant "seeks partial dismissal" of Officer Peterson's claim, alleging that Officer Peterson "failed to meet [his] obligation as to three claims asserted in

this action." Def.'s Mem. of P. & A. in Supp. of Partial Mot. to
Dismiss Pl. Luther Peterson's Claims ("Peterson MTD"), ECF No.
519-1 at 4, 10. Specifically, Defendant argues that Officer
Peterson failed to adequately allege that he suffered an adverse
action when the Department issued and rescinded discipline and
when the Department issued him a counseling note. *See id.* at 7-
8. Defendant also argues that Officer Peterson "provides no
facts whatsoever in support of his claim that he was disciplined
more harshly than others." *Id.* at 9. Finally, Defendant also
clarifies that it is only seeking a partial motion to dismiss
because it is "not seeking dismissal of Plaintiff's
discrimination claim in the Fourth Amended Complaint in
*Blackmon-Malloy* at paragraph 61 concerning the Department
allegedly issuing Plaintiff a CP-535 that resulted in a loss of
64 hours of leave." *Id.* at 5 n.2.

Looking at the allegations in the FAC and the procedural
history of Officer Peterson's claim, the Court concludes that
Defendant misinterprets Officer Peterson's single claim of
discriminatory discipline as four separate claims of
discrimination.

Beginning with the FAC, it states that Officer Peterson was
"discriminated against on the basis of his race when he was
unfairly disciplined." FAC, ECF No. 278 ¶ 59. Paragraphs 59-61
then describe the months-long investigation and subsequent

194

disciplinary actions stemming from Officer Peterson's "improper use of his weapon for shooting at an intruder while off duty in his home." *Id.* The allegations state that the incident occurred in September 2000; an Internal Affairs investigation was conducted in October 2000, resulting in a discipline that was grieved and dismissed; and then a further January 2001 inquiry into the incident resulted in a CP-535 discipline with a docking of 64 hours of pay and a CP-550 "performance note for not responding to calls from [an Internal Affairs Inspector] about [Officer Peterson's] case." *Id.* ¶¶ 59-61. Officer Peterson is then also listed as one of the "Black Officers who [was] more severely disciplined than white Officers." *Id.* ¶ 68; FAC—Ex. 10, ECF No. 278-10 at 1.

In its briefing, Defendant interprets Officer Peterson's claim for discriminatory discipline as several claims all related to the shooting incident. Defendant divides the consequences of the incident and argues that some of the resulting discipline, such as the dismissed grievance and CP-550 performance note, are not adverse actions that can sustain a claim for discrimination. *See* Peterson MTD, ECF No. 519 at 7-8. Defendant also argues that the statement from paragraph 69 of the FAC that Officer Peterson was one of the officers who received discriminatory discipline is not actionable because the FAC does not provide factual details about such discipline. *Id.*

at 9. Although the allegations in the FAC could be divided into
separate claims for discrimination, the procedural history of
Officer Peterson's claim does not support this interpretation.

Appendix II lists all of the allegations from the FAC about
the discipline related to Officer Peterson's discharging of his
firearm on one line as one single claim. *See* App. II, ECF No.
497-4 at 3. This interpretation comports with the Court's
opinion on jurisdiction, which stated that Officer Peterson "may
proceed on the *claim* for discriminatory discipline." 12(b)(1)
Op., ECF No. 429 at 116 (emphasis added). In Plaintiffs'
objections to Magistrate Judge Facciola's Report and
Recommendation, they state that Officer Peterson set forth "a
timely *claim* of discriminatory discipline," which "Defendant
conceded" was timely. Pls.' Objs. to the R. & R. of the
Magistrate Judge, ECF No. 386 at 45 (emphasis added); *see also*
Pls.' Objs. to the R. & R. of the Magistrate Judge—Ex. A, ECF
No. 386-1 at 12 (listing only one claim for "discrimination in
discipline" for Officer Peterson). Furthermore, in Officer
Peterson's declaration establishing exhaustion, he summarizes
his claim for discrimination in a single paragraph, which
describes all the repercussions of his "improper discharge of a
firearm." Errata—Exs. to Pls.' Opp'n to Def.'s Mot. to Dismiss
the Fourth Am. Compl.—Ex. 65, ECF No. 332-2 at 81. Thus, Officer
Peterson has consistently alleged—and the Court has previously

196

adopted the interpretation—that the discriminatory discipline claim is a single claim.

Furthermore, this interpretation of the claim as a single claim of discrimination conforms to the applicable law. For claims of disparate treatment, when a plaintiff does not have direct evidence of discrimination, they can establish an inference of "discriminatory motive by presenting 'evidence suggesting that the employer treated other employees of a different race . . . more favorably in the same factual circumstances.'" *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (quoting *Brady*, 520 F.3d at 495). This requires finding another employee who is "similarly situated" to establish a proper comparison. *See id*. In the discriminatory discipline context, the inquiry requires, *inter alia*, a plaintiff to "demonstrate that [he] and the allegedly similarly situated . . . employee were charged with offenses of comparable seriousness." *Id.* (internal quotation marks omitted). Thus, Courts look to offenses that triggered the discipline and the entirety of the discipline itself as a whole in considering a single claim of discriminatory discipline. *See id.* at 302 (looking to whether "other white employees were found to have committed offenses of comparable seriousness" and "were differently disciplined by the same supervisors"); *Burton v. District of Columbia*, 153 F. Supp. 3d 13, 66-83 (D.D.C. 2015)

197

(describing the standard and applying it to multiple plaintiffs).

In the FAC, Officer Peterson alleges that his triggering offense was "improper use of his weapon for shooting at an intruder while off duty in his home." FAC, ECF No. 278 ¶ 59. He then alleges that this offense triggered multiple disciplinary actions including an internal affairs investigation, a CP-535 discipline report, a docking of 64 hours of pay, and a CP-550 performance note. *See id.* ¶¶ 59-61. To establish a comparison, the FAC alleges that a white officer also "shot at an individual without provocation, and no disciplinary action was taken against him by the department." *Id.* ¶ 62. Thus, Officer Peterson's claim of discriminatory discipline compares the numerous penalties he received with the absence of disciplinary action a fellow officer received in response to a similar, single, triggering offense.

To summarize, the record and applicable law indicate that Officer Peterson is only asserting one claim of discriminatory discipline. Defendant's briefing mistakenly characterizes that claim as four separate claims of discrimination and elects to only challenge three of them. Since Defendant's motion to dismiss is based on an erroneous understanding of Officer Peterson's claim and Defendant has chosen not to challenge part of the single claim, the Court **DENIES** Defendant's motion.

## M. Reginald Waters

Officer Waters' sole remaining claim is for "[h]ostile work environment created by racist words" from *Blackmon-Malloy*. App. II, ECF No. 497-4 at 3. Defendant argues that the claim should be dismissed because "the alleged conduct was not sufficiently severe or pervasive as to create an objectively abusive work environment." Def.'s Mem. of P. & A. in Supp. of Its Mot. to Dismiss Pl. Reginald D. Waters' Claim ("Waters MTD"), ECF No. 520-1 at 6. Officer Waters argues that the FAC "sufficiently describe[s] [the Department's] racist and illegal conduct," and thus "has pled factual content that would allow[] this court to draw a reasonable inference that the defendant is liable for the misconduct alleged." Pl. Reginald Waters' Mem. of P. & A. in Opp'n to Def.'s Mot. to Dismiss ("Waters Opp'n"), ECF No. 535-1 at 11. Upon further examination of Officer Waters' allegations and the procedural history of his claim, the Court *sua sponte* concludes that it must dismiss the claim for lack of subject matter jurisdiction.

As the Supreme Court reiterated last term, "[j]urisdictional bars . . . may be raised at any time and courts have a duty to consider them *sua sponte*." *Wilkins v. United States*, 143 U.S. 870, 876 (2023) (internal quotation marks omitted). As noted previously, the 2009 appeal in this litigation held that the CAA's "three-step process is

199

jurisdictional." *Blackmon-Malloy III*, 575 F.3d at 702; *see also Ross*, 195 F. Supp. 3d at 199 ("[S]uccessful completion of every CAA prerequisite regarding each claim is a *jurisdictional* prerequisite, which means that it cannot be waived by this Court, much less any party or agent of a party."). The text of the CAA states that a "civil action may be commenced by a covered employee only to seek redress for a violation for which the employee has completed counseling and mediation." 2 U.S.C. § 1408(a). This generally requires that "administrative remedies must be exhausted for each claim." *Gordon v. Off. of the Architect of the Capitol*, 750 F. Supp. 2d 82, 92 (D.D.C. 2010); *see also Ross*, 195 F. Supp. 3d at 199 ("[I]n order for this Court to have the authority to consider his challenge to USCP's accrued-leave decision, Ross must show that he filed a request for mediation with respect to *that claim*." (emphasis added)). Although a plaintiff need not prove that a claim was "actually mediated" to satisfy the CAA's exhaustion requirement, *Blackmon-Malloy III*, 575 F.3d at 711; the employee must show that he "did not thwart mediation by failing to give notice of his or her claim," *id.* at 713. *See Macon*, 258 F. Supp. 3d at 101 (D.D.C. 2017) ("[I]t is [Plaintiff's] responsibility to set forth some evidence that a particular claim was actually presented in counseling and mediation."); *Moran v. U.S. Capitol Police Bd.*, 820 F. Supp. 2d 48, 55 (D.D.C. 2011) ("Because confidentiality

precludes courts from inquiring into what actually happened during the counseling period, other courts have looked to whether the employer was given adequate notice of the claim and the opportunity to handle it internally before the commencement of a formal legal action.").

Turning to the facts and procedural history of Officer Waters' claim, Magistrate Judge Facciola's Report and Recommendation stated that it was "unclear from the documentation which claims were raised during [the mediation] process and are therefore exhausted." Magistrate R. & R., ECF No. 376 at 35. He noted Officer Waters' name appeared on a list "for which the parties agreed at least one claim was viable," without indicating which claim that was, but that Defendant later asserted that "no claims are viable for [Officer] Waters." *Id.* at 35-36. Because of these discrepancies, Magistrate Judge Facciola ordered clarifying briefing on "what claim(s), if any, Officer Waters is asserting." *Id.* at 36.

In response to that order, Plaintiffs described Officer Waters' allegations from *Blackmon-Malloy* as a claim for "hostile work environment in that [Officer Waters] was denied opportunities for training and special assignments, because African American officers were not notified of those opportunities. [Officer Waters] provided notice of his claims through [attorney] Charles Ware's explanation to the Defendant

that many of the complainants had experienced a hostile work
environment, including racial discrimination in assignment."
Pls.' Clarification Pursuant to Magistrate Judge's R. & R. of
Dec. 14, 2012, ECF No. 379 at 6. Plaintiffs then cited to three
declarations from Officer Waters and a declaration from Attorney
Ware. *Id.* All of the declarations mentioned a hostile work
environment in connection with training opportunities, special
assignments, and promotion processes, but none mentioned racist
words. *See* Pls.' Mem. of P. & A. in Opp'n to Mot. to Dismiss—Ex.
5, ECF No. 331-2 at 22-23 (stating that Defendant "subjected
[Officer Waters] to a hostile work environment by repeatedly
denying [him] training opportunities and specialty
assignments"); Errata—Exs. to Pls.' Opp'n to Def.'s Mot. to
Dismiss the Fourth Am. Compl.—Ex. 78, ECF No. 332-4 at 24-27
(stating Officer Waters was subjected to a hostile work
environment because he was "repeatedly den[ied] . . . training
opportunities," "specialty assignments," and "promotional
opportunities"); Pls.' Notice of Filing of Revised or Add'l
Apps. & Exs. to Their Opp'n to Def.'s Mot. to Dismiss the Fourth
Am. Complaint—Ex. 96, ECF No. 345-10 at 2-3 (stating that
Officer Waters was subjected to a hostile work environment based
on denial of "training opportunities and specialty
assignments"); Pls.' Notice of Filing of Revised or Add'l Apps.
& Exs. to Their Opp'n to Def.'s Mot. to Dismiss the Fourth Am.

Complaint—Ex. 8, ECF No. 345-3 ¶ 6 (declaration of Attorney Ware
stating that "all of the Officers were complaining of a hostile
work environment" in mediation, without specific details of the
claims). In Defendant's response, it stated that Officer Waters
was "identified in Plaintiffs' FAC in Exhibit 4 as an officer
who allegedly was subjected to racial abuse, yelling and
threats, and in Exhibit 9 as an officer who did not take a
promotions process because it was futile," and that both claims
should be dismissed. Def.'s Resp. to Pl.'s Clarification on
Chart C to R. & R., ECF No. 385 at 5.

In Magistrate Judge Facciola's supplemental Report and
Recommendation, he first observed that "Officer Waters' name
appears in Exhibits 1, 4 and 9" of the FAC and that "plaintiffs
state that Officer Waters was timely in his hostile work
environment claim in the main case." Magistrate Suppl. R. & R.,
ECF No. 389 at 6. He then recommended that claim go forward
since "defendant appears to concede that the hostile work
environment claim asserted by Officer Waters in the main case is
viable, as the defendant does not address this issue in its
response to plaintiffs' clarification," citing Defendant's
response to his previous order. *Id.* The Court then adopted
Magistrate Judge Facciola's recommendation. *See* 12(b)(1) Op.,
ECF No. 429 at 92.

It appears that since Defendant contested Officer Waters'
claims from Exhibits 4 and 9 of the FAC, but did not mention
Officer Waters' claim from Exhibit 1, Magistrate Judge Facciola—
and subsequently the Court—assumed that the hostile work
environment claim was for the conduct described in Exhibit 1—
racist words. However, as noted above, the declarations Officer
Waters provided to the Court supporting his claim of exhaustion
mention a hostile work environment, but only in connection with
training opportunities, assignments, and promotional
opportunities.[31] None of the declarations mention—either
explicitly or implicitly—that Officer Waters notified Defendant
of his complaints regarding racist language. Since notifying a
Defendant of the complained about conduct is a requirement for
CAA exhaustion, the Court cannot conclude that Officer Waters
properly exhausted his hostile work environment claim on the
basis of racist language. *See Blackmon-Malloy III*, 575 F.3d at
713; *Macon*, 258 F. Supp. 3d at 101. Although the Court is aware
that both parties appear to concede jurisdiction to the claim on
the basis of racist language and briefed the claim as such on
this motion to dismiss, because subject matter jurisdiction

---

[31] In his briefing, Officer Waters does not argue that the
hostile work environment claim should proceed based on any
factual allegations from his declarations. *See* Waters Opp'n, ECF
No. 535 at 8-11. Accordingly, the Court will not look to whether
that hostile work environment claim was properly exhausted or
sufficient to survive a 12(b)(6) motion.

affects the power of the Court to hear Officer Waters' claim, the Court is duty bound to dismiss the claim when it finds a lack of subject matter jurisdiction. *See Wilkins*, 143 S. Ct. at 876. Therefore, the Court *sua sponte* **DISMISSES** Officer Waters' sole remaining claim for hostile work environment from *Blackmon-Malloy*.

### N. Richard Webb

Officer Webb has three remaining claims in the current case—one from *Blackmon-Malloy* for "[h]ostile work environment created by racist words," another from *Blackmon-Malloy* for denial of a "position with the K-9 Corp in favor of [a] less qualified white applicant," and one from *Young* for "[n]on-promotion during the 2002-2004 promotion period." App. II, ECF No. 497-4 at 4. Defendant seeks only a partial motion to dismiss, specifying that the *Blackmon-Malloy* "non-promotion to the Department's K-9 unit" is "not the subject of this [motion to dismiss]." Def.'s Mem. of P. & A. in Supp. of Partial Mot. to Dismiss Pl. Richard Webb's Claims ("Webb MTD"), ECF No. 522-1 at 6 n.1.

### 1. *Blackmon-Malloy* (1-2221)

Defendant argues that Officer Webb's hostile work environment claim should be dismissed because the "alleged offensive conduct he challenges was not sufficiently severe or pervasive as to create an objectively abusive working

205

environment." Webb MTD, ECF No. 522-1 at 10. Specifically, Defendant states that Officer Webb's "hostile work environment claim includes vague allegations of statements that were not directed at Plaintiff over a period of more than forty years, which are not sufficient to plead an actionable hostile work environment, because a handful of sporadic comments and actions are not severe or pervasive on its face." *Id.* at 11.

Turning to the allegations in the FAC, the complaint states that "[i]n late 2000 and early 2001, Plaintiff Richard Webb continued to pursue an assignment to the K-9 Unit despite reports that the [N-word] was used freely there. Management was aware of this practice but took no action to address it." FAC, ECF No. 278 ¶ 21. It also claims that "[the N-word], 'Huk,' 'gangster' and other racist epithets were commonly employed by the white Officers of the U.S. Capitol Police, creating a clearly race-based hostile work environment for . . . Officer Webb . . . and other Black Officers whose work environments were affected." *Id.* ¶ 25.

In *Ayissi-Etoh v. Fannie Mae*, the D.C. Circuit reversed a district court's grant of summary judgment on a hostile work environment claim. *Ayissi-Etoh*, 712 F.3d at 579.[32] As part of the

---

[32] Although the Court in *Ayissi-Etoh* was analyzing a hostile work environment claim under § 1981, "courts use the same framework [as is used in Title VII cases] for determining whether unlawful discrimination occurred." *Ayissi-Etoh*, 712 F.3d at 576.

claim, the plaintiff alleged that her supervisor "used a deeply offensive racial epithet when yelling at Ayissi-Etoh to get out of the office." *Id.* at 577. The D.C. Circuit noted that "[a]s other courts have observed, perhaps no single act can more quickly alter the conditions of employment' than 'the use of an unambiguously racial epithet such as [the N-word] by a supervisor." *Id.* (internal quotation marks omitted). The Court reasoned that "[t]his *single incident* might well have been sufficient to establish a hostile work environment." *Id.* (emphasis added).

Going beyond a "single incident," the FAC alleges that the N-word and other racial epithets were "commonly employed" by "the white Officers of the U.S. Capitol Police." FAC, ECF No. 278 ¶ 25. The D.C. Circuit in *Ayissi-Etoh* has indicated that the use of such language is itself "severe." *Ayissi-Etoh*, 712 F.3d at 577; *see also Na'im v. Rice*, 577 F. Supp. 2d 361, 377 (D.D.C. 2008) (describing "racial slurs, epithets[,] or comments" as "constituting severe conduct"). Furthermore, although sufficiently severe conduct can offset a showing of pervasiveness, *see Burkes v. Holder*, 953 F. Supp. 2d 167, 178 (D.D.C. 2013) ("Generally, the more severe the conduct, the fewer occurrences necessary to create a hostile work environment."); the FAC also alleges that the epithets were "commonly employed," establishing pervasiveness as well.

Defendant argues that such conduct cannot meet the hostile work environment standard because the FAC is "silent as to whether these words were directed [at Officer Webb] or even said in his presence." Webb MTD, ECF No. 522-1 at 11. But the FAC alleges that the language both "affected" Officer Webb and was "commonly used." FAC, ECF No. 278 ¶ 25. Thus, giving Officer Webb the benefit of all inferences that can be derived from the FAC, as the Court must do on this motion to dismiss, *see Atherton*, 567 F.3d at 677; it is reasonable to conclude that Officer Webb was at least present when some of the many epithets were used.

Defendant relies on two cases to support its argument, both of which the Court finds distinguishable. First, in *Nurriddin v. Goldin*, 382 F. Supp. 2d 79 (D.D.C. 2005), a court granted a defendant's motion for summary judgment on a hostile work environment claim where "the only incident with explicit racial tones was plaintiff's discovery of icons on a computer that read 'racist jokes and stories' and 'W/American Heritage'" which "plaintiff acknowledges . . . were empty [folders], and did not in fact contain racist jokes." *Id.* at 108. Second, in *Hampton v. Vilsack*, 760 F. Supp. 2d 38 (D.D.C. 2011), the district court granted a defendant's motion for summary judgment based in part on a supervisor telling plaintiff's co-workers that plaintiff "had acted like 'he's a [N-word] from California instead of a

[N-word] from Mississippi.'" *Id.* at 56. In both cases, the plaintiffs discovered discriminatory animus and language when they found or were relayed information. This suggests that the working environment in both cases was not necessarily permeated with "discriminatory intimidation, ridicule, and insult," *Baloch*, 550 F.3d at 1201 (internal quotation marks omitted); but was instead found to be racially hostile upon plaintiff's probing. In contrast, the FAC alleges that racial epithets were commonly used by at least several officers in the Department, suggesting that such conduct was indicative of the work environment. The FAC does not allege that Officer Webb went looking for or inadvertently found out that members of the Department had used offensive language on a few occasions, but rather that such epithets were commonly used. In fact, Exhibit 1, attached to the FAC lists over 100 officers who were "affected by" the racist language, *see* FAC—Ex. 1, ECF No. 278-1; further indicating that such conduct was indicative of the working environment.

Although the Court agrees with Defendant that the allegations in the FAC are not specific as to exactly when these epithets were used and by whom, this lack of specificity does not inherently mean that the alleged conduct was not sufficiently severe or pervasive. While Officer Webb may be unable to prove his general allegations in later stages of

litigation, on this motion to dismiss, he is only required to plead "sufficient factual matter" to make his claim facially plausible. *See Iqbal*, 556 U.S. at 677; *Holston*, 630 F. Supp. 3d at 59 (observing that a plaintiff is not required to "plead a *prima facie* case of hostile work environment in the complaint," but "the alleged facts must support such a claim" (internal quotation marks omitted)). At this stage of litigation, the Court cannot conclude that consistent use of racial epithets throughout a working environment is insufficient as a matter of law to state a claim for a hostile work environment. Accordingly, the Court **DENIES** Defendant's motion to dismiss Officer Webb's hostile work environment claim from *Blackmon-Malloy*.

### 2. *Young* (4-320)

Appendix II describes Officer Webb's claim from *Young* as "[n]on-promotion during the 2002-2004 promotion period." App. II, ECF No. 497-4 at 4. However, Officer Webb clarifies in his briefing that his claim is limited to asserting that the Department "intentionally administered a flawed and illegal and discriminatory promotion examination which favored and provided an advantage to two white candidates in the . . . Sergeant and Lieutenant examination." Pl. Richard R. Webb Mem. of P. & A. in Opp'n to Def.'s Partial Mot. to Dismiss Pl. Webb's Claims ("Webb Opp'n"), ECF No. 571-1 at 10; *see also id.* at 19-20 ("Plaintiff

Webb's Complaint . . . in [*Young*] . . . alleged the Department
unlawfully discriminated against him based on his race (African
American) when it gave white applicants an unfair advantage by
allowing them to take the simulation exercises in the exam at a
later date than other officers."). As Defendant notes in its
reply brief, Officer Webb's clarification indicates "that he is
not asserting a claim of failure to promote." Def.'s Reply in
Supp. of Partial Mot. to Dismiss Pl. Richard Webb's Claims
("Webb Reply"), ECF No. 583 at 2 n.1.

Although the parties now appear to agree that Officer
Webb's claim should be understood as for discrimination and
retaliation in the promotion process, because the Court's
previous opinion on jurisdiction, understood Officer Webb's
claim to be one for non promotion, the Court must ensure that
Officer Webb's claim—understood on the proper basis—was
adequately exhausted. *See Blackmon-Malloy III*, 575 F.3d at 705;
*Ross*, 195 F. Supp. 3d at 199 (observing that the CAA's
"*jurisdictional* prerequisite . . . cannot be waived by . . . any
party"). Looking to the record, the *Young* Complaint states that
"Plaintiffs have exhausted their administrative remedies by
completing counseling and mediation with the Office of
Compliance as required." *Young* Compl. ¶ 4. Specifically
referring to Officer Webb, the *Young* Complaint states that he
received his End of Mediation Notice on January 9, 2004. *Id.* In

211

Plaintiffs' opposition to Defendant's previous motion to dismiss, they submitted Officer Webb's End of Mediation Notice, which corroborates that the notice was issued on January 9, 2004 and that Officer Webb first requested counseling on November 4, 2003. *See* Pls.' Mem. of P. & A. in Opp'n to Mot. to Dismiss—Ex. 13, ECF No. 331-5 at 23. The CAA requires employees to request counseling within 180 days after the "alleged violation." *See Blackmon-Malloy III*, 575 F.3d at 702. One-hundred and eighty days before November 4, 2003 would be May 8, 2003. According to the *Young* Complaint, the simulation exercise for Sergeant candidates was administered on May 10, 2003. *See Young* Compl. ¶ 13. Since the CAA's confidentiality concerns "preclude[] courts from inquiring into what actually happened during the counseling period," *see Moran*, 820 F. Supp. 2d at 55; and because the allegations from the *Young* Complaint and the End of Mediation Notice for Officer Webb establish that his complaint about the promotion process would have been timely, the Court concludes that Officer Webb properly exhausted his claims. *See Blackmon-Malloy III*, 575 F.3d at 702 ("[W]e hold that receipt of written notice of the end of mediation . . . demonstrated the employee's completion of counseling and mediation.").

Since Officer Webb's allegations are identical to those of the other Sergeant candidates identified in the *Young* Complaint, the Court adopts its earlier reasoning regarding the

212

discrimination and retaliation claims, *see supra* Section V.D.1-
V.D.2; briefly summarizes that reasoning below; and addresses
Officer Webb's counter arguments.[33]

### a. Discrimination

The Court agrees with Defendant that Officer Webb's claim
for discrimination in the 2002 Sergeant's promotion process
should be dismissed because the *Young* Complaint fails to provide
facts that allow the Court to infer a causal connection between
the process and Officer Webb's race. Officer Webb and most of
the candidates seeking promotion to Sergeant—regardless of race—
were required to take the simulation examination on the
scheduled date. *See Young* Compl. ¶ 19. In fact, in a previous
testing cycle, a white candidate was denied the purported
advantage of taking the exam late, *see id.,* undercutting an
inference that the Department was intentionally seeking to
advantage white candidates. Additionally, further undermining
allegations of intentional discrimination, Chief Gainer changed
the examination process to limit potential advantages to the
candidates taking the exam later in response to complaints from
the other candidates. *See id.* ¶ 20.

---

[33] Because, as described below, the Court agrees with Defendant
on the issues of causal connection, it need not address
Defendant's other arguments that the *Young* Complaint fails to
allege that Officer Webb suffered an adverse employment action
or a materially adverse action.

Officer Webb resists this conclusion by arguing that the "causal connection" is that "[t]he Defendant prevailed in keeping with its longstanding racist legacy in condoning and tolerating misconduct inflicted upon black officers and employees." Webb Opp'n, ECF No. 571-1 at 12. He also alleges that the "acts occurred because of the Defendant's deeply entrenched racism which oftentimes went unchecked." *Id.* at 21. However, these vague, general allegations from Officer Webb's brief are not supported by factual statements in the *Young* Complaint. The *Young* Complaint specifically alleges that "Defendant, under Chief Terrance W. Gainer's direction, has bent the rules in order to promote favored white candidates." *Young* Compl. ¶ 15. However, this disparate treatment claim does not draw on any "longstanding" history of racism to allege racial bias; rather, it argues that the facts surrounding the promotion process itself are evidence of a causal connection to race. *See Young* Compl. ¶ 39 ("Defendant subjected its African American Officers and Sergeants to disparate treatment on the basis of race in the administration of the . . . exams for promotion to Sergeant and Lieutenant . . . ."). But, as noted above, the facts from *Young* fail to substantiate that argument. Officer Webb may not now, in this motion, attempt to reframe his argument when these new allegations are beyond the facts alleged in the *Young* Complaint.

Officer Webb also alleges that the "causal link" is that "white officers benefitted from a less stressful work environment, regularly received training, and specialized assignments to advance their career opportunities." Webb Opp'n, ECF No. 571-1 at 22. These allegations again miss the mark. They do not address the 2002 Sergeant's promotion process at issue, but instead seem to make new claims about disparate treatment in other areas of the work environment. None of these allegations find factual support in the *Young* Complaint and they therefore do not convince the Court that the *Young* Complaint adequately pleads a causal connection between the promotion process and Officer Webb's race. Accordingly, the Court **GRANTS** Defendant's motion to dismiss Officer Webb's claim of discrimination from *Young*.

### b. Retaliation

The Court also agrees with Defendant that Officer Webb's claim for retaliation fails for lack of a causal connection between the 2002 Sergeant's promotion process and Officer Webb's protected activity. Officer Webb claims that he "presented undisputed facts identifying a close period between plaintiff['s] protected activity and adverse action which negatively affected plaintiff and other black officers." Webb Opp'n, ECF No. 571-1 at 21. However, the *Young* Complaint alleges that the protected activity at issue was "participating in and

215

leading the *Blackmon-Malloy* class action." *Young* Compl. ¶ 40.
The *Blackmon-Malloy* suit was initiated in October 2001. *See*
Compl., ECF No. 1. The allegedly retaliatory Sergeant's
simulation exercise in the promotion process took place in May
2003. *See Young* Compl. ¶ 13. Usually, a period of three months
is "approaching the outer limit" of time to establish a causal
connection based on temporal proximity alone. *See Mayorkas*, 2022
WL 3452316, at *14. The time discrepancy in this case is well
over a year. Furthermore, nothing in the *Young* Complaint alleges
that Officer Webb engaged in any additional protected activity
in the three months before the simulation exercise was
administered. Thus, the Court does not agree with Officer Webb
that there was close enough temporal proximity between his
protected activity and the conduct at issue to suggest a causal
connection.

The Court also cannot find any other facts in the *Young*
Complaint that suggest a causal connection. The *Young* Complaint
establishes that officers who engaged in protected activity were
required to take the simulation exercise at the same time as
officers who did not engage in protected activity. *See Young*
Compl. ¶ 19. As noted above, it also states that a new test was
developed to combat accusations of unfairness, *see id.* ¶ 20;
further undercutting an inference that the examination was
intended to cause those who engaged in protected activity a

216

disadvantage in the process. Officer Webb asks "[w]hat would have happened to Plaintiff (black officer) engaging in protected activity if he had been a white officer not engaging in protected activity?" Webb Opp'n, ECF No. 571-1 at 24. The *Young* Complaint seems to provide an answer when it alleges that a white officer who did not participate in protected activity was required to complete the simulation exercise at the same time as Officer Webb and his fellow officers and that the white officer even complained that she previously was denied the "benefit" of taking the test at a later time. *See Young* Compl. ¶ 19. Thus, since the *Young* Complaint fails to adequately allege facts from which the Court can infer a causal connection between the 2002 Sergeant's promotion process and Officer Webb's protected activity, the Court **GRANTS** Defendant's motion to dismiss Officer Webb's retaliation claim from *Young*.

### O. Frank Wilkes

According to Appendix II, Officer Wilkes' sole remaining claim in this case is from *Young* for "[n]on promotion." App. II, ECF No. 497-4 at 4. Defendant argues that any claim based on "the Department's decision to promote [another officer] and not [Officer Wilkes] in February" is "not properly before this Court" because Officer Wilkes "did not timely exhaust administrative procedures before asserting such a claim." Def.'s Mem. of P. & A. in Supp. of Mot. to Dismiss Pl. Frank Wilkes,

Jr.'s Claims ("Wilkes MTD"), ECF No. 509-1 at 8. In his
briefing, Officer Wilkes clarifies several times that his claim
is only "challenging the intentionally discriminatory
examination procedure of the Capitol Police, which he properly
and timely exhausted." Pl. Frank Wilkes, Jr.'s Mem. in Opp'n to
Def.'s Mot. to Dismiss Pl. Frank Wilkes, Jr.'s Claims ("Wilkes
Opp'n"), ECF No. 539 at 4; *see also id.* at 5 ("That one of these
two white officers who took the test late are the ones who
ultimately was promoted to sergeant . . . is not the issue in
this case, although it does support Plaintiff's contention that
the examination was rigged and highly favored [a] white
candidate . . . .").

Looking into the procedural history of Officer Wilkes'
claim, the Court agrees that the claim is for discrimination and
retaliation in the promotion process—not the resulting act of
non promotion—and that Officer Wilkes properly exhausted the
claim on that basis. In his declaration supporting exhaustion,
Officer Wilkes stated that the complained about
"discriminatory/retaliatory act" from *Young* was that he "learned
of decision to allow white officers to take exam at a later
date." Errata—Exs. to Pls.' Opp'n to Def.'s Mot. to Dismiss the
Fourth Am. Compl.—Ex. 83, ECF No. 332-5 at 12. Although
Magistrate Judge Facciola's Report and Recommendation
characterized this claim as one for "non promotion," he cited

Officer Wilkes' declaration in concluding that the claim was properly exhausted. *See* Magistrate R. & R., ECF No. 376 at 37. The Court then adopted Magistrate Judge Facciola's Recommendation to let the claim proceed, using Magistrate Judge Facciola's characterization of the claim as one for "non promotion." *See* 12(b)(1) Op. ECF No. 429 at 93-94. Since the record reflects that Officer Wilkes notified Defendant in mediation that his claim was based on the discriminatory and retaliatory promotion process, and not the final promotion decisions, the Court concludes that the claim is properly before this Court and will be interpreted as described in Officer Wilkes' declaration and briefing.

Since Officer Wilkes' allegations are identical to those of the other Sergeant candidates identified in the *Young* Complaint, the Court adopts its earlier reasoning regarding the discrimination and retaliation claims, *see supra* Section V.D.1-V.D.2; briefly summarizes that reasoning below; and addresses Officer Wilkes counter arguments.[34]

---

[34] Because, as described below, the Court agrees with Defendant on the issues of causal connection, it need not address Defendant's other arguments that the *Young* Complaint fails to allege that Officer Webb suffered an adverse employment action or a materially adverse action.

## 1. Discrimination

The allegations in the *Young* Complaint do not support an inference of discrimination on the basis of race because Officer Wilkes was treated similarly to most of the white candidates in the Sergeant's examination process—they were all required to take the examination on the originally scheduled date. *Young* Compl. ¶¶ 19, 27. Furthermore, although Officer Wilkes alleges that two white candidates were favored for promotion by being allowed to take the examination at a later date, the *Young* Complaint does not allege that the same option was not available to non-white candidates. *Id.* ¶¶ 19, 27.[35] In fact, the allegations establish that a white candidate was previously denied this purported special treatment, *see id.* ¶ 19, undercutting an inference that any benefit was intentionally race-based. Finally, the *Young* Complaint also establishes that Chief Gainer, after complaints of favoritism, postponed the

---

[35] In his briefing, Officer Wilkes states that "several black officers" were "also allowed . . . to take the second test." Wilkes Opp'n, ECF No. 539 at 5 n.1. Defendant argues that this is further proof that the Defendant's conduct was not racially discriminatory. *See* Def.'s Reply in Supp. of Its Mot. to Dismiss Pl. Frank Wilkes, Jr.'s Claims ("Wilkes Reply"), ECF No. 546 at 9-10. However, since it is well established that a plaintiff may not amend a complaint through his briefing, *see Arbitraje Casa de Cambio, S.A. de C.V.*, 297 F. Supp. 2d at 170; and the *Young* Complaint does not include these factual allegations, the Court will not consider them on this motion to dismiss.

makeup examination so a new test could be developed and administered to combat fears of unfairness. *See id.* ¶ 20.

Officer Wilkes presents several arguments in opposition to Defendant's motion to dismiss but none are persuasive. First, Officer Wilkes argues that he needs "discovery pursuant to Rule 56(d) to prove that the examination process was intentionally modified to achieve the result it did: the promotion of a white officer." Wilkes Opp'n, ECF No. 529 at 5; *id.* at 8 ("The questions used on both examinations are or ought to be in the sole possession of the Capitol Police, and they should be required to produce them, among other evidence, in order to give Plaintiff Wilkes a fair opportunity to prove his contention that the examination process was intentionally biased in favor of the white selectee."). Although the Court is aware that plaintiffs in employment discrimination cases are often at an informational disparity before discovery, *see Swierkiewicz*, 534 U.S. at 511-14; a Plaintiff must first overcome a 12(b)(6) motion before he is entitled to discovery, *see PETA v. U.S. Dep't of Agric.*, 60 F. Supp. 3d 14, 20 (D.D.C. 2014) ("The discovery rules are designed to assist a party to prove a claim it reasonably believes to be viable *without discovery*, not to find out if it has any basis for a claim." (internal quotation marks omitted)). Since the *Young* Complaint has failed to adequately plead facts that allow the Court to infer a causal connection between

221

Officer Wilkes' race and the Department's promotion process, the Court cannot allow Officer Wilkes discovery in hopes that such a connection will be established during discovery.

Second, Officer Wilkes argues that the Department only had "two obvious non-discriminatory alternatives to allowing its ultimate white selectee an unfair advantage on the promotion test if it were actually acting in a nondiscriminatory manner." Wilkes Opp'n, ECF No. 539 at 7. He then suggests that the Department could have either forced the candidates to wait until the next promotion process or "rescheduled the examination for a time when everyone could take it." *Id.* The Court's role on this motion to dismiss is not to determine whether another procedure in the promotion process would have been fairer to the candidates. Rather, the Court is limited only to determining whether the process Officer Wilkes challenges was adequately alleged to be the product of racial discrimination. For the reasons stated above, the Court concludes that the *Young* Complaint fails to raise such an inference. Even assuming *arguendo* that another process would have been fairer to the candidates overall, that argument does not establish that the existing process was inherently unfair because of racial bias.

Finally, Officer Wilkes argues that the "departure of the Capitol Police from their usual examination procedure also raises questions of pretext." Wilkes Opp'n, ECF No. 539 at 9.

Although Officer Wilkes fails to cite any caselaw to support his claim, he is correct that courts in this circuit have found departure from usual processes may be indicative of discriminatory motivation. For example, in *Mulrain v. Donovan*, 900 F. Supp. 2d 62 (D.D.C. 2012), the court explained that "violation of hiring protocol . . . may be probative of the employer's 'true motivation' if (1) the violation is suspicious, in and of itself, (2) the agency 'inexplicably departed' from its normal procedures, or (3) the violation inherently raises credibility questions." *Id.* at 72 (quoting *Perry v. Shinseki*, 783 F. Supp. 2d 125, 138-39 (D.D.C. 2011)).

However, the *Young* Complaint does not raise such concerns. The allegations state that the Department's decision "contradicted both the department's past practice . . . and, on information and belief, the testing contractor's procedures and recommendation to the U.S. Capitol Police." *Young* Compl. ¶ 20. But the allegations never claim that there was a "protocol" or "policy" around not administering makeup examinations, merely that one candidate was denied the opportunity to do so in the past when she inquired about the possibility. Furthermore, the *Young* Complaint alleges that the Department "contrived" a defense that the makeup examination was justified under the Family Medical Leave Act, but this was a pretext for "preferential treatment" of two white candidates. *Id.* ¶ 18.

223

However, the complaint also alleges that "a few other Sergeant candidates," beyond the candidates who had the Family Medical Leave Act excuse, were also allowed to take the exam on the makeup date. *Id.* ¶ 20. This allegation undercuts an inference that the Department created and administered a makeup examination for the sole benefit of the two identified white candidates. Thus, the departure from past practice is not "suspicious" in itself and it did not "inexplicably" depart from "normal procedures." Although Officer Wilkes may not believe the purported excuse of the Family Medical Leave Act, the allegations from *Young* do not supply the crucial extra step of creating an inference that race was the underlying reason that the excuse was intended to cover up.

Accordingly, the Court **GRANTS** Defendant's motion to dismiss Officer Wilkes' discrimination claim from *Young*.

### 2. Retaliation

Similarly, the Court agrees with Defendant that Officer Wilkes' claim for retaliation should be dismissed because the *Young* Complaint does not allege facts from which the Court could conclude the Department's conduct was connected to Officer Wilkes' protected activity.

The allegations in *Young* do not suggest a causal connection based on temporal proximity because the promotion exams took place over a year after the *Blackmon-Malloy* suit was filed. *See*

Compl., ECF No. 1; *Young* Compl. ¶ 19; *Mayorkas*, 2022 WL 3452316, at *14 ("When relying on temporal proximity alone to demonstrate causation, there is no bright-line rule, although three months is perceived as approaching the outer limit."). Additionally, Officer Wilkes does not allege that any other protected activity occurred closer to the complained about conduct which could be used to establish temporal proximity.

Looking at the *Young* allegations, the facts undercut an inference of a causal connection because Officer Wilkes was treated similarly to other candidates who did not engage in protected activity. *See Young* Compl. ¶ 19. Officer Wilkes advances no argument about causal connection in his brief, only stating that "the Capitol Police ensured that a white candidate without EEO complaints would have an unfair advantage." Wilkes Opp'n, ECF No. 539 at 5. Since the facts in the *Young* Complaint do not support Officer Wilkes' conclusion, the Court **GRANTS** Defendant's motion to dismiss the retaliation claim.

### P. Kendrick Young

Officer Young's remaining claims are for "[d]iscrimination in promotion and retaliation" from *Young.* App. II, ECF No. 497-4 at 4. In his briefing, Officer Young clarifies that his contention is that "the Department unlawfully discriminated against him based on his race (African American) when it gave white applicants an unfair advantage by allowing them to take

the simulation exercises in the exam at a later date than other officers." Pl. Kendrick A. Young's Mem. of P. & A. in Opp'n to Def.'s Mot. to Dismiss Pl. Young's Claims ("Young Opp'n"), ECF No. 573-1 at 9-10.[36] Defendant argues that Officer Young's claims should be dismissed because he fails to allege that he suffered an adverse employment action, or a materially adverse action and the *Young* Complaint does not allege sufficient facts to create an inference that the Department's conduct was causally connected to Officer Young's race or protected activity.

Since Officer Young's allegations are identical to those of the other Sergeant candidates identified in the *Young* Complaint, the Court adopts its earlier reasoning regarding the discrimination and retaliation claims, *see supra* Section V.D.1-

---

[36] In its initial brief, Defendant argued that Officer Young had not exhausted any claims regarding non promotion and thus, to the extent his claims were based on his non promotion, those claims must be dismissed. *See* Def.'s Mem. of P. & A. in Supp. of Mot. to Dismiss Pl. Kendrick Young's Claims ("Young MTD"), ECF No. 508-1 at 8-10. In its reply brief, Defendant states that Officer Young "concedes that his claims are limited only to the allegation that Defendant discriminated and retaliated against him by allowing other candidates to take a make-up exam and that he is not asserting a claim of failure to promote." Def.'s Reply in Supp. of Mot. to Dismiss Pl. Kendrick Young's Claims ("Young Reply"), ECF No. 580 at 2 n.1. Because the Court agrees with Defendant's characterization of Officer Young's claims from its reply briefing, the Court need not address Defendant's initial argument regarding exhaustion because Officer Young is not asserting a failure to promote claim.

V.D.2; briefly summarizes that reasoning below; and addresses Officer Young's counter arguments.[37]

### 1. Discrimination

The *Young* Complaint fails to allege facts that support an inference of discrimination based on race because Officer Young was treated similarly to white candidates who were also required to take the simulated examination on the originally schedule date. *See Young* Compl. ¶¶ 19, 27. The *Young* Complaint does not allege that only white candidates were allowed to take the make-up examination. *Id.* In fact, it alleges that a white candidate was previously denied the purported benefit of taking a promotion examination late in a previous round of testing. *See id.* ¶ 19. The *Young* Complaint also fails to provide any other facts that support an inference that the Department's decision to hold a makeup exam had anything to do with Officer Young's race. Rather, the *Young* Complaint alleges that when Chief Gainer was confronted with allegations of favoritism, he "announced that a new Simulation Exercise/Skills Assessment would be developed and administered" to two white candidates and "a few other Sergeant candidates in September 2003." *Id.* ¶ 20.

---

[37] Because, as described below, the Court agrees with Defendant on the issues of causal connection, it need not address Defendant's other arguments that the *Young* Complaint fails to allege that Officer Young suffered an adverse employment action or a materially adverse action.

Officer Young argues that he "provides a causal link between the Defendant['s] illegal actions and [his] race" in that "Defendant prevailed in keeping with its longstanding racist legacy in condoning and tolerating misconduct inflicted upon black officers and employees." Young Opp'n, ECF No. 573-1 at 6-7. He also states that the "causal link here is white officers regularly received promotional opportunities without the added workplace stress of having to fend off discrimination and other racist illegal acts committed against black officers and employees involving employment practices made unlawful under Title VII." *Id.* at 11. These general accusations do not address the issue that the *Young* Complaint fails to allege specific facts—connected to the complained about conduct of the 2002 promotion examinations—which could allow the Court to infer *that conduct* was infected with racial discrimination. Nothing in the *Young* Complaint alleges a "legacy" of racist actions because the allegations are based on only the 2002 promotion examinations. *See id.* ¶¶ 39-40. Rather, the allegations from the *Young* Complaint undercut Officer Young's arguments because they allege that Chief Gainer specifically changed the examination in response to accusations of "condoning and tolerating misconduct inflicted upon black officers and employees." *See Young* Compl. ¶ 20. Because Officer Young's arguments fail to address the issue that the *Young* Complaint does not allege facts that allow

the Court to draw an inference of discrimination with respect to the 2002 promotion process, the Court **GRANTS** Defendant's motion to dismiss Officer Young's discrimination claim.

### 2. Retaliation

The Court reaches a similar conclusion with respect to Officer Young's claim of retaliation. The allegations in *Young* indicate that the complained about examination occurred too far apart from the initiation of the *Blackmon-Malloy* suit to indicate a causal connection based on temporal proximity. *See* Compl., ECF No. 1; *Young* Compl. ¶ 19; *Mayorkas*, 2022 WL 3452316, at *14 ("When relying on temporal proximity alone to demonstrate causation, there is no bright-line rule, although three months is perceived as approaching the outer limit.").

Turning to other indicia of a causal connection, the facts state that officers who did not engage in protected activity were also required to take the promotion examinations on their initially scheduled dates. *Young* Compl. ¶ 19. Nothing in the Complaint suggests that the makeup examination was not open to officers who had engaged in protected activity.

Officer Young argues that "Defendant must answer . . . [w]hat would have happened to Plaintiff (black officer) engaging in protected activity if he had been a white officer not engaging in protected activity?" Young Opp'n, ECF No. 573-1 at 13. However, the *Young* Complaint directly states that a white

officer who did not engage in protected activity was required to take the exam alongside Officer Young and the majority of other officers who took the examination on the regularly scheduled date. *See Young* Compl. ¶ 19. Thus, because the *Young* Complaint fails to allege facts from which the Court could infer that the Department's 2002 promotion process was causally connected to Officer Young's protected activity, the Court **GRANTS** Defendant's motion to dismiss Officer Young's retaliation claim.

## VI.  Conclusion

For the foregoing reasons, the Court will only allow plaintiffs listed in Appendix D to proceed in this action, and they will be permitted to proceed only as to the claims listed in that chart. Defendant's motions to dismiss are **GRANTED** as to the claims listed in Appendix C, except for Plaintiff Reginald Waters' claim for hostile work environment from *Blackmon-Malloy*, which is **DISMISSED WITHOUT PREJUDICE** for lack of subject matter jurisdiction.[38]

**SO ORDERED.**

**Signed:      Emmet G. Sullivan
              United States District Judge
              September 26, 2024**

---

[38] Appendix A tracks the disposition of the claims which remained in this case after the Court's previous opinion on jurisdiction and explains any discrepancies with Appendix II, *see* App. II, ECF No. 497-4, of that opinion.